IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC.,<br>4523 102nd Lane N.E.<br>Kirkland, Washington 98033<br>                    Plaintiff,<br><br>            v.<br><br>PENN TREATY AMERICA CORPORATION<br>3440 Lehigh Street<br>Allentown, Pennsylvania 18103-7001<br>            - and -<br>PENN TREATY NETWORK AMERICA<br>INSURANCE COMPANY<br>3440 Lehigh Street<br>Allentown, Pennsylvania 18103-7001<br>            - and -<br>SENIOR FINANCIAL CONSULTANTS<br>COMPANY<br>3440 Lehigh Street<br>Allentown, Pennsylvania 18103-7001<br>                    Defendants. | CIVIL ACTION<br>NO. _____<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff National Healthcare Services, Inc. ("**NHCS**"), by and through its undersigned attorneys, by way of its complaint against defendants Penn Treaty America Corporation ("**Penn Treaty**"), Penn Treaty Network America Insurance Company ("**PTNA**") and Senior Financial Consultants Company ("**SFCC**"), respectfully represent as follows:

### INTRODUCTION

1.      By this action, NHCS seek to recover from Penn Treaty and SFCC as a result of (a) Penn Treaty's, PTNA's and SFCC's fraud regarding the exclusive arrangement with NHCS, (b) Penn Treaty's, PTNA's and SFCC's wrongful breach of the agreements governing the relationship between the parties, and (c) Penn Treaty's, PTNA's and SFCC's attempt to

misappropriate for themselves the value and benefit of the "AllRisk Healthcare"$^{sm}$ senior healthcare savings program designed by NHCS.

## THE PARTIES

2. NHCS is a corporation duly organized and existing under the laws of the State of Washington and maintains its principal place of business at 4523 102nd Lane N.E., Kirkland, Washington, 98033. NHCS is engaged in the business of developing and implementing a senior healthcare savings program marketed under the service mark "AllRisk Healthcare."

3. Penn Treaty is a Pennsylvania corporation and maintains its principal place of business at 3440 Lehigh Street, Allentown, Pennsylvania 18103-7001. Penn Treaty is engaged in the business of owning and managing insurance companies.

4. PTNA is a Pennsylvania corporation and maintains its principal place of business at 3440 Lehigh Street, Allentown, Pennsylvania 18103-7001. PTNA is engaged in the business of issuing insurance policies nationwide, among them policies for what is called "long-term care" insurance.

5. SFCC is a Pennsylvania corporation and maintains its principal place of business at 3440 Lehigh Street, Allentown, Pennsylvania 18103-7001. SFCC was created by Penn Treaty to market and sell NHCS's "AllRisk Healthcare"$^{sm}$ senior healthcare savings program.

6. PTNA and SFCC are affiliates, sharing common ownership and located at the same commercial address as the company which owns them: Penn Treaty.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332(a), as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because this is the judicial district where (a) the defendants reside, (b) a substantial part of the events or omissions giving rise to this claim occurred, and (c) defendants are subject to personal jurisdiction at the time this action is commenced.

## FACTUAL BACKGROUND

### NHCS DEVELOPS THE "ALLRISK HEALTHCARE"℠ SENIOR HEALTHCARE SAVINGS PROGRAM

9. During the late 1960's, the American insurance industry recognized the phenomena commonly referred to as "the graying of America": the population of the United States was getting progressively older, thereby requiring differing insurance services.

10. In order to respond to the need for insurance to cover those expenses – such as home healthcare services, hospice care, nursing home care, geriatric medical care and the like – which have become an increasing burden on older Americans, the American insurance industry developed "long-term care" insurance: insurance policies designed to relieve the economic burden of old age if and when the insured under the long-term care insurance policy needed such services.

11. While long-term care insurance provided many older Americans the kind of insurance coverage needed by them, for many different reasons many applicants for long-term care insurance were not eligible for such coverage.

12. Recognizing the need to provide some form of assistance to those older Americans who needed or would need financial assistance to cover the many medical expenses attendant to growing older, NHCS sought to develop a product which could be marketed to those who applied for – but were rejected for – long-term care insurance.

13. Based on this premise, NHCS determined that a nationwide discount program older Americans could join would provide much needed assistance to those who did not qualify for long-term care insurance.

14. As a result, NHCS conceived, organized and developed what ultimately became known as "AllRisk Healthcare"[sm], a senior savings program which provided:

(a) <u>Medical information services</u> (toll-free 24 hours-a-day/7 days-a-week);

(b) <u>Eldercare information services</u> (toll-free information on many senior health care topics);

(c) <u>Prescription discounts</u> (discounts of up to 30% on brand name and generic prescription drugs at over 40,000 locations;

(d) <u>Mail Order Prescriptions</u> (discounts of up to 50% for up to 100-day supplies of mail-ordered prescription drugs);

(e) <u>Vision and Eyewear Network</u> (discounts of up to 60% on all prescription eyewear at locations nationwide);

(f) <u>Chiropractic Network</u> (free consultations and up to 50% discounts at one of the country's largest chiropractic networks);

(g) <u>Dental Network</u> (discounts of 15% to 50% at over 20,000 credentialed dentists);

(h) <u>Emergency Travel Benefit</u> (24-hour access, emergency air evacuations and assistance worldwide);

(i) <u>Hearing Aid Exams and Hearing Aids Network</u> (discounts of up to 20% from the largest network of audiologist in the country);

(j) <u>Medical Equipment</u> (discounts of up to 15% on a wide variety of medical equipment);

(k) <u>Podiatry</u> (discounts of up to 50% on initial examinations and up to 20% savings from the American Footcare Network);

(l) <u>Medical Records Storage and Retrieval Services</u> (providing an electronic "safe deposit box) staffed 24 hours-a-day for vital health information which was (i) worldwide and continuous, 24 hours-a-day/7 days-a-week, via a toll-free "hotline" for medical emergencies, and (ii) language translation available for over 100 different languages); and,

(m) <u>Senior Healthcare Provider Locator</u> (assistance in finding the right facility for medical services anywhere in the country).

## NHCS SEEKS A MARKETING PARTNER AND ENTERS INTO AN AGREEMENT WITH PENN TREATY

15. Once NHCS conceived, organized and developed "AllRisk Healthcare"$^{sm}$, NHCS needed to identify and contract with a provider of long-term care insurance as a way of marketing "AllRisk Healthcare"$^{sm}$ to those who for whatever reason did not qualify for long-term care insurance.

16. During 1999, NHCS contacted any number of insurance companies which provide long-term care insurance, explained its "AllRisk Healthcare"$^{sm}$ product and program, and solicited levels of interest in the marketing of "AllRisk Healthcare"$^{sm}$.

17. Among the insurance companies NHCS contacted in soliciting levels of interest in the marketing of "AllRisk Healthcare"$^{sm}$ was Penn Treaty.

18. In fact, NHCS presented its "AllRisk Healthcare"$^{sm}$ program directly to Mr. Glen Levit, the then-president of Penn Treaty.

19. At that time, Penn Treaty was rejecting some 1,500 to 2,000 applicants for long-term care insurance each month and had a nationwide network of sales agents numbering over 40,000.

20. Against the backdrop of 1,500 to 2,000 applicants per month to whom NHCS's "AllRisk Healthcare"$^{sm}$ program could be marketed by Penn Treaty's over 40,000 agents, Mr. Glen Levit quickly recognized the potential of NHCS's "AllRisk Healthcare"$^{sm}$ program and requested that NHCS discontinue disclosing its "AllRisk Healthcare"$^{sm}$ program to other insurance companies and deal exclusively with Penn Treaty.

21. By a letter dated September 9, 1999, Neal A. Forman, chief executive officer of NHCS, wrote to Mr. Glen Levit and confirmed that "effective today and based upon our telephone conversation, we shall discontinue discussions with all other insurance companies in anticipation of working with Penn Treaty 'exclusively' and will look forward to reviewing a sample contract describing our relationship that you will be preparing within the next week to ten days;" a true and correct copy of Mr. Forman's September 9, 1999 letter to Mr. Glen Levit is attached hereto as **Exhibit "A"** and is made a part hereof by reference.

22. Thereafter, on October 21, 1999, NHCS, on the one side, and PTNA, on the other, entered into that certain Agreement (the "**Agreement**") which provided, among other things, that PTNA would market NHCS's "AllRisk Healthcare"$^{sm}$ program; a true and correct copy of the Agreement is attached hereto as **Exhibit "B"** and is made a part hereof by reference.

23. In reliance on the Agreement, and in order to satisfy its own obligations under the Agreement, by a letter agreement dated October 21, 1999 (the "**Barth Letter Agreement**"), NHCS contracted with Webster E. Barth, III to provide a series of services required to implement NHCS's "AllRisk Healthcare"$^{sm}$ program; a true and correct copy of the Barth Letter Agreement is attached hereto as **Exhibit "C"** and is made a part hereof by reference.

24. In further reliance on the Agreement, and also in order to satisfy its own obligations under the Agreement, by an agreement dated October 27, 1999 (the "**DDS Agreement**"), NHCS contracted with Discount Development Services, L.L.C. to provide the discounts which were to be provided as part and parcel of NHCS's "AllRisk Healthcare"$^{sm}$ program; a true and correct copy of the DDS Agreement is attached hereto as **Exhibit "D"** and is made a part hereof by reference.

25. By entering into the Barth Letter Agreement and the DDS Agreement, NHCS initially established NHCS's "AllRisk Healthcare"ˢᵐ program in total; all that was required was the marketing of NHCS's "AllRisk Healthcare"ˢᵐ program through PTNA's agents and its support.

### PENN TREATY AGREES TO LEND UP TO $300,000 TO NHCS TO FUND NHCS'S EFFORTS TO FULLY ESTABLISH NHCS'S "ALLRISK HEALTHCARE"ˢᴹ PROGRAM

26. Realizing that NHCS did not have the financial wherewithal to fully establish NHCS's "AllRisk Healthcare"ˢᵐ program, on January 11, 2000, NHCS signed – and its principals Messrs. Schwartz and Forman partially personally guaranteed – a Promissory Note (the "**Promissory Note**") whereby Penn Treaty and PTNA agreed to lend up to Three Hundred Thousand Dollars ($300,000.00) to NHCS for the "start-up, marketing and establishing" of NHCS's "AllRisk Healthcare"ˢᵐ program; a true and correct copy of the Promissory Note is attached hereto as **Exhibit "E"** and is made a part hereof by reference.

27. Pursuant to the Promissory Note, NHCS ultimately borrowed One Hundred Twenty-Five Thousand Dollars ($125,000.00) from Penn Treaty and PTNA, leaving an amount still available to borrow under the Promissory Note of One Hundred Seventy-Five Thousand Dollars ($175,000.00).

### ALTHOUGH THE AGREEMENTS WERE SIGNED, PENN TREATY FAILS TO PERFORM AND ASKS FOR CHANGES

28. Despite NHCS having completed all that was required of it within all of eight (8) days after signing the Agreement, Penn Treaty and PTNA did not roll-out NHCS's "AllRisk Healthcare"ˢᵐ program until February, 2000, and then to only a limited number of agents in all of four (4) States.

29. Despite such delayed and then limited release, NHCS's "AllRisk Healthcare"$^{sm}$ program was one of the most successful new released programs in Penn Treaty's history.

30. Within the first three (3) months of the release of NHCS's "AllRisk Healthcare"$^{sm}$ program, Penn Treaty and PTNA determined that they wished to modify the terms of the Agreement and confirmed such changes by a letter agreement dated June 8, 2000 addressed to NHCS (the "**June 8, 2000 Letter Amendment**") and, on June 13, 2000, NHCS and Webster E. Barth, III agreed to such changes; a true and correct copy of the fully signed June 8, 2000 Letter Amendment is attached hereto as **Exhibit "F"** and is made a part hereof by reference.

31. Within less than three (3) months of the June 8, 2000 Letter Amendment, Penn Treaty and PTNA determined that they again wished to modify the terms of the Agreement by, among other things, changing the contractual relationship from one directly between NHCS, on the one side, and PTNA, on the other side, to one between NHCS and SFCC, a wholly-owned subsidiary of Penn Treaty, as guaranteed by Penn Treaty and PTNA, and confirmed such changes by a letter agreement dated August 21, 2000 addressed to the president and the chief executive officer of NHCS (the "**August 21, 2000 Letter Amendment**"); a true and correct copy of the August 21, 2000 Letter Amendment is attached hereto as **Exhibit "G"** and is made a part hereof by reference.

32. Although the August 21, 2000 Letter Amendment envisioned that Penn Treaty and PTNA would draft and submit to NHCS a contract providing for the change in the contractual relationship from one directly between NHCS, on the one side, and PTNA, on the other side, to one between NHCS and SFCC, a wholly-owned subsidiary of Penn Treaty, as guaranteed by Penn Treaty and PTNA, Penn Treaty and PTNA failed to do so and no contract to such effect was ever submitted to or signed by NHCS.

-8-

33.     As of the August 21, 2000 Letter Agreement, neither Penn Treaty, PTNA nor SFCC had yet launched the nationwide marketing of NHCS's "AllRisk Healthcare"$^{sm}$ program.

34.     In late September 2000, Penn Treaty held its annual agents' convention, during which Mr. Glen Levit addressed all of Penn Treaty's agents and declared his enthusiasm for NHCS's "AllRisk Healthcare"$^{sm}$ program and immediately expected release by Penn Treaty through SFCC, Penn Treaty's wholly-owned subsidiary.

35.     Unfortunately, on October 2, 2000, Mr. Glen Levit died unexpectedly.

36.     Because of the turmoil resulting from the unexpected death of Penn Treaty's president, NHCS waited patiently for SFCC's release and promotion of NHCS's "AllRisk Healthcare"$^{sm}$ program.

37.     SFCC did not release NHCS's "AllRisk Healthcare"$^{sm}$ program until February, 2001 and then to only a handful of states purportedly because those were the only states Penn Treaty's lawyers had approved for such release, with a few states being added to the approved list in fits-and-starts.

38.     As a direct and proximate result of these delays, Penn Treaty, PTNA and SFCC did not market NHCS's "AllRisk Healthcare"$^{sm}$ program adequately; in some states, there was no marketing of NHCS's "AllRisk Healthcare"$^{sm}$ program at all.

39.     Despite Penn Treaty's, PTNA's and SFCC's failure to perform as required under the Agreement as amended, by February 20, 2001 agent contracts for NHCS's "AllRisk Healthcare"$^{sm}$ program were arriving at Penn Treaty's offices in bulk and there was nothing but positive feedback and enthusiasm from the agents in the field for NHCS's "AllRisk Healthcare"$^{sm}$ program.

40. Indeed, by a letter dated February 21, 2001, Irving Levit, the now chief executive officer and president of Penn Treaty, wrote to all those who had become members of NHCS's "AllRisk Healthcare"[sm] program, advising them of reduced membership fees and that SFCC would be the entity providing NHCS's "AllRisk Healthcare"[sm] program services to the members; a true and correct copy of Mr. Irving Levit's February 21, 2001 letter to the members of NHCS's "AllRisk Healthcare"[sm] program is attached hereto as **Exhibit "H"** and is made a part hereof by reference.

41. Thereafter, in its September 2001 edition of "LTC Sales and Marketing INSIGHT", Penn Treaty's own "monthly newsletter for Penn Treaty Long Term Care Agents", Penn Treaty, PTNA and SFCC described its role with respect to NHCS's "AllRisk Healthcare"[sm] program as follows

> In an effort to keep Penn Treaty on the leading edge with new and innovative products one in particular has created quite a stir among our representatives. The AllRisk Program[sm] offered by Senior Financial Consultants (a subsidiary of Penn Treaty American Corporation) was recently rolled out and is garnering high praise for its simplicity, affordability and uniqueness.

A true and correct copy of the September 2001 edition of "LTC Sales and Marketing INSIGHT" is attached hereto as **Exhibit "I"** and is made a part hereof by reference.

### PENN TREATY, PTNA AND SFCC TURN AGAINST NHCS AND THE FRAUD AGAINST NHCS STARTS.

42. From the inception of the Agreement as amended, NHCS repeatedly requested information from Penn Treaty, PTNA and SFCC concerning the marketing of NHCS's "AllRisk Healthcare"[sm] program; yet despite these repeated requests, Penn Treaty, PTNA and SFCC failed and refused to provide such information, even though it was required by the Agreement as amended.

43. Penn Treaty's, PTNA's and SFCC's inattention to NHCS's "AllRisk Healthcare"$^{sm}$ program became evident when the earlier flood of applications for membership in NHCS's "AllRisk Healthcare"$^{sm}$ program slowed from an average of 35 to 50 a week to just a few a week.

44. When NHCS pressed Penn Treaty, PTNA and SFCC for answers to NHCS's questions as to when and how Penn Treaty, PTNA and SFCC intended to market NHCS's "AllRisk Healthcare"$^{sm}$ program, Penn Treaty, PTNA and SFCC devised and intended to devise a scheme and artifice to defraud NHCS by manufacturing a pretext to terminate the Agreement and thereby keeping all of the benefits of NHCS's "AllRisk Healthcare"$^{sm}$ program to themselves.

45. The reason for Penn Treaty's, PTNA's and SFCC's refusal to abide by the terms of the Agreement as amended became clear: Penn Treaty – and because of it, PTNA and SFCC – was experiencing severe financial shortfalls.

46. Indeed, in February 2001, Penn Treaty refused to honor the Promissory Note and unlawfully breached the same when it refused to fund a request for funding made by NHCS while there was still some One Hundred Seventy-Five Thousand Dollars ($175,000.00) remaining on the Promissory Note.

47. Instead, Penn Treaty, PTNA and SFCC determined that they would unlawfully (a) terminate the Agreement as amended and (b) improperly accelerate the amounts due under the Promissory Note as a way of bringing improper pressure to bear upon NHCS.

48. As a pretext, and without conducting any inquiry whatsoever, Penn Treaty, PTNA and SFCC claimed that NHCS had violated the Agreement as amended by claiming that the passive acquisition of a stockholding interest in NHCS resulted in an improper "material change

in the management of" NHCS; a true and correct copy of a letter dated November 5, 2001 from counsel for Penn Treaty, PTNA and SFCC making such claim is attached hereto as **Exhibit "J"** and is made a part hereof by reference.

49. Despite the fact that less than six (6) weeks before Penn Treaty, PTNA and SFCC had described NHCS's "AllRisk Healthcare"$^{sm}$ program as a "new and innovative product" that "has created quite a stir among our representatives" and which "garner[ed] high praise for its simplicity, affordability and uniqueness," on November 9, 2001, Penn Treaty,. PTNA and SFCC advised all sales agents that "[e]ffective today, we will no longer be marketing AllRisk Healthcare$^{sm}$, our non-insurance discount savings product;" a true and correct copy of this notice is attached hereto as **Exhibit "K"** and is made a part hereof by reference.

50. All of NHCS's entreaties to Penn Treaty, PTNA and SFCC that they honor the Agreement as amended and the Promissory Note fell on deaf ears; Penn Treaty, PTNA and SFCC were determined to put NHCS out of business.

51. Consistent with this scheme and artifice to defraud, on December 5, 2001, PTNA, at the direction of Penn Treaty and also for the benefit of SFCC, filed a lawsuit ("**Penn Treaty's Lawsuit**") in the Court of Common Pleas of Lehigh County, Pennsylvania seeking (a) payment from NHCS of the amounts outstanding under the Promissory Note and (b) to enforce the personal guarantee against Messrs. Schwartz and Forman; a true and correct copy of the lawsuit filed by PTNA at the direction of Penn Treaty and also for the benefit of SFCC is attached hereto as **Exhibit "L"** and is made a part hereof by reference.

52. As provided by law, NHCS and Messrs. Schwartz and Forman removed Penn Treaty's Lawsuit to the United States District Court for the Eastern District of Pennsylvania and, on January 9, 2002, filed an answer and affirmative defenses under the same; a true and correct

copy of the answer and affirmative defenses is attached hereto as **Exhibit "M"** and is made a part hereof by reference.

53. At the same time, and pursuant to the mandatory arbitration provisions of the Agreement as amended, NHCS demanded arbitration against Penn Treaty, PTNA and SFCC as a means of resolving Penn Treaty's, PTNA's and SFCC's breach of the Agreement as amended.

54. By way of response, Penn Treaty, PTNA and SFCC engaged in a pattern of delay and bad faith behavior designed to deny NHCS its contractual right of arbitration as the means for resolving Penn Treaty's, PTNA's and SFCC's breach of the Agreement as amended.

55. Because the monies claimed under the Promissory Note in truth and in fact had been borrowed by NHCS and should, in the fullness of time be repaid, NHCS agreed to resolve Penn Treaty's Lawsuit by admitting it owed the monies it truly owed, but providing that (a) the judgment was not to be docketed and (b) the dispute which had been referred to arbitration would now be heard by the Court; a true and correct copy of the Consent Order and Judgment entered by the Court to that effect is attached hereto as **Exhibit "N"** and is made a part hereof by reference.

## COUNT ONE

### FRAUD
### (NHCS v. PENN TREATY, PTNA AND SFCC)

56. NHCS hereby repeats and realleges all of the allegations set forth in Paragraphs 1 through 55, inclusive, of this complaint as if each such allegation was set forth herein at length.

57. Penn Treaty, PTNA and SFCC devised and intended to devise a scheme and artifice to defraud NHCS by originally agreeing to market and fund – via a $300,000 loan – the development and distribution of NHCS's "AllRisk Healthcare"[sm] program to those persons rejected by Penn Treaty and PTNA for long-term care insurance coverage when, in truth and in

fact, as Penn Treaty, PTNA and SFCC then and there well knew, Penn Treaty, PTNA and SFCC solely wished to intentionally and maliciously mislead NHCS for the ultimate purpose of misappropriating NHCS's "AllRisk Healthcare"$^{sm}$ program to Penn Treaty's, PTNA's and SFCC's sole benefit.

58.  In furtherance of that scheme and artifice to defraud, Penn Treaty, PTNA and SFCC intentionally and maliciously failed and refused to provide to NHCS additional advances of monies under the Promissory Note when, in truth and in fact, as Penn Treaty, PTNA and SFCC then and there well knew, Penn Treaty, PTNA and SFCC were contractually required to continue to fund the sums due under the Promissory Note to an aggregate of $300,000.00.

59.  Also in furtherance of that scheme and artifice to defraud, Penn Treaty, PTNA and SFCC claimed a termination of the Agreement with NHCS when, in truth and in fact, as Penn Treaty, PTNA and SFCC then and there well knew, there was no basis for any claimed termination of the Agreement and such claim was made solely as a pretext to defraud NHCS.

60.  Also in furtherance of that scheme and artifice to defraud, Penn Treaty, PTNA and SFCC filed a lawsuit seeking recovery of the amounts outstanding under the Promissory Note when, in truth and in fact, as Penn Treaty, PTNA and SFCC then and there well knew, such lawsuit was filed solely for the purpose of exerting improper pressure on NHCS.

61.  Penn Treaty's PTNA's and SFCC's actions in devising and implementing these scheme and artifice to defraud NHCS were intentional and made with malice aforethought.

62.  NHCS reasonably and justifiably relied on Penn Treaty's, PTNA's and SFCC representations in the Agreement and the Promissory Note.

63.  As a direct and proximate result of Penn Treaty's, PTNA's and SFCC's scheme and artifice to defraud, NHCS has been denied the benefit of the development and

implementation of NHCS's "AllRisk Healthcare"<sup>sm</sup> program, which the parties projected would produce revenues in excess of $200 million during its first five (5) years of operations.

**WHEREFORE,** NHCS demands judgment in its favor and against Penn Treaty, PTNA and SFCC on this Count One in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in compensatory damages, an amount in excess of Five Million Dollars ($5,000,000.00) in punitive damages, plus interest, costs, attorneys' fees and such other and further relief that the Court may deem just and proper.

## COUNT TWO

### BREACH OF CONTRACT
### (NHCS v. PENN TREATY, PTNA AND SFCC)

63.  NHCS hereby repeats and realleges all of the allegations set forth in Paragraphs 1 through 62, inclusive, of this complaint as if each such allegation was set forth herein at length

64.  The Agreement and the Promissory Note were valid and binding agreements between and among NHCS, on the one side, and Penn Treaty, PTNA and SFCC, on the other side.

65.  Penn Treaty, PTNA and SFCC breached the Agreement by falsely and improperly claiming that there had been an unauthorized change of control within NHCS.

66.  At no time did Penn Treaty, PTNA and SFCC provide NHCS any fair notice of any alleged breach or any meaningful opportunity to cure any alleged breach.

67.  Additionally, Penn Treaty, PTNA and SFCC breached the Promissory Note by wrongfully and without justification refusing to advance monies due under the Promissory Note.

68.  As a direct and proximate result of Penn Treaty's, PTNA's and SFCC's breach of the Agreement and the Promissory Note, NHCS has been denied the benefit of the development and implementation of NHCS's "AllRisk Healthcare"<sup>sm</sup> program, which the parties projected

-15-

would produce revenues in excess of $200 million during its first five (5) years of operations.

**WHEREFORE,** NHCS demands judgment in its favor and against Penn Treaty, PTNA and SFCC on this Count Two in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in compensatory damages, plus interest, costs, attorneys' fees and such other and further relief that the Court may deem just and proper.

### COUNT THREE

#### Misappropriation
#### (NHCS v. Penn Treaty, PTNA and SFCC)

69. NHCS hereby repeats and realleges all of the allegations set forth in Paragraphs 1 through 68, inclusive, of this complaint as if each such allegation was set forth herein at length.

70. NHCS was the developer of NHCS's "AllRisk Healthcare"$^{sm}$ program.

71. NHCS, on the one side, and Penn Treaty, PTNA and SFCC, on the other side, projected that NHCS's "AllRisk Healthcare"$^{sm}$ program would produce revenues in excess of $200 million during its first five (5) years of operations.

72. Without cause or justification, Penn Treaty, PTNA and SFCC sought to misappropriate NHCS's "AllRisk Healthcare"$^{sm}$ program for their own benefit and to the exclusion of NHCS.

73. As a direct and proximate result of Penn Treaty's, PTNA's and SFCC's misappropriation, NHCS has been denied the benefit of the development and implementation of NHCS's "AllRisk Healthcare"$^{sm}$ program, which the parties projected would produce revenues in excess of $200 million during its first five (5) years of operations.

**WHEREFORE,** NHCS demands judgment in its favor and against Penn Treaty, PTNA and SFCC on this Count Three in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in compensatory damages, an amount in excess of Five Million Dollars

PH2 128277v1 06/05/02

($5,000,000.00) in punitive damages, plus interest, costs, attorneys' fees and such other and further relief that the Court may deem just and proper.

                             Respectfully submitted,

                             _____
                             Roberto A. Rivera-Soto
                             **FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP**
                             2000 Market Street – Tenth Floor
                             Philadelphia, Pennsylvania 19103-3291
                             (215) 299-2000
                             **ATTORNEYS FOR PLAINTIFF,**
                                  **NATIONAL HEALTHCARE SERVICES, INC.**

**DATED:**      June 5, 2002

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), National Healthcare Services, Inc. hereby demands trial by jury on all issues so triable.

                             _____
                             Roberto A. Rivera-Soto
                             **FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP**
                             2000 Market Street – Tenth Floor
                             Philadelphia, Pennsylvania 19103-3291
                             (215) 299-2000
                             **ATTORNEYS FOR PLAINTIFF,**
                                  **NATIONAL HEALTHCARE SERVICES, INC.**

**DATED:**      June 5, 2002

## CERTIFICATION PURSUANT TO
## LOCAL RULE OF CIVIL PROCEDURE 53.2(3)(C)(1)

Pursuant to L. Civ. R. 52.2(3)(C)(1), I hereby certify that:

1. I am counsel of record for National Healthcare Services, Inc., the plaintiff in the foregoing complaint.

2. The damages recoverable pursuant to the foregoing complaint exceed the sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00) exclusive of interest and costs.

3. Pursuant to the provisions of 28 U.S.C. §1746, I certify under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Roberto A. Rivera-Soto
FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
2000 Market Street – Tenth Floor
Philadelphia, Pennsylvania 19103-3291
(215) 299-2000
ATTORNEYS FOR PLAINTIFF,
    NATIONAL HEALTHCARE SERVICES, INC.

DATED:   June 5, 2002

X:128277

-18-

PH2 128277v1 06/05/02