**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONAL HEALTHCARE SERVICES, INC.** : | : | **CIVIL ACTION** |
| : | | **NO.  02-CV-3600** |
| Plaintiff, : | | |
| : | | |
| v. : | | |
| : | | |
| **PENN TREATY AMERICAN CORPORATION** : | | |
| - and - : | | |
| **PENN TREATY NETWORK AMERICA** : | | |
| **INSURANCE COMPANY** : | | |
| - and - : | | |
| **SENIOR FINANCIAL CONSULTANTS** : | | |
| **COMPANY** : | | |
| : | | |
| Defendants. : | | **JURY TRIAL DEMANDED** |
| : | | |

<u>**ORDER**</u>

AND NOW, this _____ day of _____ , 2002, upon consideration of

Defendants' Motion to Dismiss Count Two of the Amended Complaint, and plaintiff's response

in opposition thereto, it is hereby ORDERED that the motion is DENIED.


BY THE COURT:


_____
Edmund V. Ludwig, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **NATIONAL HEALTHCARE SERVICES, INC.** : | **CIVIL ACTION** |
| : | **NO.  02-CV-3600** |
| Plaintiff, : |  |
| : |  |
| v. : |  |
| : |  |
| **PENN TREATY AMERICAN CORPORATION** : |  |
| - and - : |  |
| **PENN TREATY NETWORK AMERICA** : |  |
| **INSURANCE COMPANY** : |  |
| - and - : |  |
| **SENIOR FINANCIAL CONSULTANTS** : |  |
| **COMPANY** : |  |
| : |  |
| Defendants. : | **JURY TRIAL DEMANDED** |
| : |  |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO
<u>DISMISS COUNT TWO OF THE AMENDED COMPLAINT</u>**

Plaintiff National Healthcare Services, Inc. ("NHCS") submits this memorandum of law in opposition to the motion of defendants Penn Treaty American Corporation ("Penn Treaty"), Penn Treaty Network America Insurance Company ("PTNA") and Senior Financial Consultants Company ("SFCC") (collectively, "Defendants") to dismiss Count Two of the Amended Complaint.  As set forth below, the motion should be denied.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

A.    **NHCS Contracts With Defendants To
Market NHCS's AllRisk Healthcare[sm] Program**

In 1999, NHCS developed the AllRisk Healthcare[sm] program -- a healthcare benefits program designed to provide discounts for senior citizens who, for whatever reason, are not eligible for long-term care insurance. Amended Complaint, ¶¶ 13-14. That same year, NHCS contacted several insurance companies, including Penn Treaty, about marketing the AllRisk Healthcare[sm] program. Id. at ¶¶ 16-17. Glen Levit, then president of Penn Treaty, quickly recognized the potential of AllRisk Healthcare[sm] and requested that NHCS stop shopping the program to other insurance carriers and deal exclusively with Penn Treaty. Id. at ¶¶ 20-21.

On October 21, 1999, NHCS and PTNA (a wholly-owned subsidiary of Penn Treaty) entered into an agreement (the "Agreement") pursuant to which PTNA agreed to market NHCS's AllRisk Healthcare[sm] program. Id. at ¶ 22. In addition, on January 11, 2000, NHCS signed -- and its principals partially guaranteed -- a promissory note (the "Promissory Note") whereby Penn Treaty and PTNA agreed to lend up to $300,000.00 to NHCS for the "start-up, marketing and establishing" of NHCS's AllRisk Healthcare[sm] program. Id. at ¶ 26.

B.    **Penn Treaty And PTNA Fail To Perform
And Instead Ask For Changes To The Agreement**

Penn Treaty and PTNA did not roll-out NHCS's AllRisk Healthcare[sm] program until February 2000, and then to only a limited number of agents in a mere four states. Id. at ¶ 28. Four months later, at the request of Penn Treaty and PTNA, the parties modified the Agreement by a letter dated June 8, 2000. Id. at ¶ 30. Thereafter, again at the request of Penn Treaty and PTNA, the parties further modified the Agreement by, among other things, changing the

-2-

contractual relationship from one between NHCS and PTNA to one between NHCS and SFCC (another wholly-owned subsidiary of Penn Treaty) whose performance would be guaranteed by Penn Treaty.  Id. at ¶ 31.  The parties confirmed this change in a letter agreement dated August 21, 2000.  Although Penn Treaty and PTNA agreed to draft a new contract to formally effect this change in the relationship, no such contract was ever prepared or executed.  Id. at ¶ 32.  As of the August 21, 2000 letter agreement, the Defendants had still not launched the nationwide marketing of NHCS's AllRisk Healthcare[sm] program as required by the Agreement executed almost a year earlier.  Id. at ¶ 33.

        **C.**     **Despite The Success Of NHCS's AllRisk Healthcare[sm] Program,**
              **Defendants Continue With Their Delays And Failure To Perform**

In late September 2000, Penn Treaty held its annual agents' convention, during which Glen Levit addressed all of Penn Treaty's agents and declared his enthusiasm for NHCS's AllRisk Healthcare[sm] program.  Id. at ¶ 34.  Unfortunately, on October 2, 2000, Glen Levit died unexpectedly.  Id. at ¶ 35.  Because of the turmoil resulting from the unexpected death of Penn Treaty's president, NHCS waited patiently for SFCC's release and promotion of the AllRisk Healthcare[sm] program.  Id. at ¶ 36.

SFCC did not release NHCS's AllRisk Healthcare[sm] program until February 2001, and then to only a handful of states purportedly because those were the only states Penn Treaty's lawyers had approved for such release, with a few states being added to the approved list in fits-and-starts.  Id. at ¶ 37.  As a direct result of these delays, Defendants did not market NHCS's AllRisk Healthcare[sm] program adequately; in some states, there was no marketing of the AllRisk Healthcare[sm] program at all.  Id. at ¶ 38.

Despite the Defendants' failure to perform as required under the Agreement, by February 20, 2001, agent contracts for NHCS's AllRisk Healthcare[sm] program were arriving at Penn Treaty's offices in bulk and there was nothing but positive feedback and enthusiasm from the agents in the field for the AllRisk Healthcare[sm] program.  Id. at ¶ 39.  Indeed, by a letter dated February 21, 2001, Irving Levit, the current chief executive officer and president of Penn Treaty, wrote to all those who had become members of NHCS's AllRisk Healthcare[sm] program, advising them of reduced membership fees and that SFCC would be the entity providing the AllRisk Healthcare[sm] program services to the members.  Id. at ¶ 40.

Thereafter, in its September 2001 edition of "LTC Sales and Marketing INSIGHT", Penn Treaty's own "monthly newsletter for Penn Treaty Long Term Care Agents", Penn Treaty, PTNA and SFCC described their role with respect to NHCS's AllRisk Healthcare[sm] program as follows:

> In an effort to keep Penn Treaty on the leading edge with new and innovative products one in particular has created quite a stir among our representatives.   The AllRisk Program offered by Senior Financial Consultants (a subsidiary of Penn Treaty American [sm] Corporation) was recently rolled out and is garnering high praise for its simplicity, affordability and uniqueness.

Id. at ¶ 41.

### D.    The Defendants Turn Against NHCS

From the inception of the Agreement, NHCS repeatedly requested information from Defendants concerning the marketing of NHCS's AllRisk Healthcare[sm] program.  Despite these repeated requests, Defendants failed and refused to provide such information, even though it was required by the terms of the Agreement.  Id. at ¶ 42.  The Defendants' inattention to NHCS's AllRisk Healthcare[sm] program became evident when the earlier flood of applications for

-4-

membership in the AllRisk Healthcare[sm] program slowed from an average of 35 to 50 a week to just a few a week.  Id. at ¶ 43.  When NHCS pressed Defendants for answers to NHCS's questions as to when and how Defendants intended to market the AllRisk Healthcare[sm] program, Defendants manufactured a pretext to terminate the Agreement and thereby keep all of the benefits of NHCS's AllRisk Healthcare[sm] program to themselves.  Id. at ¶ 44.

In 2001, Defendants experienced severe financial shortfalls.  Id. at ¶ 45.  On the brink of insolvency, Defendants looked for ways to renege on their obligations to NHCS.  In February 2001, Defendants breached the Promissory Note when they refused to fund a request made by NHCS while there was still some $175,000.00 remaining on the Promissory Note.  Id. at ¶ 46. Instead, Defendants determined that they would (a) unlawfully terminate the Agreement and (b) improperly accelerate the amounts due under the Promissory Note as a way of bringing improper pressure to bear upon NHCS.  Id. at ¶ 47.  As a pretext, and without conducting any inquiry whatsoever, Defendants claimed in November 2001 that NHCS had violated the Agreement, arguing that the passive acquisition of a stockholding interest in NHCS resulted in an improper "material change in the management of" NHCS.  Id. at ¶ 48.

Despite the fact that less than six weeks earlier, Defendants had described NHCS's AllRisk Healthcare[sm] program as a "new and innovative product" that "has created quite a stir among our representatives" and which "garner[ed] high praise for its simplicity, affordability and uniqueness," on November 9, 2001, Defendants advised all sales agents that "[e]ffective today, we will no longer be marketing AllRisk Healthcare[sm], our non-insurance discount savings product."  Id. at ¶ 49.  All of NHCS's entreaties to Penn Treaty, PTNA and SFCC that they honor the Agreement and the Promissory Note fell on deaf ears.

### E.    This Lawsuit

On August 12, 2002, NHCS filed its Amended Complaint.  In Count One, NHCS alleges that Defendants breached the Agreement and the Promissory Note.  In Count Two, NHCS asserts a claim for misappropriation of its AllRisk Healthcare[sm] program.  Defendants have filed a motion to dismiss Count Two only.  In essence, Defendants argue that the misappropriation claim is subsumed by the contract claim and is therefore barred by the "gist of the action" doctrine.  Contrary to Defendants' argument, NHCS has alleged much more than a mere failure to market the AllRisk Healthcare[sm] program in violation of the Agreement – NHCS alleges that Defendants committed outright theft of NHCS's AllRisk Healthcare[sm] program.  Thus, Count Two states a valid cause of action.  The Court should therefore deny Defendants' motion to dismiss.

## II.    ARGUMENT

### A.    Standard On Motion To Dismiss

The liberal standard used to decide motions to dismiss is well settled.  The Supreme Court has stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Similarly, the Third Circuit has held that, in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), all "factual allegations of the complaint are to be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved."  D.P. Enters., Inc. v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir.

1984).  In addition, all "[r]easonable factual inferences will be drawn to aid the pleader."  <u>Id.</u>

Applying this liberal standard, the Court should deny Defendants' motion to dismiss.

### B.    <u>NHCS Has Properly Stated A Claim For Misappropriation</u>

In Count Two of the Amended Complaint, NHCS asserts a claim against Defendants for

misappropriation of the AllRisk Healthcare[sm] program.    In order to state a claim for

misappropriation under Pennsylvania law, a plaintiff must aver that:

> (1) plaintiff has made a substantial investment of time, effort and
> money into creating the thing misappropriated such that the court
> can characterize that thing as a kind of property right, (2) the
> defendant has appropriated the thing at little or no cost, such that
> the court can characterize defendant's own actions as reaping
> where it has not sown, and (3) the defendant has injured plaintiff
> by the misappropriation.

<u>Babiarz v. Bell Atlantic-Pennsylvania, Inc.</u>, August Term, 2000, No. 1863, 2001 WL 1808554

(C.C.P. Phila. July 10, 2001) (citations omitted).  NHCS has alleged these exact elements in

Count Two:

63.    NHCS was the developer of the "AllRisk Healthcare"[sm] program.

64.    NHCS made a substantial investment of time, effort and money in
developing the "AllRisk Healthcare"[sm] program.

65.    NHCS, on the one side, and Penn Treaty, PTNA and SFCC, on the
other side, projected that NHCS's "AllRisk Healthcare"[sm] program
would produce revenues in excess of $200 million during its first
five (5) years of operations.

66.    Without cause or justification, Penn Treaty, PTNA and SFCC
misappropriated NHCS's "AllRisk Healthcare"[sm] program, at little
or no cost to Penn Treaty, PTNA and SFCC, for their own benefit
and to the exclusion of NHCS.

67.    As a direct and proximate result of Penn Treaty's, PTNA's and
SFCC's misappropriation, NHCS has been injured.

Amended Complaint, ¶¶ 63-67.

Defendants attack Count Two by invoking the "gist of the action" doctrine, which generally prohibits recovery in tort for actions that sound in contract. This doctrine, however, does not apply here.

Despite the "gist of the action" doctrine, contract and tort claims are not mutually exclusive. "That a plaintiff may not sue in tort for economic losses arising from a breach of contract . . . does not preclude the possibility of a tort action between parties to a contract." Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp.2d 947, 951 (E.D. Pa. 1998). Distinct tort claims may properly be maintained even if the parties have entered into a contract -- the tort claims are precluded only if they are completely subsumed by the contract.

In support of their motion to dismiss, Defendants discuss only two cases that involved a misappropriation claim. The first case is Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 106-07 (3d Cir. 2001), cert. denied, 122 S. Ct. 1173 (2002), where the Third Circuit held that a misappropriation claim could in fact be sustained -- notwithstanding the "gist of the action" doctrine -- as long as the misappropriation claim did not totally overlap the contract claim. The same reasoning applies here. The misappropriation claim (i.e., that the Defendants stole the AllRisk Healthcare[sm] program from NHCS) is separate and distinct from the breach of contract claim (i.e., that the Defendants simply failed to market the AllRisk Healthcare[sm] program as required by the Agreement). Defendants' theft of the AllRisk Healthcare[sm] program is not an event covered by the terms of the Agreement, and there are no contractual remedies for such misconduct. Thus, as in Bohler-Uddeholm, the "gist of the action" doctrine does not bar the misappropriation claim. Id.

The only other case discussed by Defendants that involved a misappropriation claim is Babiarz v. Bell Atlantic-Pennsylvania, Inc., August Term, 2000, No. 1863, 2001 WL 1808554 (C.C.P. Phila. July 10, 2001). In that case, the plaintiff brought several claims against his employer, alleging that he did not receive proper credit for a marketing idea that he proposed. While allowing certain claims to proceed, the court dismissed the plaintiff's claim for "misappropriation of invention" because the plaintiff failed to allege that: (a) he owned the invention at issue; (b) the invention was patented, trademarked or otherwise safeguarded; or (c) he invested the time, effort and money in developing the invention. Id. at *8. The facts here are markedly different. Unlike the plaintiff in Babiarz, NHCS has alleged that: (a) it developed the AllRisk Healthcare$^{sm}$ program prior to any dealings with Defendants; (b) the AllRisk Healthcare$^{sm}$ program is protected by a service mark; and (c) NHCS spent considerable amounts of time, effort and money in developing the AllRisk Healthcare$^{sm}$ program. Accordingly, Defendants' reliance on Babiarz is misplaced.

Finally, the misappropriation claim asserted by NHCS should be allowed because, at this point, it may not be entirely clear which Defendants are bound by the Agreement. PTNA is the only Defendant that signed the Agreement. See Exhibit "B" to Amended Complaint. Subsequently, however, the parties envisioned assigning PTNA's contractual duties to SFCC, whose performance was to be guaranteed by Penn Treaty. Amended Complaint, ¶¶ 31-32. Although contemplated, a new contract to this effect was never executed. Id. Under these circumstances, PTNA may attempt to avoid the Agreement by arguing that the assignment relieved PTNA of all contractual liability. Conversely, SFCC and Penn Treaty may try to avoid their contractual commitments by arguing that the assignment was never consummated. If either of these arguments proves successful -- and one or more of the Defendants is found to be a

stranger to the Agreement -- then that Defendant's liability would necessarily sound <u>solely</u> in tort.  Accordingly, the misappropriation claim in Count Two should stand.

**III.    <u>CONCLUSION</u>**

For all of the foregoing reasons, NHCS respectfully requests that the Court deny Defendants' motion to dismiss Count Two of the Amended Complaint.


Respectfully submitted,


_____
Roberto A. Rivera-Soto
Daniel G. Lyons
**FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP**
2000 Market Street – Tenth Floor
Philadelphia, Pennsylvania 19103-3291
(215) 299-2000

**ATTORNEYS FOR PLAINTIFF,**
    **NATIONAL HEALTHCARE SERVICES, INC.**


**DATED:**  September 12, 2002

-10-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a true and correct copy of the foregoing

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Count Two of

the Amended Complaint, via first-class U.S. mail upon the following:

> Geoffrey A. Kahn, Esquire
> Douglas L. Flitter, Esquire
> Ballard Spahr Andrews & Ingersoll, LLP
> 1735 Market Street
> 51st Floor
> Philadelphia, PA  19103-7599

_____

DANIEL G. LYONS

**DATED:**  September 12, 2002