IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., <br> Plaintiff, <br> v. <br> PENN TREATY AMERICAN CORPORATION, et al. <br> Defendants. | CIVIL ACTION <br> NO. 02-CV-3600 |

## ORDER

AND NOW, this _____ day of _____, 2004, upon consideration of the motion of plaintiff National Healthcare Services, Inc. ("**Plaintiff**") for partial summary judgment as to liability, the response of defendants Penn Treaty American Corporation, Penn Treaty Network America Insurance Company, and Senior Financial Consultants Company (collectively, "**Defendants**") thereto and a hearing thereon having been held, it is hereby

1.  **ORDERED, ADJUDGED and DECREED** that Plaintiff's motion for partial summary judgment as to liability be, and the same hereby is, **GRANTED**; and it is hereby

2.  **FURTHER ORDERED, ADJUDGED and DECREED** that partial summary judgment on liability be, and the same hereby is, entered in favor of Plaintiff and against Defendants on Count One of this civil action; and it is hereby

3.  **FURTHER ORDERED, ADJUDGED and DECREED** that the parties shall have _____ days to complete expert discovery on damages; and it is hereby

4.  **FURTHER ORDERED, ADJUDGED and DECREED** that trial of this matter limited solely to determining the amount of damages sustained by Plaintiff shall be held on

_____, 2004.

**BY THE COURT:**

_____
MARY A. MCLAUGHLIN, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., : <br>                     Plaintiff,        : <br>                                     : <br>       v.                                  : <br>                                     : <br> PENN TREATY AMERICAN        : <br> CORPORATION, et al.              : <br>                  Defendants.   : | CIVIL ACTION <br> NO. 02-CV-3600 |

**PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Pursuant to Fed. R. Civ. P. 56(c), plaintiff National Healthcare Services, Inc. ("**NHCS**"), by and through its undersigned counsel, moves the Court for partial summary judgment on liability in its favor and against defendants Penn Treaty American Corporation, Penn Treaty Network America Insurance Company and Senior Financial Consultants Company (collectively, "**Penn Treaty**") on NHCS's claim that Penn Treaty breached the parties' Agreement dated October 21, 1999, as amended.

In support of this motion, NHCS relies on the attached memorandum of law and exhibits thereto, which are incorporated herein by reference.

Respectfully submitted,

_[signature]_

Roberto A. Rivera-Soto
**FOX ROTHSCHILD LLP**
2000 Market Street – Tenth Floor
Philadelphia, Pennsylvania 19103-3291
(215) 299-2000

**ATTORNEYS FOR PLAINTIFF
NATIONAL HEALTHCARE SERVICES, INC.**

**DATED:**   December 22, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., : <br> Plaintiff, : <br> : <br> v. : <br> : <br> PENN TREATY AMERICAN : <br> CORPORATION, et al. : <br> Defendants. : | CIVIL ACTION <br> NO. 02-CV-3600 |

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT AS TO LIABILITY</u>

Plaintiff National Healthcare Services, Inc. ("**NHCS**") submits this memorandum of law in support of its motion for partial summary judgment on liability against defendants Penn Treaty American Corporation, Penn Treaty Network America Insurance Company and Senior Financial Consultants Company (collectively, "**Penn Treaty**").

I.    <u>INTRODUCTION</u>.

The material facts here are straightforward and the issue for decision is very narrow. NHCS seeks partial summary judgment solely with respect to Penn Treaty's liability for breaching the termination provision of the parties' contract. Because there is no genuine issue of material fact concerning Penn Treaty's wrongful termination of that contract, NHCS is entitled to judgment as a matter of law on the issue of liability; a trial is only needed to determine the quantum of damages sustained by NHCS as a result of Penn Treaty's breach.

The reasons supporting NHCS's motion for partial summary judgment on liability follow.

II.  **FACTUAL AND PROCEDURAL BACKGROUND.**

  A.  **THE AGREEMENT.**

On October 21, 1999, NHCS and Penn Treaty entered into an agreement (the "**Agreement**") to develop, market and sell a non-insurance savings program – that came to be known as "AllRisk Healthcare®" – designed to provide healthcare discounts to senior citizens.[1] By its terms, the Agreement was to continue until December 31, 2005 unless terminated earlier in accordance with the provisions of the Agreement.[2]

The Agreement was terminable on a number of grounds, only one of which is relevant here. The only section invoked by Penn Treaty in its written notice of termination of the Agreement was Section 6.2.3(d):

> 6.2 Termination:   This Agreement shall be terminable as follows:
> . . .
> > 6.2.3  Immediately and without notice, by either party, in the event of:
> > . . .
> > (d)  The sale of all or substantially all of the assets of, the merger or transfer of a majority of the voting stock of, or <u>a material change in the management of one party which has not been approved in writing by the other party</u> provided, however, that this shall not apply to any transfer of interest between the existing shareholders of NHCS and/or their estates . . . .[3]

The <u>sole</u> issue presented by this motion is whether there was an unauthorized "material change in the management" of NHCS to justify Penn Treaty's termination of the Agreement.

---

[1]  A true and correct copy of the Agreement is attached as **Exhibit "A"** hereto and incorporated herein by reference. The parties subsequently modified the Agreement by letters dated June 8, 2000 and August 21, 2000, true and correct copies of which are attached respectively as **Exhibit "B"** and **Exhibit "C"** hereto and incorporated herein by reference. Although the Agreement was modified, none of the provisions at issue in this motion were changed.

[2]  Agreement, § 6.1.

[3]  Agreement, § 6.2.3(d) (emphasis added).

Penn Treaty breached the Agreement as a matter of law if any of the following is true: (1) there was no material change in the management of NHCS; (2) the alleged change in the management of NHCS was not material; or (3) the alleged change in the management of NHCS was approved by Penn Treaty in writing.

**B.    NHCS.**

NHCS was organized in August 1999 under the laws of the State of Washington.[4] When originally formed, NHCS had just two shareholders – Neal Forman and Herbert Schwartz – each of whom held a 50% interest in NHCS.[5] Significantly, under Article II, Section 1 of NHCS's bylaws, all management functions are entrusted to NHCS's board of directors.[6]

**C.    MICHAEL CALLAHAN AND WEBSTER BARTH.**

Effective August 22, 2001, Michael Callahan acquired a 25% non-voting shareholder interest in NHCS.[7] Callahan was not, and has never been, an officer, director or employee of NHCS.[8] In the words of Neal Forman, Callahan "never had any say in the running of this

---

[4]   See NHCS's articles of incorporation, attached as **Exhibit "D"** hereto and incorporated herein by reference.

[5]   See Plaintiff's Responses to Defendant Penn Treaty American Corporation's First Set of Interrogatories and Document Requests (response to interrogatory no. 2), attached as **Exhibit "E"** hereto and incorporated herein by reference.

[6]   See NHCS's bylaws, attached as **Exhibit "F"** hereto and incorporated herein by reference.

[7]   A true and correct copy of the certificate reflecting Callahan's acquisition of non-voting NHCS stock is attached as **Exhibit "G"** hereto and incorporated herein by reference.

[8]   Callahan Deposition Transcript at 207-08, a true and correct copy of which is attached as **Exhibit "H"** hereto and incorporated herein by reference.

company [NHCS], ever."[9]  As will be noted later, the <u>only</u> interest Callahan ever acquired in NHCS was as a non-voting 25% shareholder.

In October 2000, well before his acquisition of a 25% non-voting shareholder interest in NHCS, Callahan became involved with Copperfields, a company owned and operated by Webster E. Barth, III.[10]  One year earlier, by a Letter of Engagement dated October 21, 1999 (parenthetically also the date of the Agreement between NHCS and Penn Treaty), Barth entered into a subcontract with NHCS by which Barth agreed to perform certain services in connection with the AllRisk Healthcare® program to be marketed by Penn Treaty under its Agreement with NHCS.[11]

### D. PENN TREATY'S TERMINATION OF THE AGREEMENT.

On November 5, 2001, Thomas C. Sadler, Jr., Esquire, outside counsel for Penn Treaty, wrote to Herb Schwartz, president of NHCS, notifying NHCS of Penn Treaty's decision to terminate the Agreement.[12]  This terse termination letter provides in full as follows:

> Dear Mr. Schwartz:
>
> It has come to the attention of Penn Treaty that Michael Callahan has purchased a significant share of National Healthcare Services and has assumed management functions.  National Healthcare Services' Agreement with Penn Treaty, paragraph 6.2 states:

---

[9]  Forman Deposition Transcript at 31-32, a true and correct copy of which is attached as **Exhibit "I"** hereto and incorporated herein by reference.

[10]  Callahan Deposition Transcript at 93-94 (Exhibit "H" hereto); Barth Deposition Transcript at 29-30, a true and correct copy of which is attached as **Exhibit "J"** hereto and incorporated herein by reference.

[11]  A true and correct copy of the Letter of Engagement between Barth and NHCS is attached as **Exhibit "K"** hereto and incorporated herein by reference.

[12]  A true and correct copy of Sadler's November 5, 2001 letter to Schwartz is attached as **Exhibit "L"** hereto and incorporated herein by reference.

-4-

> 6.2 Termination:  This Agreement shall be terminable as follows:
>
> . . .
>
> > 6.2.3 Immediately and without notice, by either party, in the event of:
> >
> > . . .
> >
> > > (d) The sale of all or substantially all of the assets of, the merger or transfer of a majority of the voting stock of, or a material change in the management of one party which has not been approved in writing by the other party provided, however, that this shall not apply to any transfer of interest between the existing shareholders of NHCS and/or their estates; . . .
>
> In light of the material change in the management of National Healthcare Services, Inc., Penn Treaty is left with no choice but to immediately and without any further notice terminate the Agreement entered into between National Healthcare Services, Inc. and Penn Treaty Network America Insurance Company dated October 21, 1999, and the modification of the Agreement dated August 21, 2000.
>
> 
> Very truly yours,<br>
> /s/<br>
> Thomas C. Sadler, Jr.
> 
>
> cc: Jane M. Bagley, Esq.

Thus, Penn Treaty's decision to terminate the Agreement was premised exclusively on the conclusion that Callahan represented a "material change in the management" of NHCS. Tellingly, there is no record evidence that anyone from Penn Treaty ever made the slightest inquiry of Forman (the chief executive officer of NHCS and a 25% shareholder) or Schwartz (the president of NHCS and a 50% shareholder) about Callahan's role at NHCS prior to the November 5, 2001 termination of the Agreement.

E.     THIS LAWSUIT.

On June 5, 2002, NHCS commenced this action against Penn Treaty.  On August 12, 2002, NHCS filed an amended complaint, asserting claims for breach of contract and

misappropriation. By stipulation filed on December 18, 2003, NHCS voluntarily withdrew its misappropriation claim, leaving only the contract claim.

On November 5, 2002, NHCS served its first set of interrogatories addressed to Penn Treaty.[13] Interrogatory no. 13 asked Penn Treaty to identify and describe the "management functions" that supposedly were assumed by Callahan as alleged in Sadler's November 5, 2001 letter; Penn Treaty's response: Sadler's letter is in writing and speaks for itself.[14] Similarly, interrogatory no. 14 asked Penn Treaty to explain how it determined that the alleged change in the management of NHCS was "material" (so as to justify termination of the Agreement under Section 6.2.3(d)). Again, Penn Treaty's answer was no answer at all: Penn Treaty again simply pointed to Sadler's letter and stated that it speaks for itself.[15] Penn Treaty never amended its answers to these critical interrogatories.

Penn Treaty's termination of the Agreement was clearly wrongful. Partial summary judgment on the issue of liability is warranted.

### III.   ARGUMENT

#### A.   STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[13]   See Plaintiffs' First Set of Interrogatories Directed to Defendants, attached as **Exhibit "M"** hereto and incorporated herein by reference.

[14]   See Defendants' Responses to Plaintiff's First Set of Interrogatories, attached as **Exhibit "N"** hereto and incorporated herein by reference.

[15]   Id.

of law."[16] In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party, and must draw all justifiable inferences in its favor.[17] Our Supreme Court has made clear that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."[18] Where, as here, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is mandated.[19]

### B.  THERE WAS NO "MATERIAL CHANGE IN THE MANAGEMENT" AT NHCS.

Penn Treaty's termination of the Agreement was based solely on its unsupported conclusion that Callahan's presence caused a "material change in the management" of NHCS sufficient to trigger the termination clause in Section 6.2.3(d). Because the phrase "material change in the management" is not defined in the Agreement, and because "management" is unmistakably a term of art in the corporate realm, it "should be interpreted in accord with [its] specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent."[20]

---

[16]  Fed. R. Civ. P. 56(c).

[17]  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[18]  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

[19]  Id. at 322-23.

[20]  Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1013 (3d Cir. 1980).

There are a number of ready sources to supply the meaning of the term "management." One must first look to the corporate law of the State of Washington, where NHCS was incorporated.[21] Under the Washington Business Corporation Act, "[a]ll corporate powers <u>must</u> be exercised by or under the authority of, <u>and the business and affairs of the corporation</u> **managed** <u>under the direction of, its</u> **board of directors** . . . ."[22] It is the statutorily mandated duty of the <u>directors</u> to "manage" Washington corporations like NHCS.[23]

Another applicable definition of "management" appears in NHCS's very own bylaws; Article II, Section 1 of those bylaws provides: "The business, property and affairs of the corporation shall be **managed** by its **board of directors**."[24]

Thus, under Washington corporate law and NHCS's bylaws, the term "management" means only one thing: the board of directors. Here, it is undisputed that Callahan was never a director of NHCS (nor was he an officer or employee). As a matter of law, therefore, Callahan did not cause a change in the "management" of NHCS, let alone a "material" one that could have

---

[21]  The Agreement contains a choice of law clause providing that the Agreement is to be interpreted in accordance with Pennsylvania law. <u>See</u> Agreement, § 8.9. Pennsylvania, however, defers to the law of the state of incorporation on issues related to the internal affairs of the corporation. <u>See</u> 15 Pa.C.S. § 4145. Pennsylvania law is consistent with the generally accepted rule. <u>See</u> <u>Edgar v. MITE Corp.</u>, 457 U.S. 624, 645 (1982) (recognizing that matters peculiar to the relationships among a corporation, its officers, its directors and its stockholders are considered internal affairs of the corporation to be governed by the law of the state of its incorporation).

[22]  Wash. Rev. Code § 23B.02.020(3)(z) (emphasis added). <u>See also</u> Wash. Rev. Code § 23B.08.010 ("All corporate powers shall be exercised by or under the authority of, <u>and the business and affairs of the corporation</u> **managed** <u>under the direction of, its</u> **board of directors**, subject to any limitations set forth in the articles of incorporation.") (emphasis added).

[23]  <u>See</u>, e.g., <u>Commodity Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343, 349 n.4 (1985) ("State corporation laws generally vest management authority in a corporation's board of directors.") (citations omitted).

[24]  Bylaws of NHCS, Article II, Section 1, attached as Exhibit "F" hereto (emphasis added).

justified termination of the Agreement under Section 6.2.3(d).

Although Penn Treaty dodged NHCS's interrogatories on the purported justification for the termination of the Agreement, it became apparent during the deposition phase of this case that Penn Treaty now places all of its litigation eggs in one basket: a single e-mail sent by Callahan to Sadler, Penn Treaty's outside counsel, on October 1, 2001.[25] The transparency of Penn Treaty's reliance on that e-mail is manifest even on a cursory examination of that e-mail.

In his October 1, 2001 e-mail to Sadler, Callahan referred to himself as a "principal" who was asked by Forman and Schwartz to help negotiate certain disputes between the parties. Starving for support, Penn Treaty has pounced on the word "principal" to justify the termination of the Agreement. Penn Treaty's argument fails for a number of reasons.

As a threshold matter, the Agreement makes no mention of the term "principal." Nothing in the Agreement permits a party to terminate the Agreement in the event that a new "principal" becomes involved with the other party. Penn Treaty's attempt to equate Callahan's use of the word "principal" with a "material change in management' is a giant and tortured stretch, to say the least, and is belied by the record evidence.

In his October 1, 2001 e-mail, Callahan expressly stated that his involvement was at the specific request and direction of Forman and Schwartz, the majority shareholders of NHCS. <u>Nothing</u> in Callahan's e-mail even remotely suggests that he had the independent authority to do anything on behalf of NHCS. Moreover, there is not a shred of evidence in the record that Forman or Schwartz ever delegated any management responsibility to Callahan.

---

[25] A true and correct copy of Callahan's e-mail to Sadler, dated October 1, 2001, is attached as **Exhibit "O"** hereto and incorporated herein by reference.

Indeed, Forman made clear at his deposition that Callahan "never had any say in the running of this company [NHCS], ever."[26] Likewise, Schwartz testified that Callahan was to have no "management or any say-so in the company [NHCS] whatsoever."[27] Yet, incredibly, Penn Treaty never asked either Forman, Schwartz or even Callahan himself – or, for that matter, anyone else in a position to know – about Callahan's role with NHCS, or what he might have meant by the term "principal." Without conducting even the most cursory investigation into the very basis it used to terminate a valid contract, Penn Treaty simply and incorrectly seized what it thought was an opportunity to terminate the Agreement. Penn Treaty's liability could not be more clear.

Therefore, inasmuch as (a) there was no material change in the management of NHCS as required by the Agreement as a condition precedent to termination of the Agreement under Section 6.2.3(d), and (b) Callahan's appearance cannot credibly be claimed to be a material change in management, Penn Treaty's termination of the Agreement was wrongful and in breach of the Agreement.

C.  **PENN TREATY AUTHORIZED CALLAHAN'S INVOLVEMENT IN WRITING.**

Even if there was a material change in the management of NHCS, Section 6.2.3(d) of the Agreement requires that, in order to effect a termination, the claimed material change in management also had to be without an approval in writing by Penn Treaty. On this count, Penn Treaty also loses.

On March 23, 2001 – almost eight months before Penn Treaty decided to terminate the Agreement – Web Barth of Copperfields sent an e-mail to Jackie Frantz of Penn Treaty; that e-

---

[26]  Forman Deposition Transcript at 31-32 (Exhibit "I" hereto).

[27]  Schwartz Deposition Transcript at 275-76, a true and correct copy of which is attached as **Exhibit "P"** hereto and incorporated herein by reference.

mail informed Penn Treaty that "we have a new exec [sic] helping to manage our fulfillment and service job. His name is Mike Callahan . . . and I would appreciate it if you would include him in your email traffic to Mike Hauert and me."[28] In his use of the pronoun "we", Barth was, of course, referring to Copperfields, his own company, and not NHCS, with which Barth held no position.[29] As stated above, Callahan had invested in Copperfields in October 2000, some five months prior to Barth's e-mail to Frantz.

Penn Treaty held a different view; in doing so, Penn Treaty is unaware that it has signed its own death warrant. In Penn Treaty's mind, Barth, Copperfields and NHCS were all one and the same entity. According to Jane Bagley, general counsel for Penn Treaty, she lumped Barth, Copperfields and NHCS together without distinguishing among them.[30] It is this admission that puts the lie to Penn Treaty's desperate attempts to nit-pick the Agreement.

Using Penn Treaty's own logic – that Barth, Copperfields and NHCS were all one and the same – then Penn Treaty was told in March 2001, <u>eight months before</u> the termination of the Agreement, that Callahan was a new management executive of what Penn Treaty thought of as <u>NHCS</u>. Significantly, until its wrongful termination of the Agreement eight months later, Penn Treaty <u>never</u> objected to Callahan's perceived role at NHCS. There was not one word of protest from Penn Treaty; there was no mention at that time of Section 6.2.3(d) of the Agreement (permitting termination of the Agreement where there is an unauthorized material change in management).

---

[28] A true and correct copy of Barth's March 23, 2001 e-mail to Penn Treaty is attached as **Exhibit "Q"** hereto and incorporated herein by reference.

[29] Barth Deposition Transcript at 245 (Exhibit "J" hereto).

[30] Bagley Deposition Transcript at 84-85, a true and correct copy of which is attached as **Exhibit "R"** hereto and incorporated herein by reference.

The facts are to the contrary. On March 26, 2001, Jackie Frantz of Penn Treaty responded to Barth's e-mail and expressly approved Callahan's involvement and agreed to keep Callahan apprised of matters by e-mail in the future.[31] It is undisputed that multiple representatives of Penn Treaty – including Jane Bagley herself – openly dealt with Callahan over the next eight months, corresponding with him on issues related to the AllRisk Healthcare® program, all without once objecting to Callahan's involvement or questioning his role in any way.[32] Therefore, to the extent Penn Treaty thought that Callahan was a management executive at NHCS (as opposed to Copperfields), Penn Treaty gave its full and unequivocal authorization to that appointment, both in writing and through its conduct.

Under Section 6.2.3(d) of the Agreement, a "material change in the management" of one party is a sufficient reason for termination only where the other party does not approve such "material change in the management" in writing.[33] Believing – albeit mistakenly – that Callahan was a management executive of NHCS, Penn Treaty gave its approval in writing as early as March 26, 2001, and reaffirmed that approval by written correspondence with Callahan over the next eight months.[34] Nevertheless, when it suited its own means, Penn Treaty terminated the Agreement for behavior it ratified.

---

[31] A true and correct copy of Frantz's e-mail to Barth, dated March 26, 2001, is included in the exchange of e-mail correspondence attached as Exhibit "Q" hereto and incorporated herein by reference.

[32] A sampling of that correspondence from Penn Treaty to Callahan – all of which occurred before the November 5, 2001 termination of the Agreement – is attached as **"Exhibit S"** hereto and incorporated herein by reference.

[33] Agreement, § 6.2.3(d).

[34] Under Pennsylvania's Electronic Transactions Act, electronic records are legally equivalent to writings and equally valid. 73 P.S. § 2260.303.

When Penn Treaty's actions are gauged against this undisputed backdrop, partial summary judgment on liability in favor of NHCS and against Penn Treaty is clearly appropriate.

IV. **CONCLUSION.**

Penn Treaty's liability for breach of the Agreement is simply unavoidable. As a matter of law, NHCS is entitled to judgment in its favor on the issue of liability. Accordingly, the trial should be limited solely to issues related to the damages suffered by NHCS due to Penn Treaty's breach.

For all of the foregoing reasons, NHCS respectfully requests that partial summary judgment be entered in its favor and against Penn Treaty on the issue of Penn Treaty's liability for breach of the Agreement.

Respectfully submitted,

_____
Roberto A. Rivera-Soto
**FOX ROTHSCHILD LLP**
2000 Market Street – Tenth Floor
Philadelphia, Pennsylvania 19103-3291
(215) 299-2000

**ATTORNEYS FOR PLAINTIFF
NATIONAL HEALTHCARE SERVICES, INC.**

**DATED:**     December 22, 2003

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's motion for partial summary judgment as to liability was served by hand delivering the same to:

Martin C. Bryce, Jr., Esquire
Douglas L. Flitter, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

_____
Kimberly LaCroix

**DATED:**    December 22, 2003