IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | CIVIL ACTION |
| Plaintiff, | NO.: 02-CV-3600 |
| v. | |
| PENN TREATY AMERICAN CORPORATION, et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Martin C. Bryce, Jr.
Douglas L. Flitter
BALLARD SPAHR ANDREWS &
  INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
(215) 665-8500

-and-

Mindy J. Spector
David L. Yohai
Anna J. Hong
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
(212) 310-8000

Attorneys for Defendants

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

I.   PRELIMINARY STATEMENT ................................................................................... 1
II.  STATEMENT OF UNDISPUTED FACTS ................................................................. 3
III. ARGUMENT ................................................................................................................. 3
    A.  Plaintiff Cannot Meet Its Burden Of Proof On Its Motion With Respect To Its Breach Of Contract Claim ............................................................. 3
    B.  The Undisputed Record Demonstrates That There Was A Material Change In Management At National Healthcare .................................................. 4
    C.  Plaintiff Cannot Possibly Demonstrate Consent As A Matter Of Law ............... 11
IV.  CONCLUSION ............................................................................................................ 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abramowicz v. Rohm and Haas Co.,
No. Civ. A. 00-4645, 2001 WL 1346404 (E.D. Pa. Oct. 30, 2001)....4

Commodity Futures Trading Commission v. Weintraub,
471 U.S. 343 (1985)....5

Geller v. De Costa,
Civ. A. No. 88-1416, 1990 WL 116787 (E.D. Pa. Aug. 6, 1990)....12, 14

Jeffrey M. Brown Associate, Inc. v. CRK Contracting of Suffolk, Inc.,
124 F. Supp. 2d 895 (E.D. Pa. 2000)....3, 4

National Data Payment Systems, Inc. v. Meridian Bank,
18 F. Supp. 2d 543 (E.D. Pa. 1998)....14

Parfait v. Central Towing, Inc.,
660 F.2d 608 (5th Cir. 1981)....6

Wausau Underwriters Insurance Co. v. Shisler,
No. CIV. A. 98-5145, 2000 WL 233236 (E.D. Pa. Feb. 28, 2000)....3

## STATE CASES

Agster v. Barmada,
43 Pa. D. & C. 4th 353 (Pa. Com. Pl. 1999)....5

Commonwealth v. J.F. Lomma, Inc.,
404 Pa. Super. 185 (1991)....5

King County Department of Community and Human Services v.
Northwest Defenders Associate,
118 Wash. App. 117, 75 P.3d 583 (Ct. App. 2003)....5

Profit Wize Marketing v. Wiest,
812 A.2d 1270 (Pa. Super. 2002)....14

Trigen-Philadelphia Energy Corp. v. Drexel University,
Nos. 2160, 2002 WL 31320499 (Pa. Com. Pl. Oct. 8, 2002)....14

## FEDERAL STATUTES

Fed. R. Civ. P. 26(e)(2)....8

## STATE STATUTES

15 Pa. C.S.A. § 1721(a) (2004).....................................................................................5

Wash. Rev. Code § 23B.02.020(3) (2003)....................................................................4

Wash. Rev. Code § 23B.08.010 (2003)........................................................................4

Wash. Rev. Code § 23B.19.020(8) (2003)....................................................................6

## MISCELLANEOUS

Ballentine's Law Dictionary (1969) .............................................................................6

William S. Hochstettler & Mark D. Svejda, Statutory Needs of Close
    Corporations, 10 J. Corp. L. 849, 853 (1985)......................................................6, 7

F. Hodge O'Neal & Robert B. Thomson, O'NEALS CLOSE CORPORATIONS
    § 7.02 (3rd ed. 2003)..............................................................................................6

Defendants Penn Treaty American Corporation ("PTAC"), Penn Treaty Network America Insurance Company ("PTNA" or "Penn Treaty"), and Senior Financial Consultants Company ("SFCC") (collectively, "Defendants") respectfully submit this Memorandum of Law in opposition to the motion for partial summary judgment as to liability filed by plaintiff National Healthcare Services, Inc. ("NHCS," "National Healthcare" or "Plaintiff"). Defendants note that Plaintiff has not moved for summary judgment with respect to its breach of contract claim based upon the Promissory Note, dated January 11, 2000, and therefore, do not address that claim herein.[1]

## I. PRELIMINARY STATEMENT

Plaintiff's memorandum of law in support of its motion for partial summary judgment on its claim for breach of the termination provision of the October 21, 1999 Agreement is replete with misstatements of both law and fact. Indeed, the deficiencies inherent in Plaintiff's arguments not only preclude summary judgment in Plaintiff's favor, but also reveal why summary judgment is appropriate for Defendants.

First, National Healthcare misinterprets the Washington Business Corporation Act. A plain reading of the statute does not support Plaintiff's contention that only members of the board of a corporation can manage the business affairs of the corporation or that the term "management" is limited to the board of directors. In fact, use of the term "management" to describe activities by persons other than the board of directors is consistent with that statute and the case law interpreting the term. Moreover, the notion that this closely-held corporation –

---

[1] Defendants, however, have moved for summary judgment on Plaintiff's breach of contract claim based on the Promissory Note, as well as the claim based on the Agreement. See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03.

which consisted of three shareholders, including Mr. Michael Callahan ("Callahan"), and which was run from Mr. Forman's home – could not undergo a change in management without formally changing the "board" is patently absurd.

Second, Plaintiff mischaracterizes Defendants' position regarding National Healthcare's material change in management. National Healthcare incorrectly maintains that Defendants solely rely on an October 1, 2001 email, wherein Callahan describes himself as a "principal," as evidence of National Healthcare's material change in management. As demonstrated in the Memorandum in Support of Defendants' Motion for Summary Judgment, the totality of the circumstances prior to the November 5, 2001 termination of the Agreement, including but not limited to the October 1, 2001 email, unequivocally support the conclusion that Callahan was exercising direction and control over National Healthcare and AllRisk. In addition, Plaintiff wholly ignores the testimony of Plaintiff's own witness, Herbert Schwartz, the President of National Healthcare, who conceded that if a new "principal" was added to National Healthcare, this would constitute a material change in management.[2]

Finally, Plaintiff implicitly acknowledges the weakness of its position that there was no material change in National Healthcare's management by attempting to manufacture consent to such a change where none was ever expressly or impliedly granted by Defendants. Plaintiff's reliance on email traffic from a Penn Treaty employee in charge of AllRisk fulfillment and billing simply agreeing to <u>copy Mr. Callahan on emails</u> -- not that he was management -- as consent is nonsensical. The email traffic relied upon by Plaintiff does not conform to the notice provision in the Agreement, which required that any notice from National Healthcare concerning

---

[2] <u>See</u> Affirmation of David L. Yohai in Support of Defendants' Motion for Summary Judgment previously submitted to the Court on 12/22/03 ("Yohai Decl. dated 12/22/03") Ex. 6 (Schwartz Dep. at 116, 282).

the Agreement be sent in writing to Glen Levit, President of PTNA, or his substitute following his death, and specified the manner of service, of which an email communication is not included. Moreover, the Agreement clearly and unambiguously provides that "no ratification after the fact of any violation or breach of any provision of this Agreement by either [party], shall be construed as a waiver of any of its rights hereunder."[3]  Plaintiff's implied consent argument is a failure and only highlights why summary judgment is appropriate for Defendants.

## II.
## STATEMENT OF UNDISPUTED FACTS

Defendants' statement of undisputed facts is set forth in the Memorandum in Support of Defendants' Motion for Summary Judgment and is incorporated by reference herein.[4]

## III.
## ARGUMENT

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IS BASELESS AND SHOULD BE DENIED

A.  **Plaintiff Cannot Meet Its Burden Of Proof On Its Motion With Respect To Its Breach Of Contract Claim**

On a breach of contract claim, under Pennsylvania law, Plaintiff has the burden to demonstrate:  "(1) the existence of a valid and binding contract to which the plaintiff and defendants were parties; (2) the contract's essential terms; (3) that plaintiff complied with the contract's terms; (4) that the defendant breached a duty imposed by the contract; and (5) damages resulting from the breach."  Wausau Underwriters Ins. Co. v. Shisler, No. CIV. A. 98-5145, 2000 WL 233236, at *5 (E.D. Pa. Feb. 28, 2000); see also Jeffrey M. Brown Assoc., Inc.

---

[3] See Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 8.4).

[4] See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 3-13.

v. <u>CRK Contracting of Suffolk, Inc.</u>, 124 F. Supp. 2d 895, 900 (E.D. Pa. 2000). It is also Plaintiff's burden on this motion to show the absence of a genuine issue of material fact with respect to each element of the claim and that it is entitled to judgment as a matter of law. See <u>Abramowicz</u> v. <u>Rohm and Haas Co.</u>, No. Civ. A. 00-4645, 2001 WL 1346404, at *2 (E.D. Pa. Oct. 30, 2001) (granting defendant's motion for summary judgment as to breach of contract and denying plaintiff's cross-motion for summary judgment on the same issue). As set forth below, National Healthcare cannot possibly satisfy its burden of proving that it is entitled to judgment as a matter of law. Indeed, Plaintiff's motion for summary judgment appears to be little more than a ruse to distract this Court from the fact that Defendants are entitled to judgment as a matter of law.[5]

### B. The Undisputed Record Demonstrates That There Was A Material Change In Management At National Healthcare

Plaintiff deceptively contends that pursuant to the Washington Business Corporation Act, only the board of directors may manage National Healthcare, a Washington corporation. Plaintiff has failed to cite a single case supporting its argument. Further, a plain reading of the statute demonstrates the fallacy of such an argument.

The Washington Business Corporation Act provides that "all corporate powers must be exercised <u>by or under the authority of</u>, and the business and affairs of the corporation managed <u>under the direction of</u>, its board of directors . . . ." Wash. Rev. Code § 23B.02.020(3)(z) (2003) (emphasis added); <u>see also</u> Wash. Rev. Code § 23B.08.010 (2003).

---

[5] Even were the Court to find that there was no material change in management of NHCS or that PTNA approved Callahan's involvement in NHCS, as set forth in Defendants' moving brief, the breach of contract claims still fail due to Plaintiff's inability to prove damages as an element of its claim for breach of contract. See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 24-26.

Nowhere in the statute is "management" limited solely to board members. Indeed, the Washington statute recognizes this distinction with its use of the phrases "exercised by or <u>under the authority of</u>" and "managed <u>under the direction of</u>" the board of directors.[6] Courts have recognized that, consistent with the Washington statute, a corporation may have "management" consisting of individuals other than its board of directors. See <u>King County Dep't of Cmty. and Human Servs.</u> v. <u>Northwest Defenders Assoc.</u>, 118 Wash. App. 117, 124, 126, 75 P.3d 583, 587, 588 (Ct. App. 2003) (recognizing a corporation's board of directors and management as two separate entities).[7] Indeed, the disclosures of Washington corporations even reference executives who are part of "management," but who do not sit on the Board. See accompanying Affirmation of David L. Yohai in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment as to Liability ("Yohai Decl. dated 1/15/04") Ex. B (Form 10-K for

---

[6] Nor does the Supreme Court case of <u>Commodity Futures Trading Comm'n</u> v. <u>Weintraub</u>, 471 U.S. 343, 349 n. 4 (1985), cited by Plaintiff equate "management" solely with the board of directors. <u>Commodity Futures</u> cites state business law statutes that likewise provide that the business of a corporation shall be managed "under the direction of" its board of directors. <u>See id.</u>

[7] Plaintiff asserts without careful analysis that Washington law would apply. The contract provides for application of Pennsylvania law. <u>See</u> Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 8.9). Like the Washington statute, Pennsylvania business corporation law similarly makes clear that companies are managed <u>under the direction</u> of the board of directors, not that management is synonymous with the board. See 15 Pa. C.S.A. § 1721(a) (2004) ("Unless otherwise provided by statute or in a bylaw adopted by the shareholders, all powers enumerated in section 1502 (relating to general powers) and elsewhere vested by law in a business corporation shall be exercised <u>by or under the authority of</u>, and the business and affairs of every business corporation shall be managed <u>under the direction of</u>, a board of directors.") (emphasis added). Pennsylvania case law also makes this distinction clear and demonstrates that management may include individuals other than board members. See, e.g., <u>Commonwealth</u> v. <u>J.F. Lomma, Inc.</u>, 404 Pa. Super. 185, 193 (1991) (noting that, pursuant to 18 Pa. C.S. § 307, a corporation may be liable for offenses "performed or recklessly tolerated by the board of directors <u>or</u> by a high managerial agent acting in behalf of the corporation . . . .") (emphasis added); <u>Agster</u> v. <u>Barmada</u>, 43 Pa. D. & C. 4th 353, 364 (Pa. Com. Pl. 1999) (holding that treating only the corporation as the client for purposes of privilege is "consistent with the principles of corporate law that a corporation is to be operated by its board of directors <u>and</u> its corporate managers whom the board hires.") (emphasis added).

the Fiscal Year Ended September 30, 2002 for Washington Federal, Inc. at 36) and Yohai Decl. dated 1/15/04 Ex. C (Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 for Washington Federal, Inc. dated December 15, 2003 at 8) (listing the Senior Vice President and Chief Financial Officer of Washington Federal, Inc., a Washington corporation, who is not a board member, as "management").

Courts have interpreted the phrase "change in management" of an entity to mean a change in the person(s) having "direction and control" over the entity, regardless of whether the person is a member of the board of directors. See, e.g., Parfait v. Central Towing, Inc., 660 F.2d 608, 611 (5th Cir. 1981) (finding a change in management of a tug boat and stating that the "emphasis on control provides the guide. The parties do not and cannot deny that those individuals who make the basic decisions affecting the tug's jobs, service, location, crew, maintenance, etc. have changed.").[8] Consistent with case law, the Washington Business Corporation Act defines "control" as the "possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting shares, by contract, or otherwise." See Wash. Rev. Code § 23B.19.020(8) (2003). One of the defining characteristics of a closely-held corporation, like National Healthcare, is that stockholders, such as Callahan, often actively participate in the management of the corporation. See F. Hodge O'Neal & Robert B. Thomson, O'NEALS CLOSE CORPORATIONS § 7.02 (3rd ed. 2003) ("Ownership and management frequently coalesce in closely held corporations, where not uncommonly all the principal shareholders devote full time to corporate affairs."); William S. Hochstettler & Mark D. Svejda, *Statutory Needs of Close Corporations*, 10 J. Corp. L. 849, 853

---

[8] See also Ballentine's Law Dictionary (1969) (defining "management" as "government; control; superintendence; physical or mental handling or guidance; the act of managing by direction or regulation; administration -- as the management of a family or of a household, or of servants, or of great enterprise, or of great affairs").

(1985) ("The characteristics of a close corporation differ significantly from the characteristics of the large publicly held corporation. First, the close corporation does not have the division between ownership and management which exists in a publicly held corporation. Typically, the shareholders of a close corporations are also the officers of the corporation. Thus, the shareholders expect to manage the corporation through direct participation, rather than through a board of directors."). Plaintiff's erroneous logic, which attempts to create some statutory bar to "management" being other than the Board of Directors, fails.

Plaintiff also attempts to make the argument that National Healthcare's Bylaws preclude management other than by board members.[9] First, as demonstrated in Penn Treaty's Memorandum of Law in Support of Its Motion for Summary Judgment, the undisputed record demonstrates that Callahan did, in fact, play a management role.[10] Second, Plaintiff's own 30(b)(6) witness, Forman, testified that Plaintiff itself violated National Healthcare's Bylaws by giving Callahan purportedly non-voting shares of the company.[11]

Contrary to Plaintiff's characterization, Defendants do not rely solely on the October 1, 2001 email, wherein Callahan referred to himself as a "principal," as evidence of a material change in management of National Healthcare.[12] Rather, as demonstrated in the

---

[9] See Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Liability at 8-9.

[10] See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 8-13, 16-21.

[11] See Yohai Decl. dated 1/15/04 Ex. A (Forman Dep. at 51-58).

[12] Plaintiff further contends that Defendants are somehow limited by their purportedly deficient responses to its interrogatories concerning management functions that Defendants contend were assumed by Callahan and the materiality of NHCS's change in management. See Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Liability at 6. Plaintiff has had more than ample opportunity to, and did in fact, explore such issues during depositions taken of Defendants' witnesses. See Yohai Decl. dated 1/15/04 Ex. D (Sadler Dep.

Memorandum in Support of Defendants' Motion for Summary Judgment, the totality of the circumstances, including but not limited to the October 1, 2001 email, leaves no doubt that a material change in management did in fact occur.[13]

As set forth in Defendants' moving papers, in March 2001, Callahan was described as a "new exec," who would be "helping to manage our fulfillment and service job." At that point in time, Callahan was copied on a few emails and, thus, his role at NHCS was not clear. Over the next nine months, however, Callahan's involvement progressively increased and in the fall of 2001, it became obvious that Callahan exercised direction and control of Plaintiff. In September 2001, Forman transferred to Callahan 250 shares, or one-quarter of the outstanding stock, of National Healthcare. In an email, dated October 1, 2001, Callahan admitted that he was a "principal in this side of the AllRisk venture and was asked to put in some time on correcting the situation by Neal Forman and Herb Schwartz, the other two principals."[14] Plaintiff characterizes Defendants' equation of the word "principal" with a "material change in management" as a "giant and tortured stretch" and states that such an interpretation is "belied by

---

at 28-29, 62-63, 81-84); Yohai Decl. dated 1/15/04 Ex. E (Bagley Dep. at 57-58, 99-100). Accordingly, Defendants have no obligation to formally supplement their responses. See Fed. R. Civ. P. 26(e)(2) ("A party is under a duty to seasonably amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process") (emphasis added). Moreover, Plaintiff formally asked for greater specificity from Defendants on certain interrogatory responses, but not with respect to Interrogatory Nos. 13 and 14. See Yohai Decl. dated 1/15/04 Ex. F (Letter from Lyons to Flitter of 12/16/02).

[13] See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 16-21.

[14] See Yohai Decl. dated 12/22/03 Ex. 7 (Email from Callahan to Sadler of 10/1/01) (emphasis added).

the record evidence."[15]  Plaintiff, however, wholly disregards the deposition testimony of its own witness.  Herbert Schwartz, the President of Plaintiff, unequivocally conceded that a "principal" has management responsibility and that the addition of a new principal to National Healthcare would constitute a change in management.[16]  Schwartz further testified that it would be reasonable for PTNA to assume, based on the October 1, 2001 email, that Callahan had become a principal.[17]

Plaintiff suggests that Defendants place all of their litigation eggs in one basket by relying upon this email.  First, rarely is there such a document so clearly demonstrating the correctness of one side's position.  Second, Plaintiff's fundamental premise is wrong since Defendant does not only rely on this email (although it alone is sufficient for summary judgment here).  In a telephone conversation with Sadler, Defendant's counsel, Callahan admitted that he had authority to make decisions regarding National Healthcare and AllRisk, and that he was the only person, not Forman or Schwartz, Sadler should contact regarding AllRisk.[18]  Callahan does not dispute that this occurred, recognizing that there was a conversation, but testified that he can no longer remember what was said.[19]  Accordingly, the record is left with the unrebutted and undisputed testimony of Sadler.  Subsequent to that conversation between Sadler and Callahan,

---

[15] See Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Liability at 9.

[16] See Yohai Decl. dated 12/22/03 Ex. 6 (Schwartz Dep. at 26, 116).

[17] See Yohai Decl. dated 12/22/03 Ex. 6 (Schwartz Dep. at 282).

[18] See Yohai Decl. dated 12/22/03 Ex. 30 (Sadler Dep. at 29, 35, 82).

[19] See Yohai Decl. dated 12/22/03 Ex. 8 (Callahan Dep. at 124-25).

neither Forman nor Schwartz were involved in the negotiations with Defendants; only Callahan communicated on behalf of NHCS.[20]

Moreover, as set forth in Defendants' moving papers, Callahan's control of National Healthcare was further evidenced by his and National Healthcare's actions after the termination of the Agreement.[21] Plaintiff argues that PTNA took an improper opportunity to terminate the Agreement without ever conducting an inquiry as to Callahan's role with NHCS.[22] Plaintiff's argument reverses the burden. There is no duty imposed upon Penn Treaty to so inquire. Rather, the duty is on Plaintiff to request approval of a material change in management.[23] Moreover, such an inquiry would have been nonsensical in light of Callahan's email. Indeed, Callahan took the lead on behalf of National Healthcare in negotiations with Sadler, the only "business" of National Healthcare at that point in time.[24] Accordingly, the undisputed record establishes that prior to November 5, 2001, Callahan exercised direction and control over National Healthcare. As such, a material change in management of National

---

[20] See Yohai Decl. dated 12/22/03 Ex. 30 (Sadler Dep. at 83–84); Yohai Decl. dated 12/22/03 Ex. 7 (Email from Callahan to Sadler of 10/1/01); Yohai Decl. dated 12/22/03 Ex. 31 (Email from Callahan to Sadler of 10/17/01); Yohai Decl. dated 12/22/03 Ex. 32 (Email from Callahan to Sadler of 10/26/01); Yohai Decl. dated 12/22/03 Ex. 33 (Email from Callahan to Sadler of 11/01/01).

[21] See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 20-21.

[22] See Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Liability at 10.

[23] See Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 6.2.3).

[24] See Yohai Decl. dated 12/22/03 Ex. 7 (Email from Callahan to Sadler of 10/1/01); Yohai Decl. dated 12/22/03 Ex. 31 (Email from Callahan to Sadler of 10/17/01); Yohai Decl. dated 12/22/03 Ex. 32 (Email from Callahan to Sadler of 10/26/01); Yohai Decl. dated 12/22/03 Ex. 33 (Email from Callahan to Sadler of 11/01/01); Yohai Decl. dated 12/22/03 Ex. 30 (Sadler Dep. at 83-84).

Healthcare had occurred without PTNA's written consent, which permitted PTNA to exercise a clear, unambiguous contractual right and terminate the Agreement.[25]

C.   **Plaintiff Cannot Possibly Demonstrate Consent As A Matter Of Law**

Plaintiff contends that Penn Treaty authorized a material change in NHCS's management when Jackie Frantz stated in an email that she would "add Mike Callahan to our list of contacts" and that Penn Treaty's conduct thereafter was also evidence of approval of a material change in National Healthcare's management. Plaintiff's argument is specious for numerous reasons.

First, Frantz's March 26, 2001 responsive email is clearly insufficient to qualify as the requisite written approval under the Agreement. Barth's March 23rd email to Frantz and Frantz's March 26th responsive email state absolutely nothing about a material change in the management of NHCS. No reasonable jury could find that consenting to send Callahan copies of communications is equivalent to a consent to a material change in management.[26] Nor can

---

[25] Plaintiff appears to argue that Callahan's involvement was in connection with Copperfields, not National Healthcare. See Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Liability at 4, 11. As set forth in Defendants' moving papers, since PTNA or SFCC never authorized Copperfields to perform any services, and since NHCS was contractually prohibited from contracting for such services without prior written approval of PTNA, see Yohai Decl. dated 12/22/03 Ex. 5 (Agreement §§ 3.1(a), 8.8), this would constitute a separate breach of the Agreement that would preclude recovery by Plaintiff. See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 18-19 n. 10.

[26] Plaintiff contends that Jane Bagley did not distinguish between Barth, Copperfields and NHCS. See Plaintiff's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as to Liability at 11. Nothing could be further from the truth. The portion of Ms. Bagley's transcript that is cited merely states that Barth and Plaintiff worked together, which they did, and that Schwartz would use the pronoun "we" to refer to NHCS's side of the Agreement, which included Barth as Barth was retained by NHCS to fulfill NHCS's duties under the Agreement. See Plaintiff's Motion for Partial Summary Judgment as to Liability, Ex. R. Further, Ms. Bagley testified that she did not know who Copperfields was until after the commencement of this lawsuit. See Yohai Decl. dated 1/15/04 Ex. E (Bagley Dep. at 83).

the mere receipt of copies of communications on behalf of National Healthcare be construed as evidence of a "material" change in management. At the time of the March 26, 2001 email, it was not possible to glean the full extent of Callahan's involvement in NHCS since Callahan's involvement at that time was limited to the receipt of a few emails.[27] As set forth above and in Defendants' moving brief in support of their motion for summary judgment, it was not until the fall of 2001 when it became apparent that Callahan exercised control over National Healthcare and AllRisk, that Penn Treaty concluded that there had been a "material change in management" of Plaintiff.[28]

Second, the March 23, 2001 email from Barth does not comply with the notice provision of the Agreement. Any notice regarding a material change in the management of NHCS must be made in compliance with the notice provision of the Agreement. See Geller v. De Costa, Civ. A. No. 88-1416, 1990 WL 116787, at * 8 (E.D. Pa. Aug. 6, 1990) (finding failure to send notice in accordance with the notice provision was a material breach). Section 8.6 of the Agreement provides that notice be in writing by certified or registered mail or some other means at least as fast and reliable as certified or registered mail, or overnight mail and addressed to Glen Levit, the President of PTNA, or his substitute upon his death, if to PTNA, and to Schwartz, the President of NHCS, if to NHCS.[29] The March 23, 2001 email relied upon by Plaintiff, however, is from Barth to Frantz. It is undisputed that Barth was never an officer,

---

[27] See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 8 n. 6, 16 n. 9.

[28] See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 16-21.

[29] See Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 8.6).

director or employee of NHCS and is not a party to the Agreement.[30]  Barth, therefore, had no authority under the Agreement to notify Penn Treaty regarding a material change in NHCS's management.  Likewise, Frantz was not authorized to receive notices pursuant to the notice provision of the Agreement.  Frantz worked solely in the fulfillment and billing departments at Penn Treaty.  NHCS was well aware that Frantz is not the individual to whom key notices or communications concerning the Agreement should be directed.[31]  In this regard, Plaintiff exchanged key communications with (a) Jeff Underhill, Senior Vice-President Long Term Care, (b) Derrick Brickhouse, Vice-President of Sales, (c) Jane Bagley, in-house counsel for PTNA, and (d) Cameron Waite, Penn Treaty's Chief Financial Officer.[32]  No other Penn Treaty employees, however, were copied on Barth's March 23, 2001 email to Frantz.[33]  The Agreement clearly states the procedure for providing notice.  The purpose of the notification requirement in the Agreement was to prevent the very situation that Plaintiff is claiming occurred

---

[30] See Yohai Decl. dated 1/15/04 Ex. G (Barth Dep. at 44-45); Yohai Decl. dated 12/22/03 Ex. 5 (Agreement at 13).

[31] Callahan testified that he had reviewed the Agreement.  See Yohai Decl. dated 1/15/04 Ex. H (Callahan Dep. at 176).  As an attorney, Callahan, who was copied on both Barth's email of March 23rd and Frantz's email of March 26th, see Plaintiff's Motion for Partial Summary Judgment as to Liability, Ex. Q, should also have known that such communications did not comply with the notice provision of the Agreement.

[32] See Yohai Decl. dated 1/15/04 Ex. I (Letter from Bagley to Schwartz and Forman of 6/8/00; letter from Forman to Waite of 2/11/01; letter from Schwartz to Waite of 4/18/01; email from Schwartz to Brickhouse of 5/7/01; letter from Schwartz to Underhill of 6/1/01; letter from Schwartz to Underhill of 6/27/01; letter from Schwartz to Bagley of 7/24/01).

[33] See Plaintiff's Motion for Partial Summary Judgment as to Liability, Ex. Q.  Indeed, the information that Callahan was a "new exec" and that he should be included in email communications regarding AllRisk was not forwarded to Jane Bagley and Derrick Brickhouse until August 20, 2001, approximately six months later.  See Yohai Decl. dated 1/15/04 Ex. J (Email from Levit-Sussman to Bagley and Brickhouse of 8/20/01).  Shortly thereafter, it became clear to Penn Treaty that Callahan's role in NHCS was greater than that of a mere observer.  See Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 16-21.

here and to preclude a dispute over whether notice and consent was proper. Accordingly, Plaintiff's "failure to give notice under the terms of the Agreement is both unexplained and unexcused." See Geller, 1990 WL 116787, at *8.

Third, Plaintiff's contention that Penn Treaty waived its right to terminate the Agreement under Section 6.2.3 based on the material change in management of NHCS because Penn Treaty, by its conduct, approved Callahan's involvement and management of NHCS is equally baseless and must fail.[34] It is well settled under Pennsylvania law that the intention of the parties is contained within the written contract. See Trigen-Philadelphia Energy Corp. v. Drexel University, Nos. 2160, 2002 WL 31320499, at *2 (Pa. Com. Pl. Oct. 8, 2002). When an agreement contains clear and unambiguous terms, a court need only examine the writing to give meaning to the parties' intent. See Profit Wize Marketing v. Wiest, 812 A.2d 1270, 1274 (Pa. Super. 2002); National Data Payment Systems, Inc. v. Meridian Bank, 18 F. Supp. 2d 543, 547 (E.D. Pa. 1998). Where the clear language of the contract indicates the parties' intention that there be no modifications or waivers of the agreement except in a writing signed by the party, there can be no express waiver of a provision of the contract. See National Data, 18 F. Supp. 2d at 548 ("We find that the express language of the contract clearly and unequivocally indicates the intention of the parties that there be no modifications or waivers of the contract provisions except in a writing signed by both parties. . . . Thus, on the facts before us, there could be no express waiver of the termination provision of the contract.").

---

[34] Plaintiff refers to the correspondence between the parties to support its argument that Penn Treaty purportedly consented to a material change in management. See Plaintiff's Motion for Partial Summary Judgment as to Liability, Ex. S. The correspondence does not establish Penn Treaty's purported consent but demonstrates Defendants' position that Callahan's involvement in the spring of 2001 was limited to the receipt of copies of communications and by the late summer and fall of 2001, evolved to control of NHCS.

Under Section 6.2.3 of the Agreement, "a material change in management of one party" must be approved in writing by the other party. In addition, Section 8.10 of the Agreement provides that "[t]his Agreement may be amended only by a written document signed by authorized representatives of PTNA and NHCS." The Agreement also contains a "No Waiver" clause that clearly provides that "NHCS and PTNA each agree that no ratification after the fact of any violation or breach of any provision of this Agreement by either, shall be construed as a waiver of any of its rights hereunder."[35] Thus, under the clear and unambiguous terms of the Agreement, NHCS is precluded from arguing that Penn Treaty's conduct excused NHCS's failure to obtain Penn Treaty's written consent to a material change in management or that Penn Treaty was precluded from exercising its contractual right to terminate the Agreement for a material change in management due to waiver. The Agreement clearly and unequivocally indicates the intent that there can be no oral modification of any of the provisions unless provided in a writing signed by authorized representatives of both parties, and no waiver of any violations or breaches.[36]

Plaintiff's implied consent argument is absurd and only serves to highlight the weakness in its position. Plaintiff is confronted with its own undisputed witness's testimony and with the clear terms of the Agreement. Summary judgment for Plaintiff is completely inappropriate and summary judgment should be entered for Defendants.

---

[35] See Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 8.4).

[36] See Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 8.10).

## IV.
## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment as to liability should be denied.

_____
Martin C. Bryce, Jr.
Douglas L. Flitter
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

- and –

Mindy J. Spector
David L. Yohai
Anna J. Hong
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

Attorneys for Defendants

Dated: January 16, 2004