# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONAL HEALTHCARE                    *

SERVICES, INC.,                        :

Plaintiff,                             :    CIVIL ACTION

- vs -                                 :

PENN TREATY AMERICAN                   :

CORPORATION, et al.,                   :    NO. 02-CV-3600

Defendants.                       :    (MM)

ORIGINAL

Tuesday, October 14, 2003

*   *   *   *   *   *   *

Realtime videotape

deposition of NEAL A. FORMAN, in his

individual capacity, and Rule 30 (b)(6)

realtime videotape deposition of NATIONAL

HEALTHCARE SERVICES, INC., taken through

its representative NEAL A. FORMAN, held

in the law offices of BALLARD SPAHR,

ANDREWS & INGERSOLL, LLP, 1735 Market

Street, 42nd Floor, Philadelphia,

Pennsylvania 19103, on Tuesday, October

14, 2003, beginning at 9:33 a.m., before

Kimberly A. Cahill, a Registered

Professional Reporter and Approved

Reporter of the United States District

Court.

*   *   *

ESQUIRE DEPOSITION SERVICES

15th Floor

1880 John F. Kennedy Boulevard

Philadelphia, PA 19103

(215) 988-9191

1

BY MR. YOHAI:

1   Q.    Now, you said before that

2   you believe that you transferred to Mr.

3   Callahan nonvoting shares?

4        A.    Uh-hum.

5        Q.    Are you aware of whether the

6   bylaws permit the transfer of nonvoting

7   shares?

8        A.    No.

9        Q.    You're not aware either way.

10       A.    No.

11       Q.    Have you ever seen the

12  bylaws of the company?

13       A.    I may have glanced at them,

14  but I'm not sure that, being an attorney

15  -- not being an attorney, that I can

16  interpret whether they were -- whether we

17  had the right to do it or not do it. I

18  don't know.

19       Q.    Okay.

20       MR. YOHAI:    Can we mark

21  this, please, as Forman Exhibit 3?

22

23             (Whereupon, the

1    above-mentioned document was

2    marked for identification as

3    Forman-3.)

4                        *   *   *

5                     (PAUSE)

6    BY MR. YOHAI:

7         Q.     My first question to you,

8    Mr. Forman, is just whether you've

9    actually seen these bylaws.

10        A.     I just glanced at them.

11        Q.     This is NHCS 757 through

12   762.

13               These are the bylaws of

14   National Healthcare Services, Inc.;

15   correct?

16        A.     Yes, they are.

17        Q.     Okay.

18               And are you an officer in

19   National Healthcare Services, Inc.?

20        A.     Yes, I am.

21        Q.     What -- what is your title

22   as officer?

23        A.     Herb was president and I was

24   the -- the vice president of the company.

1    Q.        Okay.

2              And as a vice president of

3    the company, was it your understanding

4    that you were supposed to act in

5    accordance with the bylaws of the

6    company?

7    A.        Yes, I was.

8    Q.        Okay.

9              Looking at article 6,

10   section 1, restricted transfers --

11   A.        Section 6?

12   Q.        Yes -- article 6, section 1.

13   A.        Okay, restricted transfer,

14   okay.

15   Q.        Can you read that first

16   sentence, please?

17   A.        "The Shareholders agree that

18   it is to the best interest of the

19   corporation that the stock of the

20   corporation shall be restricted from

21   passage to anyone who is not actively

22   interested in its affairs and familiar

23   with the management problems and politics

24   of the corporation.  Stock and shares

```
 1   shall mean validly issued and outstanding
 2   capital stock of the corporation as the
 3   corporation exists and shall include any
 4   successor corporation."
 5        Q.    What is your understanding
 6   of what the first sentence means?
 7        A.    That --
 8             MR. LYONS:  Objection.
 9             MR. YOHAI:  You can answer.
10             THE WITNESS:   -- it's in the
11   best interest of the shareholders,
12   meaning Herb and I, in the best
13   interest of the corporation, that
14   the stock of the corporation shall
15   be restricted from passage to
16   anyone that's not actively
17   interested in the affairs and
18   familiar with the company.
19   BY MR. YOHAI:
20        Q.    What is your understanding
21   of what it means to be not actively
22   interested in its affairs and familiar
23   with the management problems and politics
24   of the corporation?
```

NEAL A. FORMAN

1        A.    That means that it's in the

2   best interest not to transfer stock to

3   somebody that doesn't have an active

4   interest in the corporation --

5        Q.    And as --

6        A.    -- or the affairs of running

7   the corporation.

8        Q.    Okay.

9              Do you -- as -- as a vice

10  president of National Healthcare.

11  Services, you try to act in the best

12  interest of the company?

13        A.    I try to.

14        Q.    Okay.

15              And you agree that the

16  bylaws state that it would not be in the

17  best interest of the corporation that

18  stock of the corporation shall be

19  restricted -- well, strike that. Strike

20  that.

21              Was it your understanding

22  that stock of the corporation should be

23  restricted from passage to anyone who is

24  not actively interested in the affairs of

55

NEAL A. FORMAN

1    the business and familiar with the

2    management problems --

3        MR. LYONS:  Objection.

4    BY MR. YOHAI:

5        Q.    -- is that your

6    understanding?  Yes or no.

7        MR. LYONS:  Objection.  The

8        bylaws say what they say.

9        MR. YOHAI:  You can answer.

10       THE WITNESS:  They say what

11       they say.

12   BY MR. YOHAI:

13       Q.    Okay.

14            Putting aside the bylaws for

15   a moment, was it your understanding that

16   the shares of the corporation were not to

17   be passed to anyone who didn't have an

18   active interest in the corporation; was

19   that your understanding?

20       MR. LYONS:  Objection.

21       THE WITNESS:  I always felt

22       that based upon the section 1,

23       restricted shares, that it was in

24       the best interest.  It didn't mean

56

1    that I couldn't do it.  It says

2    that it was in the best interest

3    not to do it.

4                    MR. YOHAI:  Okay.

5    BY MR. YOHAI:

6         Q.    Do you believe that you

7    transferred shares to someone not

8    actively interested in the affairs of the

9    corporation?

10        A.    Yes, I did.

11        Q.    So you acted in what you

12   believe to be contravention of the

13   bylaws?

14        A.    That is correct.

15        Q.    Okay.

16              Was there any reason,

17   important reason, that you can give us as

18   to why, as vice president of the

19   corporation and the corporate

20   representative, you acted against the

21   corporation's bylaws in passing shares to

22   Mr. Callahan?

23                    MR. LYONS:  Objection to

24   form.

58

1           THE WITNESS: Because I had

2      not read this agreement thoroughly

3      at the time to have realized that

4      probably we should never have done

5      it, but I did.

6  BY MR. YOHAI:

7      Q.      You -- you agree that

8  corporate officers such as yourself

9  should try to act in accordance with the

10 bylaws for a corporation.  Right?

11          MR. LYONS:  Objection.

12          MR. YOHAI:  Yes?

13          THE WITNESS:  I suppose one

14      should follow the bylaws of the

15      corporation.

16          MR. YOHAI:  Okay.

17 BY MR. YOHAI:

18     Q.      And looking at section 7 of

19 the bylaws -- I'm sorry -- yes, section 7

20 of article 1 of the bylaws, voting of

21 shares --

22          MR. LYONS:  Page 1.

23          THE WITNESS:  Oh, page 1?

24      Section 7 -- okay.

Exhibit B

Table of Contents

# FORM 10-K

## Securities and Exchange Commission
Washington, D.C. 20549

[X]     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
        EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED SEPTEMBER 30, 2003

OR

[ ]     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
        SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number: 0-25454

# Washington Federal, Inc.

(Exact name of registrant as specified in its charter)

| Washington | 91-1661606 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 425 Pike Street, Seattle, Washington | 98101 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (206) 624-7930

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| NA | NA |

Securities registered pursuant to section 12(g) of the Act:

Common Stock, $1.00 par value per share

(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes [X]  No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein. and will not be contained. to the best of registrant's knowledge. in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes [X]  No [  ]

As of November 28, 2003. the aggregate market value of the 69,993,599 shares of Common Stock of the Registrant issued and outstanding on such date, which excludes 1,220,515 shares held by all directors and executive officers of the Registrant as a group, was $2,008,116,355. This figure is based on the closing sale price of $28.69 per share of the Registrant's Common Stock on November 28, 2003, as reported in *The Wall Street Journal* on December 1, 2003.

Number of shares of Common Stock outstanding as of November 28, 2003: 71,214,114

## DOCUMENTS INCORPORATED BY REFERENCE

List hereunder the following documents incorporated by reference and the Part of Form 10-K into which the document is incorporated:

(1)  Portions of the Registrant's Annual Report to Stockholders for the fiscal year ended September 30, 2003, are incorporated into Part II, Items 5-8 of this Form 10-K.

(2)  Portions of the Registrant's definitive proxy statement for its 2003 Annual Meeting of Stockholders are incorporated into Part III, Items 10-13 of this Form 10-K.

1

Table of Contents

## PART II

### Item 5. Market for Registrant's Common Equity and Related Stockholder Matters

The information required herein is incorporated by reference from page 27 of the Company's Annual Report to Stockholders for Fiscal 2003 (Annual Report), which is included herein as Exhibit 13.

### Item 6. Selected Financial Data

The information required herein is incorporated by reference from page 7 of the Annual Report.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The information required herein is incorporated by reference on pages 4 through 6 of the Annual Report.

### Item 7A. Market Risk Disclosures

The information required herein is incorporated by reference to Interest Rate Risk commencing on page 22 of this Form 10-K.

### Item 8. Financial Statements and Supplementary Data

The financial statements and supplementary data required herein are incorporated by reference from pages 8 through 27 of the Annual Report.

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Not applicable.

### Item 9A. Controls and Procedures

As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's President and Chief Executive Officer along with the Company's Senior Vice President and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. Based upon that evaluation, the Company's President and Chief Executive Officer along with the Company's Senior Vice President and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the Company's periodic SEC filings. There have been no significant changes in the Company's internal controls or in other factors which could materially affect, or are reasonably likely to materially affect, these controls subsequent to

35

Table of Contents

the date the Company carried out its evaluation.

Disclosure controls and procedures are Company controls and other procedures that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports that it files under the Exchange Act is accumulated and communicated to the Company's management, including its President and Chief Executive Officer and Senior Vice President and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

# PART III

## Item 10. Directors and Executive Officers of the Registrant

The information required herein is incorporated by reference to pages 4 through 14 of the proxy statement dated December 15, 2003.

The Company has adopted a code of ethics that applies to all senior financial officers, including its chief executive officer and chief financial officer. The code of ethics is publicly available on the Company's website at www.washingtonfederal.com. If the Company makes any substantive amendments to the code of ethics or grants any waiver from a provision of the code, the Company will disclose the nature of such amendment or waiver on its website or in a report on Form 8-K.

## Item 11. Executive Compensation

The information required herein is incorporated by reference to pages 12 through 14 of the proxy statement dated December 15, 2003.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information required herein is incorporated by reference to pages 2 through 3 and 5 through 8 of the proxy statement dated December 15, 2003.

## Item 13. Certain Relationships and Related Transactions

The information required herein is incorporated by reference to page 16 of the proxy statement dated December 15, 2003.

## Item 14. Principal Accountant Fees and Services

The information required herein is incorporated by reference to page 19 of the proxy statement dated December 15, 2003.

Exhibit C

**Table of Contents**

Schedule 14A Information

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

Filed by the Registrant   [X]

Filed by a Party other than the Registrant   [ ]

Check the appropriate box:

[ ]   Preliminary Proxy Statement
[ ]   Confidential, for Use of the Commission Only (as permitted by
       Rule 14a-6(e)(2))
[X]   Definitive Proxy Statement
[ ]   Definitive Additional Materials
[ ]   Soliciting Material Pursuant to 240.14a-11(c) or 240.14a-12

Washington Federal, Inc.

---

(Name of Registrant as Specified In Its Charter)

---

Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]   No fee required

[ ]   Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11

    (1)   Title of each class of securities to which transaction applies:

---

    (2)   Aggregate number of securities to which transaction applies:

---

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth
        the amount on which the filing fee is calculated and state how it was determined):

---

    (4)   Proposed maximum aggregate value of transaction:

---

    (5)   Total fee paid:

---

[ ]   Fee paid previously with preliminary materials

[ ]   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for
    which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the
    Form or Schedule and the date of its filing

    (1)   Amount Previously Paid:

Washington Federal, Inc. Notice and Proxy Stmt.                    Page 3 of 38

Case 2:02-cv-03600-MAM     Document 42-3     Filed 01/16/2004     Page 18 of 30

(2)   Form, Schedule or Registration Statement No.:

_____

(3)   Filing Party:

_____

(4)   Date Filed:

_____

Table of Contents



## Washington Federal, Inc.

425 PIKE STREET
SEATTLE, WASHINGTON 98101-2334
(206) 624-7930

December 15, 2003

Dear Stockholder:

You are invited to attend our Annual Meeting of Stockholders to be held on Wednesday, January 21, 2004 at 2:00 p.m. at the Seattle Sheraton Hotel, 1400 Sixth Avenue, Seattle, Washington.

We hope you can attend this meeting in person, but whether or not you plan to attend, it would be very helpful if you would sign the enclosed proxy card and return it in the envelope provided. Please do this immediately so that we can **save your company the time and expense of contacting you again.** Your vote is important regardless of the number of shares you own. Voting by proxy will not prevent you from voting in person if you attend the meeting, but will assure that your vote will be counted if you are unable to attend.

If you have any questions, please do not hesitate to contact us.

Sincerely,

Roy M. Whitehead
*Vice Chairman, President and*
*Chief Executive Officer*

Washington Federal, Inc. Notice and Proxy Stmt.  Page 14 of 38

Case 2:02-cv-03600-MAM   Document 42-3   Filed 01/16/2004   Page 20 of 30

**Table of Contents**

**Certain Executive Officers Who are Not Directors**

The following table sets forth information concerning the current executive officers of Washington Federal who are not directors and who are listed in the Summary Compensation Table under "Executive Compensation" below.

| Name | Age | Positions with Washington Federal and Principal Occupation During Past Five Years | Common Stock Owned Directly or Indirectly as of October 1, 2003(1)(2) | |
| --- | --- | --- | --- | --- |
| | | | No. | Percentage |
| Brent J. Beardall | 32 | Senior Vice President and Chief Financial Officer since October 2003; Vice President Finance and Controller from October 2002 to October 2003; and Controller since February 2001. Former Audit Manager with Deloitte & Touche from September 1998 until January 2001. | 1,052 | 0.00% |
| Edwin C. Hedlund | 47 | Executive Vice President since July 1999, Secretary since February 2001. Previously a founder, President and Director of Phoenix Savings Bank from April 1997 until July of 1999. | 65,904(3) | 0.09% |
| Jack B. Jacobson | 53 | Executive Vice President and Chief Lending Officer since October 2001; Senior Vice President from October 2000 to October 2001; and Vice President from November 1996 until October 2000. | 45,758(3) | 0.06% |

(1) Pursuant to rules promulgated by the SEC under the Exchange Act, a person is considered to beneficially own shares of Common Stock if he or she has or shares: (i) voting power, which includes the power to vote or direct the voting of the shares; or (ii) investment power, which includes the power to dispose or direct the disposition of the shares.

(2) Based on information furnished by the respective officers. The percentage of outstanding shares of Common Stock is based upon the 71,173,478 shares of

8

# Exhibit D

COPY

1                    UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF PENNSYLVANIA

3

4    NATIONAL HEALTHCARE SERVICES,    : Civil Action
                                      : No. 02-CV-3600
5                   Plaintiff,        :
                                      :
6         vs.                         :
                                      :
7    PENN TREATY AMERICAN CORPORATION :
                                      :
8                   Defendants.       :

9

10                        - - -
                 Wednesday, October 29, 2003
11               Philadelphia, Pennsylvania
                          - - -
12

13

14        Oral videotaped deposition of THOMAS SADLER, ESQUIRE,

15   taken at the Law Offices of FOX ROTHSCHILD, LLP, 2000 Market

16   Street, beginning at approximately 12:07 p.m., on the above

17   date, before Margaret M. Reihl, RPR, CRR, CSR and

18   Commissioner of Deeds.

19                        - - -

20

21

22                   MARGARET M. REIHL
                 Certified Shorthand Reporter
23                   80 Annapolis Drive
             Sicklerville, New Jersey  08081
24                   (856) 435-6638

25

1   A.      Yes.

2   Q.      I'm sorry, Sadler-2.  Did I fairly describe

3   Sadler-2?

4   A.      Yes.  I'm sorry.

5   Q.      And were you the author of Sadler-2?

6   A.      Yes.

7   Q.      And were you authorized by your client to

8   issue Sadler-2?

9   A.      Yes.

10  Q.      And did you, in fact, issue Sadler-2?

11  A.      Yes.

12  Q.      Do you make any reference in Sadler-2 to any

13  concern about best efforts?

14              MS. SPECTOR:  Objection as to form.

15  The document speaks for itself, but you can answer.

16              THE WITNESS:  No.

17  BY MR. RIVERA-SOTO:

18  Q.      Do you make any mention in Sadler-2 with

19  regard to any arbitration provision?

20  A.      No.

21  Q.      On what basis did you issue Sadler-2?

22  A.      Client --

23  Q.      Factual basis?

24  A.      The client asked me to.

25  Q.      Did you conduct an independent investigation

1    to determine whether the bases upon which Sadler-2 was

2    issued were, in fact, correct?

3    A.      I had had personal conversations with

4    Mr. Michael Callahan in which he informed me that he

5    was involved in the operations and the running of

6    National Healthcare Services, Inc. and that I was to

7    deal with him and him alone.

8    Q.      And when did these conversations occur?

9    A.      I believe in the very first part of October,

10   it might have even have been October 1st, I'm not

11   sure, but it was very early in October.

12   Q.      When you say "conversations," are you

13   referring solely to oral conversations between you and

14   Mr. Callahan or is your scope larger than that?

15   A.      I'm sorry.  I didn't get the last part of your

16   question.

17   Q.      Or is your scope, what you are throwing into

18   the term conversation, larger than that?

19   A.      There were telephone conversations and there

20   were e-mails.

21   Q.      Did you at any time reduce to writing any of

22   those telephone conversations?

23           MS. SPECTOR:  Are you including in

24   reduced to writing a writing to someone else

25   summarizing?

1    and that he was the one that was going to be resolving

2    this matter or attempting to resolve this matter.

3    BY MR. RIVERA-SOTO:

4    Q.    Now, let me take you back to Sadler-2.

5    Sadler-2 is your letter --

6    A.    Yes.

7    Q.    -- of November 5, 2001?

8    A.    Yes.

9    Q.    I would like to ask you a few questions about

10   it.

11   A.    Sure.

12   Q.    The first sentence says, and I quote, "It has

13   come to the attention of Penn Treaty that Michael

14   Callahan has purchased a significant share of National

15   Healthcare Services and has assumed management

16   functions."

17         Was that your statement?

18   A.    Yes.

19   Q.    On what did you base that statement?

20   A.    Mr. Callahan's statements to me.

21   Q.    And, specifically, which statements from

22   Mr. Callahan did you base that on?

23   A.    As far as the first part of that sentence is

24   concerned, he told me he purchased half of Neal's

25   interest.  As far as the second half of that statement

Thomas Sadler, Esquire                    63

1    is concerned, he told me that he was the person that

2    would be resolving this matter, that he had authority,

3    that he would make the decisions.  I was not to

4    contact Neal or Herb, that he was the person.

5    Q.      And that was with regard to the dispute that

6    then existed between Penn Treaty on the one side and

7    National Healthcare Services on the other?

8    A.      That was with regard to the entire

9    relationship between Penn Treaty and National

10   Healthcare Services.

11   Q.      Do you remember when you were authorized by

12   Penn Treaty to send Sadler-2?

13                   MS. SPECTOR:  Specific date?

14                   MR. RIVERA-SOTO:  Yeah, or as close to

15   it as you can get.

16                   THE WITNESS:  It was very close to

17   November 5th, if it wasn't November 5th.

18   BY MR. RIVERA-SOTO:

19   Q.      It was either a day or so before?

20   A.      Or November 5th.

21   Q.      Or that same day?

22   A.      Yes.

23   Q.      And you received that authorization from

24   Ms. Bagley?

25   A.      Yes.

1    consider addressing it to?

2    A.    Michael Callahan.

3    Q.    Why were you going to send it to Mr. Callahan?

4    A.    Because in my conversation with Michael

5    Callahan he instructed me that he was the person that

6    I should deal with with regard to Penn Treaty.

7    Q.    And why wasn't this letter sent to

8    Mr. Callahan?

9    A.    It wasn't sent to Mr. Callahan because when I

10    looked at the Agreement, there was a provision in the

11    Agreement that required all notices to be sent to

12    Mr. Schwartz and it was felt by me at the time that

13    the letter went out that if I didn't send it to

14    Mr. Schwartz, as required by the Agreement, that it

15    wouldn't be official notice under 8.6 of Sadler

16    Exhibit 1, so I sent it to Mr. Schwartz.

17    Q.    Now, the last paragraph of your letter states,

18    in light of the material change in the management of

19    National Healthcare Services, Penn Treaty is left with

20    no choice but to immediately and without further

21    notice terminate the Agreement entered into between

22    National Healthcare Services and Penn Treaty Network

23    America Insurance Company dated October 21, 1999, and

24    the modification of the Agreement dated August 21,

25    2000.

1          Can you, as best as you can recall, set forth

2     the facts that constituted the change in management of

3     National Healthcare?

4     A.      Mr. Callahan became the person who was running

5     things, to our understanding, for National Healthcare

6     Services and all communications were instructed to go

7     through him.  We were informed that he would be the

8     one making decisions with regard to resolving issues

9     between National Healthcare Services and Penn Treaty

10    and that to our understanding Mr. Callahan's intent

11    was to arbitrate or litigate with Penn Treaty.

12    Q.      Other than the -- directing your attention to

13    this time frame, October, November of 2001, other than

14    the ongoing disputes with respect to its relationship

15    with Penn Treaty, do you know if National Healthcare

16    had any other business?

17    A.      No, I do not.  I didn't believe they did.

18    There was this Joint Venture Agreement, I didn't know

19    if there was anything else.  I didn't believe there

20    was anything else.

21    Q.      Prior to sending this letter, why didn't you

22    call Mr. Forman or Mr. Schwartz and ask them if

23    Mr. Callahan was engaged in the management of National

24    Healthcare Services?

25                    MR. RIVERA-SOTO:  Objection to the

1    form.

2    BY MS. SPECTOR:

3    Q.      You can answer.

4    A.      Because I was told by Mr. Callahan not to

5    contact them, that I was to contact him.

6    Q.      Did Mr. -- other than Mr. -- strike that.

7            In your dealings with Mr. Callahan did you

8    form any belief as to whether or not Mr. Callahan was

9    managing National Healthcare?

10                   MR. RIVERA-SOTO:  Objection to the

11   form.

12                   THE WITNESS:  Yes.

13   BY MS. SPECTOR:

14   Q.      Was that belief based on anything other than

15   his statement in his E-mail to you that he was a

16   principal in the All Risk venture?

17                   MR. RIVERA-SOTO:  Objection to the

18   form.

19                   THE WITNESS:  Yes.

20   BY MS. SPECTOR:

21   Q.      What other facts?

22   A.      His consistent communication with me, the fact

23   that after we had that initial conversation that, to

24   my understanding, there were no further communications

25   by either Mr. Forman or Mr. Schwartz with Penn Treaty,

1    that everything was coming through Mr. Callahan, that

2    each proposal and response to proposal was, in fact,

3    communicated by Mr. Callahan.

4                    MS. SPECTOR:  I have nothing further.

5    BY MR. RIVERA-SOTO:

6    Q.    Who informed you that Mr. Callahan would be

7    the one making the decisions on behalf of National

8    Healthcare Services?

9    A.    Mr. Callahan.

10   Q.    And when did he do that?

11   A.    In the first conversation we had.

12   Q.    This is the telephone conversation?

13   A.    Yes.

14   Q.    Was that before or after October 1 of 2001?

15   A.    I believe it was either -- I think it was the

16   next day.

17   Q.    Now, you were told by Mr. Callahan that he was

18   the one making decisions?

19   A.    Yes.

20   Q.    Why didn't you send a copy of Sadler-2 to

21   Mr. Callahan?

22                    MS. SPECTOR:  2 is the November 5th

23   letter.

24                    THE WITNESS:  Why didn't I send a copy?

25   BY MR. RIVERA-SOTO: