# Exhibit E

1          UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF PENNSYLVANIA

3

4   NATIONAL HEALTHCARE SERVICES,    : Civil Action
                                     : No. 02-CV-3600
5                  Plaintiff,        :
                                     :
6         vs.                        :
                                     :
7   PENN TREATY AMERICAN CORPORATION :
                                     :
8              Defendants.           :

9

10                      - - -
               Thursday, October 30, 2003
11             Philadelphia, Pennsylvania
                        - - -
12

13

14      Oral videotaped deposition of JANE M. BAGLEY, ESQUIRE,

15   taken at the Law Offices of FOX ROTHSCHILD, LLP, 2000

16   Market Street, beginning at approximately 10:00 a.m., on

17   the above date, before Margaret M. Reihl, RPR, CRR, CSR

18   and Commissioner of Deeds.

19                      - - -

20

21

22             MARGARET M. REIHL
          Certified Shorthand Reporter
23             80 Annapolis Drive
        Sicklerville, New Jersey  08081
24             (856) 435-6638

25

1    really was the first time that the name came to your

2    attention?

3                    MS. SPECTOR:  Objection as to form.

4    You can answer.

5                    THE WITNESS:  Bagley-5, this E-mail

6    from Tracy, is when -- like I said, when I was able to

7    put it in context like, oh, Mike Callahan is

8    Callahankids and this is -- because I didn't -- I knew

9    he had been copied on things and he had been editing

10   advertising and working on marketing and getting

11   reports, but I didn't know who he was.

12   BY MR. RIVERA-SOTO:

13   Q.      The description of the functions that you

14   understood Mr. Callahan to be performing up until that

15   point, do they fall within the management of the

16   fulfillment and service job as described in Bagley-5?

17                    MS. SPECTOR:  Objection.

18                    THE WITNESS:  Once I got this memo put

19   into context, I would say it was a lot more than that.

20   BY MR. RIVERA-SOTO:

21   Q.      Okay.  What was he doing that was in addition

22   to managing fulfillment and service?

23   A.      Well, through my discussions with Tracy, I

24   understood that he was doing the editing on

25   advertising pieces, marketing pieces, he was working

Jane M. Bagley, Esquire                 58

1    with Jackie on getting reports, all the stuff that

2    Neal used to do.  Herb was sort of taking a back seat

3    at that time.  He wasn't really involved as much and

4    Neal used to handle this stuff and now it seemed like

5    Callahan was handling all that.

6    Q.      Did you ever make any inquiry or did anyone at

7    Penn Treaty, to your knowledge, make any inquiry as to

8    the scope of the services that Mr. Callahan was

9    performing on behalf of National Healthcare Services?

10   A.      When?

11   Q.      At any time?

12   A.      Well, they had a lot of -- they had Web Barth

13   doing a lot of their stuff too, so they never told us

14   who he was that was doing a lot of their work, but so

15   was Web Barth and Michael Hauert.

16   Q.      Do you know if Mr. Callahan's work in

17   fulfillment and service was with Mr. Barth and not

18   with National Healthcare Services?

19            MS. SPECTOR:  Objection.  You can

20   answer.

21            THE WITNESS:  I don't know.  I know

22   that Web Barth was contracted through Neal and Herb.

23            (Document marked for identification

24        as Bagley Deposition Exhibit Number 7.)

25            MR. RIVERA-SOTO:  Let me show you what

Jane M. Bagley, Esquire                    83

1    BY MR. RIVERA-SOTO:

2    Q.      Did anybody else at Penn Treaty ever ask what

3    Mr. Callahan's role was?

4    A.      I don't know.

5    Q.      Are you familiar with the company named

6    Copperfield's?

7    A.      I've seen documents with that name.

8                MS. SPECTOR:  Again, separate out any

9    documents or information you learned since the lawsuit

10   was started, as distinguished from before.

11               THE WITNESS:  Okay.

12   BY MR. RIVERA-SOTO:

13   Q.      Do you recall knowing about Copperfield's

14   before this lawsuit was started?

15   A.      I don't think I did, no.

16   Q.      Do you know whether Copperfield's is

17   Mr. Barth's company?

18               MS. SPECTOR:  Again, with the same

19   instruction.

20               THE WITNESS:  I didn't know, no.

21   BY MR. RIVERA-SOTO:

22   Q.      Now, I showed you earlier what we've marked as

23   Bagley-7?

24   A.      Yes.

25   Q.      And, specifically, I pointed you to the E-mail

1    A.    I don't believe so, no.

2    Q.    Did you discuss its contents with Mr. Sadler

3    before it was sent?

4    A.    We discussed the termination with Mr. Sadler,

5    yes.

6    Q.    And did you -- when you discussed the

7    termination, did you discuss specifically under what

8    provision of the Agreement the termination was going

9    to be made?

10   A.    Yes.

11   Q.    And what provision specifically did you

12   determine the termination was going to be made under?

13   A.    That there was a material change in the

14   management of NHCS without our prior approval.

15   Q.    Who else was involved in that decision-making

16   process?

17   A.    I went to Cameron Waite and Bill Hunt and

18   advised them what Mr. Sadler had told me.

19   Q.    Do you know if Mr. Sadler performed any

20   independent inquiry as to whether there had been a

21   material change in the management of National

22   Healthcare Services?

23   A.    Mr. Callahan told him.

24   Q.    So my question to you is, Ms. Bagley --

25   A.    Yes.

1    Q.      -- do you know if Mr. Sadler performed any

2    independent inquiry as to whether there had been a

3    material change in the management of National

4    Healthcare Services?

5    A.      Other than speaking with Mr. Callahan, I don't

6    know.  I don't know what he did.

7    Q.      Did Mr. Sadler ever communicate to you that he

8    did anything other than just talk to Mr. Callahan?

9              MS. SPECTOR:  Objection as to form.

10   You can answer.

11             THE WITNESS:  I don't recall.

12   BY MR. RIVERA-SOTO:

13   Q.      Did Mr. Sadler at any time submit to you in

14   writing anything with regard to his conversations with

15   Mr. Callahan that has not been identified here in this

16   deposition?

17   A.      I don't know.  Not that I can recall.

18   Q.      Do you recall any other written communications

19   from Mr. Sadler concerning any discussions that he had

20   with Mr. Callahan?

21             MS. SPECTOR:  Objection.  I withdraw

22   the objection to that.  That was, actually, an okay

23   question.

24             THE WITNESS:  I don't recall.

25             MR. RIVERA-SOTO:  Let me take a moment.

# Exhibit F

# FOX ✦ ROTHSCHILD
## O'BRIEN & FRANKEL LLP

### ATTORNEYS AT LAW

2000 MARKET STREET • TENTH FLOOR • PHILADELPHIA, PA 19103-3291
215-299-2000 • FAX 215-299-2150 • www.frof.com

Daniel G. Lyons
Direct Dial: (215) 299-2142
Internet Address: dlyons@frof.com

December 16, 2002

**VIA FACSIMILE**

Douglas L. Flitter, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599

> Re: *NATIONAL HEALTHCARE SERVICES, INC., PLAINTIFF, V. PENN TREATY AMERICAN CORPORATION, PENN TREATY NETWORK AMERICA INSURANCE CORPORATION, AND SENIOR FINANCIAL CONSULTANTS COMPANY, DEFENDANTS*
> Civil Action No. 02-3600 (EL)
> United States District Court for the Eastern District of Pennsylvania

Dear Doug:

We are in receipt of Defendants' responses to our first set of interrogatories and document requests. Unfortunately, however, many of Defendants' objections are improper. This letter is written in a good faith attempt to resolve this discovery dispute.

As you know, National Healthcare Services, Inc. ("NHCS") claims, among other things, that Defendants terminated the parties' contracts, at least in part, because Defendants were experiencing financial and regulatory problems, and seized on a false pretext as an expedient way to avoid their contractual obligations. Thus, matters regarding Defendants' financial health and the regulatory actions taken against Defendants are undoubtedly relevant and discoverable.

Accordingly, we ask that you supplement your discovery responses and provide full and complete answers to interrogatories 15, 16, 17, 18 and 19, and document requests 9, 10, 11, 12, 13, 14 and 15. Please provide the supplemental answers by December 23, 2002.

ATLANTIC CITY, NJ • DOYLESTOWN, PA • EXTON, PA • LANSDALE, PA • LAWRENCEVILLE, NJ • PHILADELPHIA, PA • VOORHEES, NJ • WILMINGTON, DE

Douglas L. Flitter, Esquire
December 16, 2002
Page 2

    Please call us if you have any questions. We would prefer to avoid Court intervention if possible.

                    Very truly yours,

                    Daniel G. Lyons

DGL:slm

cc:    Roberto A. Rivera-Soto, Esquire

FOX • ROTHSCHILD
O'BRIEN & FRANKEL llp

# FOX ✦ ROTHSCHILD
## O'BRIEN & FRANKEL LLP
### ATTORNEYS AT LAW

2000 MARKET STREET, TENTH FLOOR
PHILADELPHIA, PA 19103-3291
VOICE: (215)299-2000
FAX: (215) 299-2150

### DATE: DECEMBER 16, 2002

---

## FACSIMILE TRANSMITTAL SHEET

---

| TO:<br>Douglas L. Flitter, Esquire | COMPANY:<br>Ballard, Spahr, Andrews & Ingersoll, LLP | FAX NUMBER:<br>(215) 864-9168 | PHONE NUMBER:<br>(215) 864-8218 |
|---|---|---|---|
| FROM:<br>Daniel G. Lyons, Esquire | PHONE NUMBER:<br>(215) 299-2142 | EMAIL:<br>dlyons@frof.com | BILLING NUMBER:<br>562 |
| NUMBER OF PAGES:<br>3 | CHARGE FILE NUMBER:<br>61927-00001 | PRIORITY:<br>RUSH | LOG NUMBER:<br>16 |

### IF YOU DO NOT RECEIVE ALL OF THE PAGES,
### PLEASE CALL (215) 299- AS SOON AS POSSIBLE.
### ORIGINAL DOCUMENT  FOLLOW BY MAIL

---

URGENT     FOR REVIEW     PLEASE COMMENT     PLEASE REPLY     FOR YOUR INFORMATION

---

NOTES/COMMENTS:

---

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

PH1 451931v1 12/13/02

# Exhibit G

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                    -   -   -
4   NATIONAL HEALTHCARE      :   CIVIL ACTION
    SERVICES, INC.,         :
5            Plaintiff,     :
                            :
6            v.             :
                            :
7   PENN TREATY AMERICAN    :
    CORPORATION, et al.,    :
8            Defendants.    :   NO. 02-CV-3600
                    -   -   -
9         Monday, October 13, 2003
                    -   -   -
10
11            Videotaped deposition of
    WEBSTER E. BARTH, III, taken pursuant to
12   notice, was held at the law offices of
    Ballard, Spahr, Andrews & Ingersoll, LLP,
13   1735 Market Street, 51st Floor,
    Philadelphia, Pennsylvania, beginning at
14   9:42 a.m., on the above date, before Ann
    Marie Mitchell, a Federally-Approved
15   Registered Merit Reporter and
    Commissioner of Deeds in the Commonwealth
16   of Pennsylvania.
17
                    -   -   -
18
19
20   Job # 153612
21
22
23
24

Page 44

1          A.    Yes.  Neal and Herb were

2    partners and created the entity to which

3    I later became a vendor.  Copperfields

4    became a vendor.

5          Q.    And which entity is that?

6          A.    National Healthcare

7    Services.

8          Q.    When was National Healthcare

9    Services created?

10          A.    Most likely in that '99 time

11    frame.

12          Q.    Do you know what business,

13    what type of business, National

14    Healthcare Services engages in?

15          A.    It was created, I believe,

16    to market the AllRisk health care

17    product.

18          Q.    Was it created solely to

19    market the AllRisk health care product?

20          A.    I believe so.

21          Q.    Were Mr. Forman and Mr.

22    Schwartz the sole creators, founders, of

23    National Healthcare Services?

24          A.    Yes.

1          Q.     Did they have any other

2     employees?

3          A.     No.

4          Q.     So they were the sole

5     employees of National Healthcare?

6          A.     Yes.

7               MR. RIVERA-SOTO:  Are you

8          okay?

9               THE WITNESS:  I'm fine.

10         Thank you.

11    BY MS. HONG:

12         Q.     So you were discussing with

13    Mr. Forman this concept that became known

14    as the AllRisk program starting from '92

15    or '94.

16               Did there come a time when

17    you formalized your relationship with Mr.

18    Forman, Mr. Schwartz and/or National

19    Healthcare in connection with your

20    participation?

21         A.     Yes.

22         Q.     And when was that?

23         A.     Most likely spring of '99.

24         Q.     Was there a written

# Exhibit H

Page 1

1          UNITED STATES DISTRICT COURT

    EASTERN DISTRICT OF PENNSYLVANIA

2

    ----------------------------x

3   NATIONAL HEALTHCARE SERVICES,:  CIVIL ACTION

    INC.,                         :

4         Plaintiff,              :  NO. 02-CV-3600

                                  :  (MM)

5         VS.                     :

                                  :

6   PENN TREATY AMERICAN          :

    CORPORATION, et al.,          :

7         Defendants.             :

    ----------------------------x

8

9          Videotaped deposition of

10  MICHAEL J. CALLAHAN, held at the law

11  offices of BALLARD, SPAHR, ANDREWS &

12  INGERSOLL, LLP, 1735 Market Street, 51st

13  Floor, Philadelphia, Pennsylvania 19103,

14  on Wednesday, October 15, 2003, beginning

15  at 9:09 a.m., before Debra J. Weaver, a

16  Federally Approved Registered

17  Professional Reporter, Certified Realtime

18  Reporter and Certified Shorthand Reporter

19  of NJ (No. XI 01614) and Delaware (No.

20  138-RPR, Expiration 1/13/05).

21

22

23

24  Job No: 153616                    COPY

1         A.    I don't recall.

2         Q.    Did you and Mr. Forman have

3    any discussions in substance that you had

4    acquired interest in Copperfields first

5    instead of National Healthcare because of

6    provisions in the Penn Treaty National

7    Healthcare agreement?

8         A.    No.

9         Q.    Did Mr. Forman or Mr.

10   Schwartz ever tell you about the

11   termination provision in the National

12   Healthcare/Penn Treaty agreement prior to

13   your seeing Mr. Sadler's letter

14   referencing that provision?

15        A.    Well, by then I had read the

16   contract.

17        Q.    You had read the contract

18   before you received Mr. Sadler's letter?

19        A.    Yes.

20        Q.    Did you ever have any

21   discussions with Mr. Forman and Schwartz

22   when you acquired your interest in

23   National Healthcare, when you acquired

24   the stock, as to whether your acquisition

Exhibit I

 **Penn Treaty Network America Insurance Company**

(PTNA Life Insurance Company in CA)

June 8, 2000                                   Via Facsimile and First Class U.S. Mail

Herbert E. Schwartz
7329 NE 18th Street
Medina, WA 98039

Neal A. Forman
4523 102nd Lane NE
Kirkland, WA 98033

Dear Herb and Neal:

It was a pleasure meeting with both of you recently and, as promised, I have drafted this letter to confirm, in writing, the AllRisk terms and provisions that we agreed to modify during the meeting. If the modified terms meet with your approval, please indicate your consent by signing below. You will note that I have also included a space for Web to sign and I would ask that you forward this letter to him after you have both signed the letter. The modified terms are as follows:

1. A new pricing structure will be implemented on or about June 19, 2000. The cost for all ages shall be $695.00 for an individual membership and $995.00 for a couple and/or a household membership.

2. There shall be no commission reduction to agents as a result of this new pricing structure.

3. All parties understand and agree that it is necessary to obtain information on both the "usual and customary" charges by zip code listing and the average discount per network provider cost from HSI. As we discussed, the charge by HSI for this information is $20,000 upon our receipt of the initial list and $500 every month thereafter in order to obtain monthly updates from HSI.

4. All charges billed by HSI shall be shared equally by the parties with Penn Treaty being responsible for 50% of all cost, NHCS being responsible for 33.33% of the costs and Web Barth being responsible for 16.66% of the costs.

5. Both Penn Treaty's agreement with NHCS and NHCS's agreement with Web Barth shall be amended to reflect that the administrative fee paid by NHCS to Web Barth shall be adjusted from the current $99.80 per member to $99.80 per household.

6. Pursuant to discussions held yesterday between the parties and Web Barth, Penn Treaty shall be permitted to contact HSI directly in order to obtain network provider information.

7. Any agents who are not licensed with Penn Treaty may be sponsored by another agency to sell AllRisk memberships.

8. Penn Treaty and NHCS shall develop and agree upon the contents of a letter to be sent to all existing members of the AllRisk program as of June 19, 2000, concerning the implementation of the new pricing structure. The letter will offer such members the opportunity to extend their membership for an additional year at no extra cost and will require that such members formally accept this option.

NHCS00324

9.  The parties have agreed to roll-out the AllRisk product on an national basis on or about June 19, 2000; however it is understood and agreed that neither party shall market the AllRisk plan in states in which the product is not in compliance with a states' laws and regulations, Penn Treaty has retained legal counsel to serve as an advisor as to which states the AllRisk program is in compliance and both parties agree that the AllRisk plan will not be marketed in any state where the product may not be in compliance.

I am forwarding the original of this letter to Herb with a copy to Neal.  If you are in agreement with the above and intend to be legally bound thereby, please execute this letter where indicated below.  I would ask that Herb execute the letter and then forward the original to Neal for his signature.  Neal should then forward the original letter to Web Barth for his signature as well.  The letter should then be sent back to me and I will obtain Glen's signature and will forward copies of the letter to all parties.

Very truly yours,

PENN TREATY NETWORK AMERICA INSURANCE COMPANY


Jane M. Bagley
General Counsel


                                                    ACCEPTED AND AGREED TO:

                                                    _____  6/13/00
                                                    Herbert E. Schwartz        Date

                                                    _____  6-13-2000
                                                    Neal A. Forman             Date

                                                    _____  6/15/2000
                                                    Web Barth                  Date

                                                    _____  6/15/00
                                                    Glen A. Levit              Date


cc. Neal A. Forman


NHCS00325

FEB-11-01  SUN  16:23  N.H.S. INC                4258226306                P.01

*All-Risk*

# National Healthcare Services, Inc.
4523 102nd Lane N.E., Kirkland, WA 98033
Phone: (425) 450-4000  Fax: (425) 822-6306

February 11, 2001

Cameron Waite                                    VIA FACSIMILE:
Penn Treaty Network America                      610-965-0668

Re:  Request for Advance per 1/11/00 Promissory Note

Dear Cameron,

    I am writing to confirm our conversation of Friday, February 9, 2001 regarding an advance of $25,000 as provided for in the agreement dated January 11, 2000 between National Healthcare Services, Inc. and Penn Treaty Network America.

    I have discussed this matter with Herb and he was equally surprised to hear of your decision not to abide by this provision of our agreement. He, like I, had heard nothing from Glen or anyone else in this regard and are unaware of any reason why Penn Treaty should take this position. Subsequent to our conversation I reviewed all of our files and can find no writing that modifies our agreement as would be required by Section 10(a) of the Promissory Note prior to such a change. As important, is the fact that the delays in the launching of this project have been due in large part to the change of entity required by Penn Treaty. As you know, N.H.S., Inc. accommodated this change to expedite the rollout.

    With the recent progress in rolling out this program, N.H.S. would like to begin aggressive marketing efforts from our end and had required this line of credit as part of our original agreement for that reason. We would appreciate the immediate re-consideration of your position and the forwarding of funds as requested.

    Thank you for your anticipated courtesy and cooperation.

Sincerely,

Neal A. Forman
CEO, NHS, Inc.

Confidential
PT 004545

**National Healthcare Services, Inc.**
4523 102ⁿᵈ Lane N.E., Kirkland, WA 98033
Phone: (425) 450-4000 Fax: (425) 822-6306

April 18, 2001

Cameron Waite                                              VIA FACSIMILE:
Penn Treaty Network America                                  610-965-0668

     Re:  All Risk Program

Dear Cameron,

     Neal and I have been watching the press releases and have had various discussions and correspondence with people in your organization. We are writing to express our continuing support for you, your company and our joint venture in this time of business turmoil at Penn Treaty. Based upon your communications, we are confident that Penn Treaty will emerge from this difficult time with renewed strength.

     We are certainly aware of how busy each of you must be at this time but need to address a few important issues with you. We have a number of less serious concerns that can be discussed later but the following items need attention now:

1.  Suspension of Note Payment Withholdings.  As you know, National HealthCare Services, Inc., pursuant to our agreement, was drawing money from a $300,000.00 credit facility established under a Promissory Note dated January 11, 2000. This was established for the expressed purpose of "the sole use of Debtor (NHS) in funding Costs" of our joint venture. "Costs" were defined as monies for "startup, marketing and establishment of the Enterprise."

     Despite the fact that this "Line" was a critical part of the underlying consideration for our entering into an agreement with Penn Treaty, the Line was unilaterally terminated by Glen. We were advised of the same in a February 12, 2001 letter from you, Cameron.  In Neal's response on February 13, 2001 he advised that, while NHS was not waiving its rights relative to the delays by Penn Treaty in rolling out the Enterprise or in regard to termination of the Line, NHS would take no action at that time and continue to support your staff in making our joint venture a success. By agreement, Penn Treaty has been deducting principal and interest payments from the monthly checks sent to NHS as the profits from our joint venture.

     As can be seen in the two most recent activity reports from Judith Guerard, it is clear that the suspension of Penn Treaty's sales activities in Florida and elsewhere, together with press releases and the recently filed lawsuits, have seriously impacted the reputation of Penn Treaty and, in turn, the growth of our program. While we are addressing the accuracy of these reports with Jackie

Confidential
PT 011351

Franz, we feel that the unrelated business dilemmas of Penn Treaty are seriously affecting our Enterprise and that until these problems are solved a moratorium on interest and a suspension of note payments is justified. We are requesting your immediate agreement in this regard.

2. <u>Documentation of Our Agreement</u>. On August 21, 2000 Glen Levit sent a letter confirming our mutual agreement to enter into a new contract with Senior Financial Consultants Company, in essence substituting this new entity in the place of Penn Treaty. Despite our requests, the new agreements have never been forwarded. Today it was brought to my attention that checks are still being issued by Penn Treaty and not Senior Financial Consultants Company. NHS is concerned that these checks create some confusion about whom the partner to our venture is, especially without any action on documents called for in the August 21st correspondence from Glen. While this may appear to be a "housekeeping" matter we want to make sure that no problems arise related to our joint venture as a result of the increased scrutiny Penn Treaty is currently under. We are requesting that you give the execution of these documents your immediate attention.

3. <u>Approval of Marketing Efforts</u>. Section 1.3 of the October 21, 1999 Agreement provides that:

> The parties will jointly develop a plan detailing the marketing means and methods to be used in the marketing, distribution and sale of the Benefit Program. *The marketing plan, and any modifications thereto, shall be subject to and require the prior written approval of both parties,* which approval shall not be unreasonably withheld....

While we respect your staff and the efforts they have made to date, we feel that Neal and I know this product, its strengths and market better than anyone else and should be developing and approving the marketing means and methods. This has not happened to date. We respectfully request that this provision of our agreement be reviewed and honored. Please view us as a "marketing resource" as well as a partner and use our expertise and knowledge of this product and the market to accelerate its success. We have invested a lot of time and money into this venture and view this contractual provision as central to our agreement.

Neal and I hope that these requests do not add too much to your current business

Confidential
PT 011352

burdens but feel that our requests are reasonable and necessary. Your prompt attention will be greatly appreciated.

With kind regard,

Piero Schwartz, Pres.
National Healthcare Services, Inc.

cc: Derrick Brickhouse

Confidential
PT 011353

Subject: RE: communication???
  Date: Mon, 7 May 2001 17:02:43 -0400
  From: "Brickhouse, Derrick" <DBrickhouse@penntreaty.net>
   To: "Hesassoc@aol.com" <Hesassoc@aol.com>
   CC: "Bagley, Jane" <Jbagley@penntreaty.com>, nforman@nwlink.com, CALLAHANKIDS@aol.com,
       "Waite, Cameron" <CWaite@penntreaty.com>, "Levit-Sussman, Tracy" <tlevit-sussman@penntreaty.com>

Herb,

I am writing in response to your letter stating that I am not communicating
with you.  Clearly I feel as if we have been very responsive to all of your
requests and keeping you up to date on all the current events at Penn
Treaty.  I have had Tracy add you and Neal to the advance e-mail
notification list early in the year so that you receive  advance notice of
all Marketing activities before the field force is mailed.  In regards to
recent events, before we left for the Atlantis Tracy e-mailed Neal Forman in
regards to the status of selling AllRisk in the states we have voluntarily
stopped selling our Long Term Care Insurance products.  Tracy stated that
Tennessee is the same status as Florida and Virginia in that we are
continuing to market AllRisk in those states.  I assumed that Neal would
have shared this information with you.  Furthermore, I am aware of your
conversation with my Director of Sales, Matt Sussman, as to the status of
AllRisk and our current financial/marketing status this past Friday.

In respect to the letter you sent to Cam Waite, he will be responding to
your letter as it was written to him directly.  Any letter or phone call you
have directed towards me has been handled on a priority.

You also mentioned your concern with AllRisk not being a part of the
Atlantis presentation.  As you can understand, our presentation was geared
towards the financial situation at the Company.  Our agents only concern is
their renewals, not products.  If the agents are unsure of their status with
renewals on the long term care insurance placed with our Company, why do you
think they will want to write AllRisk?  Understand that all of our business
is down even as we have increased our marketing efforts in all areas due to
agents being unsure of their renewals for all lines of business.

As you stated your concern for our Marketing efforts, I would love to hear
your recent success stories as to how you have been marketing this product
since the re-rollout in February.  We both want this partnership to yield
great results and must continue to work in a positive way together as all of
our reputations are involved.

Please let me know if you have any additional concerns that you would like
me to address.  Otherwise I will look forward to hearing about your recent
successes in Marketing AllRisk.

Regards,
Derrick

> -----Original Message-----
> From: Hesassoc@aol.com [SMTP:Hesassoc@aol.com]                NHCS00444
> Sent: Monday, May 07, 2001 3:13 PM
> To:   dbrickhouse@penntreaty.net
> Cc:   jbagley@penntreaty.com; nforman@nwlink.com; CALLAHANKIDS@aol.com
> Subject:      communication???
>
> Derrick;   I still have not heard from you after numous calls and emails.
> l

> also understand that ALL-RISK was not mentioned at the agent meetings in
> Atlantis, this surprised me, because All-Risk is still salable in the
> states
> which PTNA withdrew from. The product was supposed to be discussed at the
> convention for your producers, this is not making "every effort" to
> promote
> All-Risk. Derrick, I know PTNA has problems, and so do I!   1 must know
> what
> happening with All-Risk, and I must get some answers to my letters,
> emails,
> *and phone calls!*
> Herb Schwartz
>
>
----------------------------------------------------------------

The information contained in this e-mail message is intended only for the
personal and confidential use of the recipient(s) named above.  If the
reader of this message is not the intended recipient or an agent responsible
for delivering it to the intended recipient, you are hereby notified that
you have received *this document* in error and that any review, dissemination,
distribution, or copying of this message is strictly prohibited.  If you
have received this communication in error, please notify us immediately by
e-mail at ptna@penntreaty.com and delete the original message.

NHCS00445

Phone **425. 455.4141**
Fax **425. 455.2915**

**H.E.SCHWARTZ**

# FAX

From:

**TO:** _JOHN F. UNDERHILL_    _HERB SCHWARTZ_

**Fax:** _610-965-0131_    **Date:** _JUNE 1, 2001_

**Phone:**    **Pages:** _2_

**Re:** _ALL RISK_    **CC:**

☒ Urgent    ☐ For Review    ☐ Please Comment    ☒ Please Reply    ☐ Please Recycle

**·Comments:**

_JOHN, PLEASE LET ME KNOW ASAP_
_RE: H.O. VISIT WEEK OF JUNE 11, 2001_

Confidential
PT 004578

**National Healthcare Services, Inc.**
4523 102nd Lane N.E., Kirkland, WA 98033
Phone: (425) 450-4000  Fax: (425) 822-6306

June 1, 2001

John F. Underhill
Senior Vice-President Long Term Care
Penn Treaty Network America

<span style="float:right">VIA FACSIMILE:
610-965-0131
via e-mail:
junderhill@penntreaty.com</span>

Re:  All Risk Program

Dear Mr. Underhill,

It was a pleasure to speak with you during our conference call May 21st . Neal and I are pleased to see that Penn Treaty is committed to improving its management team.  We look forward to working with you.

I am in receipt of your letter dated May 25, 2001.  I regret if there has been any misunderstanding but NHSI does not agree to a mutual termination of our Agreement. To the contrary, we are excited to have you on board to address the many problems we have had with Penn Treaty's rollout of the All Risk Program.  We look forward to addressing the various breaches we have cited in earlier correspondence with P.T.A. representatives.  We are happy to discuss each of these items with you and to propose some workable solutions.

Probably the best way to move forward would be with a face-to-face meeting. Neal and I are available to meet with you a week from Monday (June 11, 2001).  If this works with your schedule please get back to me right away so we can firm up travel plans.  We are most anxious to get this program up to the potential we all recognized going in.

I look forward to hearing from you.

With kind regard,

Herb Schwartz, Pres.
National Healthcare Services, Inc.

Confidential
PT 004579

06·26·01  19:20  FAX 425 455 4141          H.E.Schwartz                          ☑01

Phone: 425. 455.4141
Fax:   425. 455.2915

## H.E.SCHWARTZ

# FAX                    From: HERB SCHWARTZ
To: JEFF UNDERHILL
Fax: 610 - 965 - 0131     Date: JUNE 27, 2001
Phone:                    Pages: 3
Re:                       CC:

☒ Urgent   ☒ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• Comments:

PLEASE ACKNOWLEDGE THAT
YOU RECIEVED THIS FAX LETTER
      Thank You
          Herb

6-27-01

RECEIVED

6-27-01
Discussed w/
your Brg 1·1
S Levin

Confidential
PT 004252

**National Healthcare Services, Inc.**
4523 102ⁿᵈ Lane N.E., Kirkland, WA 98033
Phone: (425) 450-4000 Fax: (425) 822-6306

June 27, 2001

Jeff F. Underhill                                    VIA FACSIMILE:
Senior Vice-President Long Term Care                 610-965-0131
Penn Treaty Network America                          via e-mail:
                                                     junderhill@penntreaty.com

Dear Jeff,

I am writing to thank you for your time and courtesy during our phone conference yesterday. The meeting was difficult for all involved as we are not accustomed to having to deal with such negative issues. Nonetheless, Neal and I are adamant about receiving proper compensation for the failures we have cited and felt it was important to make our position known to see if we could avoid an adversarial proceeding.

While I appreciate that you are relatively new to the P.T.A. team and may not be fully aware of the history that has brought us to this point, I hope that you left the meeting with the knowledge that I am available to discuss and document any unclear items. While Derrick may have felt it appropriate to terminate the possibility of further settlement discussions (before July 3rd) it is my guess that the "powers that be" would want to make that decision after fully considering the effect our filing will have on your reconstruction efforts.

It is not N.H.C.S.'s aim to "punish" P.T.A. in any fashion as evidenced by our expression of a willingness to consider creative settlement scenarios in lieu of an all-cash proposal. (Since it is apparent that you give the All Risk Program a negligible value perhaps that might be one of the items to consider.) In any event, we will not file for arbitration until after 11:00 a.m. on July 3rd and are available for further discussions until that time.

I would like to emphasize again that while we are committed to receiving proper compensation and will file for immediate arbitration if necessary, this is not our desired course of action. We are concerned that just the filing of the lawsuit and the subsequent notification to shareholders and creditors will, of itself, cause a domino effect that not only puts P.T.A. in a bad way but also eliminates any real chance of All Risk ever achieving even a fraction of its remaining potential value. Please think hard before flatly rejecting our proposal (as Derrick has just done).

Finally, I want to confirm my statements to you that N.H.C.S. is not terminating our agreement even though we intend to file for arbitration. Unless P.T.A. unilaterally terminates we will expect full compliance with the terms of our agreement, including

Confidential
PT 004253

N.H.C.S.'s approval of marketing plans, the "best efforts" clause and the approach to the 1500-2000 rejected applications each month.

I hope to hear from you.

Sincerely,

Herb Schwartz, Pres.
National Healthcare Services, Inc.

Confidential
PT 004254

Wed
425.652.6300

**Phone** 425. 455.4141
**Fax** 425. 455.2915

**H.E.SCHWARTZ**

# FAX

**From:** HERB

**TO:** JANE BAGLEY

**Fax:** 610-967-4616        **Date:** 7/24/01

**Phone:**        **Pages:** 3

**Re:**        **CC:**

□ Urgent    ☒ For Review    □ Please Comment    ☒ Please Reply    □ Please Recycle

•**Comments:**

Need. FYi ALSO 1 CALLED LEft JANE
R̸ A MESSAGE WiTH HER ASST.
'' JANE iF YOU COULD RESPOND TO
FAX PRiOR TO tHURS. ConV. CALL
WiTH DARRiELL, WE WOULD
APPRECiATE. it. "

HS

NHCS00469

# National Healthcare Services, Inc.
### 4523 102ⁿᵈ Lane N.E., Kirkland, WA 98033
### Phone: (425) 450-4000 Fax: (425) 822-6306

July 24, 2001

Jane Bagley                                             VIA FACSIMILE:
Penn Treaty America Corporation                         610-967-4616

Dear Jane,

As we are preparing to appoint our arbitrator I received Derrick's letter to the Florida Sales Force and your correspondence regarding persistency of the All Risk Memberships. This is the kind of activity we have been looking for during the past year and a half. We sincerely hope that this effort continues as it may mitigate some of the damage done by delays to date.

As General Counsel for P.T.A. you probably like litigation less than I do. However, my attempts to get your company to acknowledge what has happened (or not happened) since signing our contract have fallen on deaf ears. With the prospect of going forward in earnest I am writing to set forth one last proposal in an attempt to avoid an adversarial process.

As you know from our conversations and my previous correspondence, N.H.C.S.'s primary complaint is that the All Risk program was "back-burnered" after Glen passed away and has stayed there while P.T.A. deals with unrelated financial difficulties. Glen truly recognized the importance of being first to market and that much of our success would depend on an initial blitz of P.T.A.'s (then) 40,000 agents and their rejected business. Since that "blitz" never occurred we have lost the advantage of being the first to market and are now seeing competitive products offered by reputable companies while faced with the fact that your own agents are reluctant to write P.T.A. business. The real question then becomes "Can significant marketing efforts at this time bring All Risk back to the point that it should be had a real effort been made from the beginning?" As important, is it realistic to think that P.T.A. can give it the required effort when even Jeff Underhill has acknowledged that Penn Treaty's efforts and resources have to be focused elsewhere for the next 12-18 months?

The fact is, neither of us know the answer to those questions. However, N.H.C.S. has expressed its willingness to gamble on the future with P.T.A. *if* there is compensation for the last year and a half. The significance of this position should not be overlooked: In essence, N.H.C.S. will limit its damage claim to those losses incurred to date and gamble that we can regain enough of the market by a vigorous sales effort going forward if P.T.A. will only compensate us for the last 18 months. If we have to arbitrate we will be looking for damages to date and will leave open the claim of further damages resulting from the existing breaches. Jane, this is a good deal.

NHCS00470

I have given some thought to the difficulty of Penn Treaty writing a check as compensation. I am proposing this alternative:

1) Penn Treaty waives any further loan repayment.
2) Penn Treaty waives its 50% of the profits from our venture until
   a. $2 million is paid to N.H.C.S. and
   b. We hit 3 consecutive months of 1000 new policies
3) Penn Treaty waives the $25.00/policy admin fee until Item 2 is met.
4) Penn Treaty allocates a minimum of $200,000 per year in marketing hard costs.
5) Penn Treaty gives control of design of the marketing program over to N.H.C.S.
6) Penn Treaty opens up the rejected business to marketing efforts as originally agreed. (This may involve overcoming some pragmatic hurdles but an effort in this regard should be made.)
7) Penn Treaty waives the exclusivity provisions of the contract to allow us to see if another company is interested in taking on the program.
8) Penn Treaty gives us the right to buy their interest for $1 if we find another interested party.

I hope you will consider this offer in the light intended and respond quickly after discussing it and the alternative with your people. Since this is my first attempt to narrow the scope to damages to date it might be helpful if you tell me what items are agreeable and which items we are apart on to see if I can further refine the concept. If, on the other hand, you feel that Penn Treaty has no exposure and are prepared to defend that position then please let me know and we will forward our arbitrator's name.

Other than this, I hope all else is well with you.

Sincerely,

Herb Schwartz, Pres.
National Healthcare Services, Inc.

NHCS00471

# Exhibit J

## Fritzinger, Sharon

**From:** Levil-Sussman, Tracy
**Sent:** Monday, August 20, 2001 10:41 AM
**To:** Bagley, Jane; Brickhouse, Derrick
**Subject:** fyi - AllRisk

fyi from Mike Hauert:

**First of all, we a have a new exec helping to manage our fulfillment and
service job.  His name is Mike Callahan (callanhankids@aol.com) and I would
appreciate it if you would include him in your email traffic to Mike Hauert
and me.**



Confidential
PT 003201

1