## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., : <br> Plaintiff, : <br> : <br> v. : <br> : <br> PENN TREATY AMERICAN : <br> CORPORATION, et al. : <br> Defendants. : | **CIVIL ACTION** <br> **NO. 02-CV-3600** |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff National Healthcare Services, Inc. ("**NHCS**") submits this opposition to the motion for summary judgment filed by defendants Penn Treaty American Corporation, Penn Treaty Network America Insurance Company and Senior Financial Consultants Company (collectively, "**Penn Treaty**").

### I.    INTRODUCTION.

Ironically, Penn Treaty's motion for summary judgment only highlights why summary judgment on liability should be entered in favor of NHCS.[1]  Far from disproving liability, Penn Treaty has all but admitted its culpability.

Penn Treaty has moved for summary judgment on three separate grounds; these are:

(1)    that Penn Treaty was justified in terminating the October 21, 1999 Agreement between the parties (the "**Agreement**") because Michael Callahan

---

[1]    On December 22, 2003, NHCS filed its motion for partial summary judgment on the issue of Penn Treaty's liability. Rather than burdening the Court with a repetition of that motion, NHCS incorporates the same by reference as if the same were set forth at length.

represented a "material change in the management" of NHCS that was not approved by Penn Treaty in writing;[2]

    (2)    that Penn Treaty was justified in refusing to advance funds to NHCS under the January 11, 2000 Promissory Note made by Penn Treaty and delivered to NHCS (the "**Promissory Note**") because NHCS defaulted on the Promissory Note;[3] and

    (3)    that NHCS's claim for damages is speculative.

All three of these arguments are completely refuted by the facts and the law. Penn Treaty's motion for summary judgment should be denied.

## II.  ARGUMENT.

### A.  PENN TREATY BREACHED THE AGREEMENT.

#### 1.  There was no "material change in the management" of NHCS.

As detailed in NHCS's pending motion for partial summary judgment, Michael Callahan did not represent a "material change in the management" of NHCS so as to justify Penn Treaty's termination of the Agreement. Some key points, however, warrant repeating:

- As of November 5, 2001 – the date Penn Treaty terminated the Agreement – Callahan was only a 25% <u>non-voting</u> shareholder of NHCS.[4]

---

[2]     A true and correct copy of the Agreement is attached as **Exhibit "A"** hereto and incorporated herein by reference. Section 6.2.3(d) permits the termination of the Agreement if there is a "material change in the management" of one party that is not approved in writing by the other party.

[3]     A true and correct copy of the Promissory Note is attached as **Exhibit "B"** hereto and incorporated herein by reference.

[4]     A true and correct copy of the certificate reflecting Callahan's acquisition of non-voting NHCS stock is attached as **Exhibit "C"** hereto and incorporated herein by reference.

- Callahan was not, and has never been, an officer, director or employee of NHCS.[5]

- Neal Forman – the chief executive officer of NHCS and a 25% shareholder – testified unequivocally that Callahan "never had any say in the running of this company [NHCS], ever."[6]

- Herb Schwartz – the president of NHCS and a 50% shareholder – testified that Callahan had no "management or any say-so in the company [NHCS] whatsoever."[7]

- Under Article II, Section 1 of NHCS's bylaws, all management functions are entrusted to NHCS's board of directors, of which Callahan was never a member.[8]

- Under the corporate law of the State of Washington, where NHCS was incorporated, the business and affairs of NHCS are required to be managed by its board of directors, of which Callahan was never a member.[9]

Any one of these facts standing alone would be sufficient to withstand Penn Treaty's motion for summary judgment; taken together, these facts mandate not only that Penn Treaty's

---

[5]    Callahan Deposition Transcript at 207-08, a true and correct copy of which is attached as **Exhibit "D"** hereto and incorporated herein by reference.

[6]    Forman Deposition Transcript at 31-32, a true and correct copy of which is attached as **Exhibit "E"** hereto and incorporated herein by reference.

[7]    Schwartz Deposition Transcript at 275-76, a true and correct copy of which is attached as **Exhibit "F"** hereto and incorporated herein by reference.

[8]    NHCS's bylaws, true and correct copies of which are attached as **Exhibit "G"** hereto and incorporated herein by reference.

[9]    Wash. Rev. Code § 23B.02.020(3)(z). See also Wash. Rev. Code § 23B.08.010 ("All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation **managed** under the direction of, its **board of directors**, subject to any limitations set forth in the articles of incorporation.") (emphasis added).

motion be denied, but that summary judgment instead be entered in favor of NHCS on the issue of Penn Treaty's liability for breaching the Agreement.

Regrettably, Penn Treaty seeks to support its motion for summary judgment by distorting four (4) isolated pieces of the record. NHCS will correct these distortions in turn.

*First*, Penn Treaty cites to an e-mail sent by Callahan to Thomas C. Sadler, Jr., Esquire (Penn Treaty's outside counsel) on October 1, 2001 where Callahan referred to himself as a "principal" who was asked by Forman and Schwartz to help negotiate certain disputes between the parties. Penn Treaty has wrongly pounced on the word "principal" to justify the termination of the Agreement. Penn Treaty's argument fails for several reasons.

As a threshold matter, the Agreement makes no mention of the term "principal;" nothing in the Agreement permits a party to terminate the Agreement if a new "principal" becomes involved with the other party. Penn Treaty's attempt to equate Callahan's use of the word "principal" with the contractually-agreed-on requirement of a "material change in management" is a giant and tortured stretch belied by the record evidence.

In his October 1, 2001 e-mail, Callahan made his position clear: he expressly stated that his involvement was at the specific request and direction of Forman and Schwartz, the majority shareholders of NHCS. Nothing in Callahan's e-mail even remotely suggests that he had the independent authority to do anything on behalf of NHCS. Moreover, there is not a shred of evidence in the record that Forman or Schwartz ever delegated any management responsibility to Callahan. Penn Treaty has not produced one single piece of paper indicating that Callahan had any independent management authority on behalf of NHCS. Indeed, the only other documents cited by Penn Treaty on this issue confirm that Callahan was at all times subordinate to – and

- 4 -

acting under the direction of – Forman and Schwartz.[10]

*__Second,__* Penn Treaty points to an incomplete snippet of Schwartz's deposition transcript. In response to a hypothetical question from Penn Treaty's counsel, Schwartz testified that, under his personal understanding of the term "principal", there would be a "material change in the management" of NHCS if a new "principal" became involved with the company. Penn Treaty, however, inexplicably omits the most important and relevant portion of that testimony: Schwartz went on to testify that, in his view, Callahan was <u>not</u> a "principal" of NHCS, as Schwartz understood that term.[11] All semantics aside, Schwartz testified emphatically that Callahan "was never an employee and never paid a fee from National Healthcare Services or was he voted into the company as an officer, nor did he ever have any control or voting stock or say-so in the company."[12] Putting the matter to rest, Schwartz further testified that "<u>[t]here was no other management in this company [NHCS] other than Neal [Forman] and myself.</u>"[13]

*__Third,__* Penn Treaty cites the deposition testimony of Sadler, Penn Treaty's outside counsel. In October 2001, Sadler communicated with Callahan regarding a possible resolution of the dispute between the parties. At his deposition, Sadler testified that Callahan said all

---

[10]     <u>See</u> letter from Schwartz to Cameron Waite and John Underhill of Penn Treaty, dated June 25, 2001, a true and correct copy of which is attached as **Exhibit "H"** hereto and incorporated herein by reference (Schwartz identifies Callahan as "an <u>associate</u> of ours who we have been <u>consulting</u> with on some of the contractual issues." (emphasis added)). <u>See also</u> e-mail from Callahan to Sadler, dated October 17, 2001, a true and correct copy of which is attached as **Exhibit "I"** hereto and incorporated herein by reference (Callahan prefaces his remarks by stating "I have spoken with Neal [Forman] and Herb [Schwartz] . . . ."). This is hardly evidence that Callahan was somehow in charge of NHCS and "calling the shots" on his own, as Penn Treaty would have this Court believe.

[11]     Schwartz Deposition Transcript at 279 (Exhibit "F" hereto).

[12]     <u>Id.</u> at 281.

[13]     <u>Id.</u> at 114 (emphasis added).

negotiations should be conducted through Callahan (and not Forman or Schwartz). If anything, this testimony proves only that Callahan – a law school graduate and formerly a practicing attorney – was the spokesperson chosen by NHCS to communicate NHCS's settlement position, in much the same way that Sadler was the person chosen by Penn Treaty to conduct the negotiations on behalf of Penn Treaty. As Penn Treaty must surely concede, if Sadler did not represent a "material change in the management" of Penn Treaty, likewise, Callahan did not represent a "material change in the management" of NHCS; simply having been selected to conduct the settlement negotiations does not create a "material change in the management."

*Fourth and finally,* Penn Treaty attempts to make hay out of the fact that Callahan has taken an "active" role in this litigation by reviewing the complaint before it was filed and attending certain depositions. This argument smacks of desperation. Obviously, as a 25% non-voting shareholder, Callahan has a legitimate stake in the outcome of this lawsuit; plainly put, he has every right to be involved in the case. More importantly, whatever role Callahan plays at NHCS now has absolutely no bearing on the core issue in this case: the role Callahan played at NHCS prior to November 5, 2001, when Penn Treaty terminated the Agreement. Penn Treaty's reliance on post-November 5, 2001 evidence to justify its November 5, 2001 termination is wholly misplaced.

### 2.    Penn Treaty authorized Callahan's involvement in writing.

Section 6.2.3(d) of the Agreement allows a "material change in the management" of one party if it is approved in writing by the other party. Even if Callahan is deemed to have represented a "material change in the management" of NHCS, that change was undoubtedly approved in writing and by the conduct of Penn Treaty.

In its motion for summary judgment, Penn Treaty freely admits it was on notice of Callahan's involvement in the AllRisk Healthcare® venture as early as March 2001 – <u>eight months before Penn Treaty terminated the Agreement.</u>[14]  On March 23, 2001, Web Barth – one of the persons jointly approved by NHCS and Penn Treaty to handle certain aspects of the AllRisk Healthcare® program – sent an e-mail to Jackie Frantz of Penn Treaty, informing Penn Treaty that "we have a new exec [sic] helping to manage our fulfillment and service job.  His name is Mike Callahan . . . and I would appreciate it if you would include him in your email traffic to Mike Hauert and me."[15]

As explained in NHCS's motion for partial summary judgment, Callahan was involved at that time with Barth, but not with NHCS.  Callahan did not acquire his non-voting shareholder interest in NHCS until August 22, 2001, well after he became involved with Barth.[16]  Nevertheless, Penn Treaty believed – and apparently, despite overwhelming evidence to the contrary, still chooses to believe – that Callahan became actively involved in the management of <u>NHCS</u> in March 2001.  Significantly, until its wrongful termination of the Agreement eight months later, Penn Treaty <u>never</u> objected to Callahan's perceived role at NHCS.  It is patent: there was not one word of protest from Penn Treaty.

To the contrary, the record shows that Penn Treaty fully authorized Callahan's involvement.  On March 26, 2001, Jackie Frantz of Penn Treaty responded to Barth's e-mail and expressly approved Callahan's involvement and agreed to keep Callahan apprised of matters by

---

[14]    Memorandum in Support of Defendants' Motion for Summary Judgment, at 8.

[15]    A true and correct copy of Barth's March 23, 2001 e-mail to Penn Treaty is attached as **Exhibit "J"** hereto and incorporated herein by reference.

[16]    <u>See</u> Exhibit "C" hereto.

e-mail in the future.[17]  It is undisputed that multiple representatives of Penn Treaty openly dealt with Callahan over the next eight months, corresponding with him on issues related to the AllRisk Healthcare® program, all without once objecting to Callahan's involvement or questioning his role in any way.[18]  Therefore, to the extent Penn Treaty thought that Callahan was a management executive at NHCS, Penn Treaty gave its full and unequivocal authorization to that appointment, both in writing and through its conduct.

Under Section 6.2.3(d) of the Agreement, a "material change in the management" of one party is a sufficient reason for termination only where the other party does not approve such "material change in the management" in writing.[19]  Believing – albeit mistakenly – that Callahan was a management executive of NHCS, Penn Treaty gave its approval in writing as early as March 26, 2001, and reaffirmed that approval by written correspondence with Callahan and NHCS over the next eight months.[20]  Only when convenient, Penn Treaty terminated the Agreement in protest over behavior Penn Treaty repeatedly ratified.

In sum, then, Penn Treaty must pick its own poison: **either** Callahan never represented "a material change in the management" of NHCS **or** Penn Treaty, by its own words and deeds,

---

[17]    A true and correct copy of Frantz's e-mail to Barth, dated March 26, 2001, is included in the exchange of e-mail correspondence attached as Exhibit "J" hereto and incorporated herein by reference.

[18]    A sampling of that correspondence from Penn Treaty to Callahan – all of which occurred before the November 5, 2001 termination of the Agreement – is attached as **Exhibit "K"** hereto and incorporated herein by reference.  Over the same time period, Penn Treaty also sent numerous e-mails to Forman, Schwartz, Barth and others on which Callahan was copied; a sampling of such correspondence is attached as **Exhibit "L"** hereto and incorporated herein by reference.

[19]    Agreement, § 6.2.3(d).

[20]    Under Pennsylvania's Electronic Transactions Act, electronic records, such as e-mails, are legally equivalent to writings and equally valid.  73 P.S. § 2260.303.

authorized Callahan's participation in NHCS's management. Either choice is equally deadly to Penn Treaty's claims.

### B.    PENN TREATY BREACHED THE PROMISSORY NOTE.

As a prominent part of this business relationship, on January 11, 2000, Penn Treaty executed a Promissory Note in favor of NHCS, extending a line of credit to NHCS of up to $300,000.00[21] so as to fund the "start-up, marketing and establishment" of the AllRisk Healthcare® program.[22] It is undisputed that NHCS ultimately borrowed $125,000.00 from Penn Treaty under the Promissory Note, leaving $175,000.00 still available to be borrowed.

On February 9, 2001, NHCS requested an advance of $25,000.00 under the Promissory Note.[23] At the time of that request, NHCS was not in default. Rather, as Penn Treaty admits in its motion, the parties agreed that payments owed to Penn Treaty under the Promissory Note would be deducted from the income due to NHCS from sales of the AllRisk Healthcare® program.[24] Though NHCS was not in default, Penn Treaty wrongfully denied NHCS's February 9, 2001 request for additional funding under the Promissory Note.[25]

---

[21]    See Exhibit "B" hereto.

[22]    Id. Despite Penn Treaty's protestations to the contrary, there is nothing in the Promissory Note that prohibited Forman or Schwartz – the very men responsible for fulfilling NHCS's end of the bargain – from drawing a salary for the services they rendered in connection with the AllRisk Healthcare® venture.

[23]    See letter from Forman to Cameron Waite of Penn Treaty dated February 9, 2001, a true and correct copy of which is attached as **Exhibit "M"** hereto and incorporated herein by reference.

[24]    See, e.g., letters from Michael Grill of Penn Treaty to Forman, true and correct copies of which are attached as **Exhibit "N"** hereto and incorporated herein by reference.

[25]    See letter from Forman to Cameron Waite of Penn Treaty dated February 11, 2001, a true and correct copy of which is attached as **Exhibit "O"** hereto and incorporated herein by reference.

Significantly, the income stream generated by sales of the AllRisk Healthcare® program covered the amounts due under the Promissory Note until April 2001 – two months after Penn Treaty improperly denied NHCS's request for funding.[26]    Significantly, Penn Treaty did not declare the Promissory Note in default until it filed its lawsuit under the Promissory Note in December 2001 – ten (10) months after Penn Treaty improperly denied NHCS's request for funding.[27]

Oddly, in its motion for summary judgment, Penn Treaty relies solely on NHCS's alleged default as the reason for Penn Treaty's refusal to honor NHCS's earlier request for funding under the Promissory Note.    Once again, Penn Treaty is attempting to rely on after-the-fact evidence that did not exist at the time of Penn Treaty's wrongful decision.    Simply put, Penn Treaty cannot rely on post-February 2001 events to justify its unilateral and wrongful February 2001 decision to revoke the Promissory Note.[28]

---

[26]    Exhibit "G" to Penn Treaty's complaint originally filed in the Court of Common Pleas of Lehigh County and removed to and indexed in this Court at Civil Action No. 02-46 (EL) (the "**Promissory Note Litigation**"); a true and correct copy of the complaint in the Promissory Note Litigation is attached as **Exhibit "P"** hereto and incorporated herein by reference.

[27]    Id. Curiously, Penn Treaty itself did not formally declare the Promissory Note in default until March 2002, two months after the issues were joined in the Promissory Note Litigation and a year after Penn Treaty improperly denied NHCS's request for funding.

[28]    The record makes clear that NHCS's subsequent default under the Promissory Note was caused by the failure of Penn Treaty to live up to its commitments under the Agreement to properly market AllRisk Healthcare®. See Forman Deposition Transcript at 122 (Exhibit "E" hereto). Because all of NHCS's income came from sales of the AllRisk Healthcare® program, Penn Treaty's failure to properly market the program directly caused NHCS to fail financially. Wrongfully deprived of its sole source of revenue, NHCS eventually (and predictably) defaulted under the Promissory Note. Under Pennsylvania law, however, the "[c]onduct of one party that prevents the other from performing is an excuse for nonperformance." Liddle v. Scholze, 768 A.2d 1183, 1185 (Pa. Super. Ct. 2001). See also Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988) ("The general rule is that a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract."); Craig Coal Mining Co. v. Romani, 513 A.2d 437, 440 (Pa. Super. Ct. 1986)

**C.    NHCS'S DAMAGES ARE NOT SPECULATIVE.**

Lastly, Penn Treaty moves for summary judgment on the ground that NHCS's claim for damages is too speculative.    This argument flies in the face of the record evidence and established contract law.

Under Pennsylvania law, damages need not be proven with exact mathematical precision.[29]  Rather, damages need only be established with a "reasonable" degree of certainty.[30]  "The basis for this rule is that the breaching party should not be allowed to shift the loss to the injured party when damages, even if uncertain in amount, were certainly the responsibility of the party in breach."[31]  Applying these standards, there is ample evidence in the record to support NHCS's claim for damages.

Contrary to Penn Treaty's argument, NHCS's AllRisk Healthcare® program is anything but an unknown commodity.  In fact, AllRisk Healthcare® was on the market for two years before Penn Treaty wrongfully terminated the Agreement, and – significantly – many AllRisk

---

(recognizing that a contracting party cannot "take advantage of an insurmountable obstacle placed, by himself, in the path of the other party's adherence to an agreement.").  Thus, even had NHCS's default occurred before Penn Treaty's revocation of the Promissory Note, Penn Treaty would still be liable.

[29]    Smith v. Penbridge Assocs., Inc., 655 A.2d 1015, 1022 (Pa. Super. Ct. 1995); Molag, Inc. v. Climax Molybdenum Co., 637 A.2d 322, 324 (Pa. Super. Ct. 1994); Pikunse v. Kopchinski, 631 A.2d 1049, 1052 (Pa. Super. Ct. 1993).

[30]    Smith, 655 A.2d at 1022; Molag, 637 A.2d at 324; Pikunse, 631 A.2d at 1052.

[31]    Smith, 655 A.2d at 1022 (citations omitted).  In addition, the recovery of lost profits is not precluded simply because the plaintiff's business is relatively new.  Id.  See also Jahanshahi v. Centura Dev. Co., Inc., 816 A.2d 1179, 1184 (Pa. Super. Ct. 2003) ("Lost profits from a new business may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.") (citations omitted).

- 11 -

Healthcare® customers continue to renew their memberships to this day.[32]

The AllRisk Healthcare® program had a proven track record before Penn Treaty abruptly and wrongfully abandoned the program.  In September 1999, at the outset of the AllRisk Healthcare® venture, the parties created financial projections of the revenue to be generated by sales of the AllRisk Healthcare® program.  Based on data supplied by Penn Treaty, the parties anticipated that the program would generate millions of dollars.[33]  In February 2000, Penn Treaty conducted a "test market" of the AllRisk Healthcare® program.[34]  The test market confirmed AllRisk Healthcare®'s enormous potential.[35]  Thereafter, following considerable delays by Penn Treaty, AllRisk Healthcare® was finally "launched" in February 2001 – albeit in a limited number of states and without the marketing efforts promised by Penn Treaty.[36]  Again, however,

---

[32]    The parties entered into the Agreement on October 21, 1999, and Penn Treaty terminated the Agreement on November 5, 2001.  The AllRisk Healthcare® program was marketed and sold during the intervening two years.  Further, it is undisputed that despite Penn Treaty's termination of the Agreement, and the resulting cessation of new sales, the AllRisk Healthcare® program still generates renewal fees to this day – without even the slightest marketing efforts to retain such business.

[33]    Certification of Neal Forman, attached as **Exhibit "Q"** hereto and incorporated herein by reference, at ¶¶ 2-8.

[34]    Id. at ¶¶ 9-11.

[35]    Id. at ¶¶ 17-25.

[36]    Id. at ¶¶ 12-16.  The reasons for Penn Treaty's delays and inattentiveness to the AllRisk Healthcare® program were readily apparent:  Penn Treaty was experiencing severe financial and regulatory problems in 2001.  Penn Treaty's stock price plummeted; A.M. Best Co. downgraded its rating of Penn Treaty; and Penn Treaty's license to sell insurance was suspended nationwide.  See Penn Treaty's supplemental responses to NHCS's interrogatories, true and correct copies of which are attached as **Exhibit "R"** hereto and incorporated herein by reference.  See also selected media reports regarding Penn Treaty's troubles, true and correct copies of which are attached collectively as **Exhibit "S"** hereto and incorporated herein by reference.  With its very survival at stake, Penn Treaty did not consider AllRisk Healthcare® a priority, and represented to NHCS that Penn Treaty could not turn its attention to the program for two years while Penn Treaty got its financial and regulatory house in order.  Schwartz Deposition Transcript at 246-49

the product launch reaffirmed that AllRisk Healthcare® would generate substantial revenue if properly marketed by Penn Treaty's agents.[37]

Thus, in its two years on the market, AllRisk Healthcare® was poised to become the huge financial success both NHCS and Penn Treaty envisioned at the outset of the venture.[38] If Penn Treaty had not wrongfully terminated the Agreement, the AllRisk Healthcare® program would have continued to generate revenue for the next four years remaining on the original term of the Agreement and beyond.[39] Without question, there is a sufficient basis in the record for the calculation of NHCS's damages.

Further, it is undisputed that other companies have entered into the non-insurance healthcare discount marketplace, selling programs comparable to AllRisk Healthcare®. The success of those products serves as a useful yardstick for the success that AllRisk Healthcare® would have achieved but for Penn Treaty's breach of the Agreement. At trial, NHCS will offer expert testimony on this subject and other issues related to damages.

---

(Exhibit "F" hereto).    Viewing AllRisk Healthcare® as a distraction, Penn Treaty simply manufactured a pretext to terminate the Agreement.

[37]    Certification of Neal Forman, at ¶¶ 26-31.

[38]    When the parties entered into the Agreement, the late Glen Levit, former president of Penn Treaty, "was very enthusiastic about the opportunity. He could see a huge market potential for the [AllRisk Healthcare®] product . . . ." Forman Deposition Transcript at 154 (Exhibit "E" hereto). Because of Penn Treaty's failure to properly market AllRisk Healthcare®, the parties' early financial projections were obviously not met. Schwartz Deposition Transcript at 213-19 (Exhibit "F" hereto). The fact that Penn Treaty prevented AllRisk Healthcare® from reaching its full potential certainly provides no support for Penn Treaty's motion for summary judgment.

[39]    Section 6.1 of the Agreement provided that it was to continue until December 31, 2005. Under Section 3.3(a), NHCS is also entitled to receive its share of income from AllRisk Healthcare® membership renewals even after the Agreement is terminated.

- 13 -

Notwithstanding the rhetoric in Penn Treaty's motion for summary judgment, Penn Treaty knows full well that AllRisk Healthcare® was a valuable product. Indeed, prior to this litigation – before Penn Treaty had a motive to slant its position – Penn Treaty boasted about the success and promise of the AllRisk Healthcare® program. In February 2001, Derrick Brickhouse, a senior executive of Penn Treaty, reported to NHCS that AllRisk Healthcare® agent contracts were arriving at Penn Treaty's office "in bulk" and that "[t]here has been nothing but positive feedback from the field on the program."[40] Similarly, in September 2001, just two months before Penn Treaty terminated the Agreement, Penn Treaty described AllRisk Healthcare® in glowing terms in Penn Treaty's monthly newsletter:

> In an effort to keep Penn Treaty on the leading edge with new and innovative products one in particular has created quite a stir among our representatives. The AllRisk Program offered by Senior Financial Consultants (a subsidiary of Penn Treaty American Corporation) was recently rolled out and is garnering high praise for its simplicity, affordability and uniqueness.[41]

Now that it has been sued for going back on its word, Penn Treaty has changed its tune, arguing that the AllRisk Healthcare® program is worthless. This inconsistent and self-serving argument simply cannot form the basis of a motion for summary judgment.

The record contains more than enough evidence to support NHCS's claim for damages; Penn Treaty's motion for summary judgment should be denied.

---

[40]    E-mail from Brickhouse to Schwartz dated February 20, 2001, a true and correct copy of which is attached as **Exhibit "T"** hereto and incorporated herein by reference.

[41]    September 2001 edition of Long Term Care Sales and Marketing INSIGHT, at 6, a true and correct copy of which is attached as **Exhibit "U"** hereto and incorporated herein by reference.

## III.     CONCLUSION.

For all of the foregoing authority, arguments and reasons, NHCS respectfully requests that the Court deny Penn Treaty's motion for summary judgment and grant NHCS's motion for summary judgment.

Respectfully submitted,

Roberto A. Rivera-Soto
FOX ROTHSCHILD LLP
2000 Market Street – Tenth Floor
Philadelphia, Pennsylvania 19103-3291
(215) 299-2000

ATTORNEYS FOR PLAINTIFF
NATIONAL HEALTHCARE SERVICES, INC.

**DATED:**     January 16, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Opposition to

Defendants' Motion for Summary Judgment was served by hand delivering the same to:

Martin C. Bryce, Jr., Esq.
Douglas L. Flitter, Esq.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103


Roberto A. Rivera-Soto

**DATED:**        January 16, 2004

X:183593

- 16 -