## AGREEMENT

This Agreement is made and entered into on the ____21/__ day of October, 1999, by and between Penn Treaty Network America Insurance Company (hereinafter referred to as "PTNA") with its principal place of business in Allentown, Pennsylvania and National Healthcare Services, Inc. (hereinafter referred to as "NHCS"), with its principal place of business in Bellevue, Washington.

RECITALS:

WHEREAS, PTNA is a life insurance company organized under the laws of the Commonwealth of Pennsylvania and, together with its affiliates, is licensed to conduct insurance business in all of the United States; and

WHEREAS, NHCS is a duly licensed registered firm authorized to conduct business in all jurisdictions in which its activities so require; and

WHEREAS, NHCS has developed a relationship with a network of long-term care service providers who have entered into agreements with long-term care facilities and ancillary providers to provide long-term care services to individuals ("Beneficiaries") covered by certain long-term care benefits programs ("Benefit Program"); and

WHEREAS, PTNA and NHCS desire to enter into an arrangement for the shared development, marketing and sale of the Benefits Program (the "Venture") pursuant to the terms and conditions set forth in this Agreement; and,

NOW THEREFORE, intending to be legally bound, and in consideration of the foregoing premises and the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### Article I. The Benefit Program

**1.1 Benefit Program Design:** Within thirty (30) days of the date this Agreement is executed, NHCS shall prepare and deliver to PTNA a business plan describing the general business direction, products and programs for the Venture for the immediately succeeding fiscal year.

**1.2 Offering and Issuance to Beneficiaries:** Upon execution of this Agreement, PTNA and NHCS shall enter into a Marketing General Agent's Contract (the "MGA Contract") whereby PTNA will designate and appoint NCHS as a general sales agent and producer in all states in which both PTNA and NHCS are duly licensed for certain long-term care insurance products as mutually agreed upon by both parties. The provisions of said Contract shall set forth and govern the responsibilities of NHCS as a General Agent of PTNA and an executed copy of said Contract shall be attached to this Agreement as Exhibit A.

PLAINTIFF'S EXHIBIT A

1

The Benefit Program shall be offered for sale to individuals exclusively through a distribution network consisting of (i) duly appointed insurance agents ("Agents") and other individuals ("Other Producers") as designated by NHCS and as appointed with (or approved by, in the case of Other Producers) PTNA, and (ii) duly licensed insurance agents who are either already, or those who will be, directly appointed with PTNA. No Agent or Other Producer affiliated with NHCS shall offer to sell the Benefit Program in any state unless such individuals are (a) affiliated with NHCS pursuant to a contract provided by NHCS for such purposes; (b) authorized by PTNA to sell the Benefit Program, and (iii) in the case of an Agent, licensed with PTNA in accordance with the rules of the insurance regulatory authority of said state. PTNA shall appoint such Agents pursuant to forms for such purpose submitted to PTNA by NHCS. PTNA shall have the right to approve all such Agents and Other Producers appointed by NHCS and, in its sole discretion, may give, withhold, suspend or terminate any Agent's or Other Producer's rights or privileges to participate in the marketing and/or sale of the Benefit Program. Both parties agree to use their best efforts to recruit members of their respective agency networks to market and solicit sales under the Benefit Program. PTNA and NHCS shall jointly develop and approve the commission scale under which the agents will be compensated for Benefit Program sales.

1.3 **Marketing Means and Methods:** The parties will jointly develop a plan detailing the marketing means and methods to be used in the marketing, distribution and sale of the Benefit Program. The marketing plan, and any modifications thereto, shall be subject to and require the prior written approval of both parties, which approval shall not be unreasonably withheld. Both parties covenant and agree that during the term of this Agreement, they shall use their best efforts to promote, market and distribute the Benefit Program.

1.4 **Exclusivity:** During the term of this Agreement and for a period of one year following the termination of this Agreement, both parties agree that neither they nor any of their affiliates shall engage in or possess any interest in any business or activity that directly competes with the benefit Program without the prior written approval of the other party. The Benefit Program shall be offered for sale exclusively as set forth in Section 1.2 above. No provision or condition of this Agreement shall be interpreted to restrict in any way the sales activity of any PTNA agent, broker or representative of PTNA with respect to the offer and sale of this Benefit Program in any state.

1.5 **Trademarks, Service-marks and Logos:**

   1.5.1   Neither party shall have the right to use the other's name or any of the other's service marks, trademarks, designs or logos relating to such names, trade or business, without the other party's prior written consent.

   1.5.2   The parties agree that upon agreement by the parties of a name for the Benefit Program (i) any related products, and any variant of the foregoing, and all related symbols, trademarks and service marks shall be the sole

and exclusive property of the Venture, and (ii) PTNA shall file for service mark registration of the name, and all such related designs and logos.

1.5.3 Upon the expiration or termination of this Agreement pursuant to Section 6.2 herein, it is agreed that both parties shall immediately cease from using the Benefit Program name(s), related products, and any variant of the foregoing, and all related symbols, trademarks and service marks to bind or issue any further Benefit Programs. Pursuant to Section 6.6 herein, the parties may continue to use such names, marks, logos and designs in order to perform duties with respect to the business produced prior to the expiration or termination, until all such obligations on the part of both parties have been fully satisfied.

## Article II. Contributions and Financing

**2.1 Contributions and Percentage Interests:** The parties shall each have a 50% (fifty-percent) ownership interest in the Venture. It is further agreed that PTNA shall be responsible to pay for all reasonable and necessary initial Venture start-up costs for printing, materials and other related expenses.

## Article III. Distributions and Allocations

**3.1 Distribution to Parties/ Allocation of Profits and Losses:** Distribution shall be made to the parties as follows:

a. The first ninety-five dollars ($95.00) of premium for every household enrolled in the Benefit Program shall be distributed to NHCS, or as NHCS shall direct in writing, which shall be earned and payable for all specific functions for which NHCS is responsible and which it may provide directly or, upon the prior written approval of PTNA, through contract with others. At the signing of this Agreement, NHCS has elected, and PTNA gives its approval, to provide such functions through a contract with Web Barth and, until further written notice, NHCS directs that this fee be disbursed directly to Web Barth. This fee shall be earned and payable when PTNA receives the full premium in cash for Benefit Program business pursuant to the applications procured while this Agreement is in effect. Renewal fees shall be ninety-five dollars ($95.00) for every household enrolled in the Benefit Program and shall be earned and payable to NHCS, or as NHCS may direct as provided above, when PTNA receives the applicable renewal premiums in cash services and responsibilities as set forth in Exhibit B.

b. While this Agreement is in effect, a fee in the amount of twenty-five dollars ($25.00) for every household enrolled in the Benefit Program shall be disbursed directly to PTNA and shall be earned and payable to PTNA for all administrative functions performed by PTNA. Renewal fees shall be twenty-five dollars ($25.00) for every household enrolled in the Benefit Program and shall be earned and payable to PTNA when PTNA receives the applicable

3

      renewal premiums in cash. Said functions include, but are not limited to billing, collection of premium and commission services.

  c. Each month, after all Venture cash expenditures are paid or reserved for payment (including commissions payable to NHCS, PTNA, Agents or Other Producers, respectively, as set forth in Exhibit "A") and the disbursements called for in Sections 3.1(a) and 3.1(b) are made, fifty percent (50%) of the remaining and available cash shall be distributed to NHCS and fifty percent shall be distributed to PTNA. It is the intent of the parties that such profits or losses shall be shared equally between them.

3.2 <u>Commissions:</u> Subject to the terms of the MGA Contract and in accordance with the rules and regulations of PTNA, PTNA shall pay commissions as appropriate to NHCS on account of Benefit Program plans issued by PTNA during the term of this Agreement with respect to applications procured by NHCS through its Agents and submitted to PTNA. All such first year commissions shall be earned and payable when PTNA receives the full premium in cash for Benefit Program business pursuant to the applications procured while this Agreement is in effect. Renewal commissions shall be earned and payable by the fifteenth of the month following the month when PTNA receives the applicable renewal premiums in cash.

3.3 <u>Payments After Termination:</u>

  a. Upon termination of this Agreement, both parties shall be entitled to receive payment of commissions on all premiums which are received in cash by PTNA after such termination, the first year commission and any renewal commission which said party would have earned had this Agreement continued in effect. These commissions are vested to both parties and their respective agents.

  b. Notwithstanding the provisions of Section 3.3(a) of this Agreement, if at any time before or following termination of this Agreement either party determines in good faith, with just cause and documented proof that the other party has entered into or engaged in a pattern of conduct to induce Beneficiaries of the Benefit Program to terminate enrollment in the Benefit Program or has entered into or engaged in a pattern of conduct to induce agents of the other party to terminate their services for said party, all of the breaching party's rights to earned commissions otherwise payable after termination shall immediately thereafter terminate, and the breaching party's commissions shall be retained by the non-breaching party.

  c. If at any time before or following termination of this Contract either party determines in good faith, with just cause and documented proof that any Agent or Other Producer of the other party has entered into or engaged in a pattern of conduct to induce Beneficiaries of the Benefit Program to terminate enrollment in the Benefit Program, or has entered into or engaged in a pattern of conduct to induce representatives of the other party to terminate their services for said party, the party who recruited said Agent (or Other Producer) shall, immediately upon notice of such conduct, take immediate and reasonable action to remedy

   the situation.
d. Notwithstanding the provisions of Section 3.3(a) of this Agreement, if the termination of this Agreement is required pursuant to Section 6.2.3(a), all of the breaching party's rights to earned commissions otherwise payable after termination shall immediately thereafter terminate, and the breaching party's commissions shall be retained by the non-breaching party.

### Article IV. Representations and Warranties

**4.1 Representations and Warranties of PTNA:** PTNA hereby makes the following representations and warranties to NHCS:

   4.1.1  PTNA is, and during the term of this Agreement shall, at all times, continue to be a duly incorporated insurance company, validly existing and in good standing under the laws of the State of Pennsylvania. The execution, delivery and performance of this Agreement and the performance by PTNA of its obligations hereunder, have been duly and validly authorized by all necessary corporate action on the part of PTNA. This Agreement has been duly and validly executed and delivered to NHCS and constitutes the valid and legally binding obligation of PTNA, enforceable in accordance with its terms.
   4.1.2  To the best of PTNA's current knowledge, the execution and delivery of and the performance by PTNA under this Agreement does not and will not conflict with or result in a breach or violation of, or a default under the bylaws or certificate of incorporation of PTNA or any other obligation to which PTNA is a party or by which it is or may be bound.
   4.1.3  To the best of PTNA's current knowledge, there are no actions, suits, investigations or proceedings pending or threatened against PTNA, in law or in equity, that individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement or the transactions contemplated hereby.
   4.1.4  To the best of PTNA's current knowledge, no warranty or representation by PTNA in this Agreement, or in any writing furnished, or to be furnished to NHCS by PTNA pursuant hereto or in connection herewith, contains or will contain any untrue statement of material fact, or omits, or will fail to state, any material fact necessary to make the statements herein or therein not misleading.

**4.2 Representations and Warranties of NHCS:** NHCS hereby makes the following representations and warranties to PTNA:

   4.2.1  NHCS is, and during the term of this Agreement shall, at all times, continue to be a duly incorporated company, validly existing and in good standing under the laws of the State of Washington. The execution, delivery and performance of this Agreement and the performance by NHCS of its obligations hereunder, have been duly and validly authorized

       by all necessary corporate action on the part of NHCS. This Agreement has been duly and validly executed and delivered to PTNA and constitutes the valid and legally binding obligation of NHCS, enforceable in accordance with its terms.

4.2.2 To the best of NHCS's current knowledge, the execution and delivery of and the performance by NHCS under this Agreement does not and will not conflict with or result in a breach or violation of, or a default under the bylaws or certificate of incorporation of NHCS or any other obligation to which NHCS is a party or by which it is or may be bound.

4.2.3 To the best of NHCS's current knowledge, there are no actions, suits, investigations or proceedings pending or threatened against NHCS, in law or in equity, that individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement or the transactions contemplated hereby.

4.2.4 To the best of NHCS's current knowledge, no warranty or representation by NHCS in this Agreement, or in any writing furnished, or to be furnished to PTNA by NHCS pursuant hereto or in connection herewith, contains or will contain any untrue statement of material fact, or omits, or will fail to state, any material fact necessary to make the statements herein or therein not misleading.

### Article V. Proprietary Interests

<u>5.1 PTNA Proprietary Information:</u> During the course of performance under this Agreement, NHCS and its agents, employees and representatives may obtain or have access to certain proprietary information of PTNA including, without limitation, names of policyholders, the identity and production of PTNA's distribution network (the "Proprietary Information"). NHCS covenants as follows with respect to PTNA Proprietary Information:

    <u>5.1.1</u> NHCS will maintain PTNA Proprietary Information on a strictly confidential basis and will permit its disclosure to only those employees, representative and agents of NHCS who require such for purposes in furtherance of the transaction contemplated herein and who have been advised of, and have agreed to be bound by, the terms of this Article V.

    <u>5.1.2</u> NHCS will, and will cause its employees, representatives and agents, to (i) keep PTNA Proprietary Information confidential; (ii) use PTNA Proprietary Information only as necessary to carryout the terms and conditions of this Agreement; and (iii) not disclose such information to others without the prior written consent of PTNA, except as may be required by law.

    <u>5.1.3</u> In the event that NHCS or anyone to whom NHCS discloses PTNA Proprietary Information as permitted by this Agreement becomes legally compelled to disclose any of PTNA's Proprietary Information, NHCS will provide PTNA with prompt notice so that they may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is

6

       not obtained or that PTNA waives compliance with the provisions of this Agreement, NHCS will disclose only that portion of the PTNA Proprietary Information which is legally required, and NHCS will exercise best efforts to obtain assurance that confidential treatment will be accorded PTNA Proprietary Information.

  5.1.4  Upon termination of this Agreement, NHCS will deliver all documents in its possession reflecting PTNA Proprietary Information to PTNA.

5.2 <u>NHCS Proprietary Information:</u> During the course of performance under this Agreement, PTNA and its agents, employees and representatives may obtain or have access to certain proprietary information of NHCS including, without limitation, the identity and production of NHCS's distribution network (the "Proprietary Information"). PTNA covenants as follows with respect to NHCS Proprietary Information:

  5.2.1  PTNA will maintain NHCS Proprietary Information on a strictly confidential basis
and will permit its disclosure to only those employees, representative and agents of PTNA who require such for purposes in furtherance of the transaction contemplated herein and who have been advised of, and have agreed to be bound by, the terms of this Article V.

  5.2.2  PTNA will, and will cause its employees, representatives and agents, to (i) keep NHCS Proprietary Information confidential; (ii) use NHCS Proprietary Information only as necessary to carryout the terms and conditions of this Agreement; and (iii) not disclose such information to others without the prior written consent of NHCS, except as may be required by law.

  5.2.3  In the event that PTNA or anyone to whom PTNA discloses NHCS Proprietary Information as permitted by this Agreement becomes legally compelled to disclose any of NHCS's Proprietary Information, PTNA will provide NHCS with prompt notice so that they may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is not obtained or that NHCS waives compliance with the provisions of this Agreement, PTNA will disclose only that portion of the NHCS Proprietary Information which is legally required, and PTNA will exercise best efforts to obtain assurance that confidential treatment will be accorded NHCS Proprietary Information.

  5.2.4  Upon termination of this Agreement for reasons other than as set forth in Section 6.3 of this Agreement, PTNA will deliver all documents in its possession reflecting NHCS Proprietary Information to NHCS, except as necessary for any continuing servicing responsibilities or obligations PTNA may have with respect to the Benefit Program.

Article VI. Term and Termination

6.1 <u>Term:</u> The initial term of the Venture shall commence on the date of this Agreement, and shall continue until December 31, 2005 unless earlier dissolved and terminated pursuant to the provisions of this agreement or applicable law. In the event

7

the agreement is not terminated (pursuant to Section 6.2 below) prior to that date, the term of this Agreement shall automatically extend for additional, successive three year periods unless either party gives the other party written notice of intent to terminate at least ninety (90) days prior to the end of the initial term or the then current three year extension, as the case may be.

6.2 Termination: This Agreement shall be terminable as follows:

    6.2.1  At any time, by mutual written agreement of the parties hereto.

    6.2.2  By either party, thirty (30) days following written notice to the other party that the other party has breached any material duty or obligation under this Agreement, provided that such breach remains uncured at the expiration of thirty (30) days after such notice;

    6.2.3  Immediately and without notice, by either party, in the event of:

        (a)  Fraud or willful misconduct committed by the other party, including but not limited to, a party willfully acting beyond the scope of its duties as contemplated by this Agreement or a party willfully binding the other party in any manner not contemplated by this Agreement;

        (b)  The insolvency of the other party;

        (c)  The commencement of any proceeding in bankruptcy, liquidation, receivership or dissolution by or against the other party which, if commenced against the other party, is not dismissed within sixty (60) days;

        (d)  The sale of all or substantially all of the assets of, the merger or transfer of a majority of the voting stock of, or a material change in the management of one party which has not been approved in writing by the other party provided, however, that this shall not apply to any transfer of interest between the existing shareholders of NHCS and/or their estates; or

        (e)  A determination by any official agency, board, commission or governmental entity that the provisions of this Agreement are invalid and unenforceable.

6.3  PTNA's Right of First Refusal: If, at any time, NHCS desires to sell or otherwise transfer all or any its ownership interest in the Venture, NHCS shall first obtain a bona fide written offer which they desire to accept (hereinafter called the "Offer") to purchase said interest for a fixed cash price. The Offer shall set forth its date, the proposed purchase price and the other terms and conditions upon which the purchase is proposed to be made, as well as the name and address of the prospective purchaser. NHCS shall transmit copies of the Offer to PTNA within seven days of NHCS's receipt of the Offer.

Transmittal of the Offer to PTNA shall constitute an offer by NHCS to sell NHCS's interest in the Venture to PTNA at the price and upon the terms of the Offer. For a

period of thirty (30) days after the submission of the Offer to PTNA, PTNA shall have the option, exercisable by written notice to NHCS, to (i) accept NHCS's offer as to the purchase of NHCS's interest in the Venture, or (ii) approve the sale or transfer of NHCS's ownership interest to the prospective purchaser. PTNA agrees that, in the event it elects not to exercise its option to purchase NHCS's interest pursuant to the terms of the Offer, PTNA shall not unreasonably withhold approval of NHCS's sale or transfer to the prospective buyer.

6.4 <u>PTNA's Buy-Out Option:</u> Notwithstanding the provisions of Section 6.3 of this Agreement, PTNA, in its sole discretion, may at any time, elect to purchase NHCS's entire interest in the Venture as follows: (i) PTNA shall provide written notice of it's election to NHCS; and (ii) the parties shall agree to a mutually agreeable amount to effectuate such purchase.

6.5 <u>Transfer of Interest; Withdrawal:</u>  Neither party shall, without in each instance obtaining the prior written approval of the other party, sell, assign or otherwise transfer, or mortgage, charge or otherwise encumber, or suffer or permit any third party to sell, assign or otherwise transfer, or mortgage, charge or otherwise encumber, all or any part of its interest, or contract to do, suffer or permit any of the foregoing. Any such transfer or encumbering or attempted transfer or encumbering by a party of its interest in violation of this Agreement shall be void and of no force or effect.

<u>6.6 Duty to Perform Post-Termination.</u>  Upon the expiration or termination of this Agreement, both parties and their respective Agents and Other Producers shall cease and desist from marketing or issuing any further Benefit Program plans, but shall continue to perform all other duties described in this Agreement with respect to the business produced prior to the expiration or termination, until all such obligations on the part of both parties have been fully satisfied. The parties shall continue to be reimbursed for services provided post-termination with respect to the Benefit Program business in accordance with Sections 3.3 above.

<u>6.7 Effect of Termination on Prior Rights and Obligations.</u> The termination or expiration of this Agreement shall not affect the rights and obligations of the parties hereto with respect to acts committed prior to the effective date of termination of expiration, nor shall such termination or expiration affect the indemnification obligations of the parties described in Section 8.2 below.

<u>VII. Accounting and Records</u>

<u>7.1 Books and Records.</u>

    7.1.1 <u>Maintenance.</u> At all times during the term hereof, the parties shall cause accurate books and records of account to be maintained for the Venture in which shall be entered all matters relating to the business and operations of the Venture, including all income, expenditures, assets and liabilities thereof. PTNA shall be responsible for maintaining all of the Venture's

9

books and records, which shall be maintained at PTNA. Each party, its authorized representatives, and any supervisory or regulatory authority shall have the right to inspect, examine and copy the books, records, files and other documents of the Venture at all reasonable times. Either party may at any time request an audit of the Venture's books and records; provided, however, that such audit shall be conducted in a manner that causes it to not unreasonably interfere with the conduct of business. The cost of any such audit, if separate from the annual audit to be performed pursuant to Subsection 7.1.3. hereof, shall be borne by the party requesting such audit; provided, however, that if such audit shall reveal any substantial discrepancy from any regular Venture audit, the cost of the audit shall be paid by the Venture.

7.1.2. <u>Method of Accounting.</u> Venture books and financial records shall be kept in accordance with the accrual method of accounting and as otherwise may be required by law and generally accepted account principles, and shall otherwise be adequate to provide each party with all such financial information as such party shall reasonably require to satisfy the tax and financial reporting obligations of such party. Each party shall be entitled to any additional information necessary for the party to adjust its financial basis statements to federal income tax basis statements (or vice versa) as the party's individual needs may dictate.

7.1.3 <u>Reports.</u> Within fifteen (15) business days after the end of each month of the term of this Agreement, the parties shall report to each other, in a form acceptable to both parties, such information with respect to the Benefit Program written during the previous month as, and in such form, either party reasonably may request.

<u>Article VIII. Miscellaneous Provisions</u>

**8.1 <u>Conformance with Law:</u>** NHCS and PTNA shall perform their respective duties hereunder in accordance with all applicable statutes and administrative regulations and shall immediately notify the other party of any notice received of any alleged violation thereof, and the violating party promptly shall correct such violation regardless of whether it has notified the other party.

**8.2 <u>Mutual Indemnification:</u>** PTNA shall hold harmless and indemnify NHCS, its officers, directors, employees and affiliates from and against any expenses, damages, liability, actions, costs or other claims, including, but not limited to, reasonable attorneys' fees and associated costs, incurred as a result of or in connection with any breach on the part of PTNA of any duty or obligation hereunder. Additionally, PTNA shall be responsible for any fines or liabilities incurred by the Venture as a result of the conduct of any Agent or Other Producer appointed by PTNA.

10

NHCS shall hold harmless and indemnify PTNA, its officers, directors, employees and affiliates from and against any expenses, damages, liability, actions, costs or other claims, including, but not limited to, reasonable attorneys' fees and associated costs, incurred as a result of or in connection with any breach on the part of NHCS of any duty or obligation hereunder. Additionally, NHCS shall be responsible for any fines or liabilities incurred by the Venture as a result of the conduct of any Agent or Other Producer appointed with PTNA by NHCS.

8.3 Arbitration: As a condition precedent to any right of action hereunder, any dispute arising out of this Agreement shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire, meeting in Lehigh County, Pennsylvania, unless otherwise agreed.

The members of the board of arbitrators shall be active or retired disinterested officials of insurance or reinsurance companies other than the Parties or their affiliates. Each Party shall appoint its arbitrator, and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails to appoint its arbitrator within thirty (30) days after being requested to do so by the claimant, the latter shall also appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within thirty (30) days after their nominations, each of them shall name three, of whom the other shall decline two and the decision shall be made by drawing lots.

The claimant shall submit its initial statement within twenty (20) days from appointment of the umpire. The respondent shall submit its statement within twenty (20) days after receipt of the claimant's statement, and the claimant may submit a reply statement within ten (10) days after receipt of the respondent's statement.

The board shall make its decision with regard to the custom and usage of the insurance and reinsurance business. The board shall issue its decision in writing upon evidence introduced at the hearing or by other means of submitting evidence in which strict rule of evidence need not be followed, but in which cross-examination and rebuttal shall be allowed if requested. The board shall make its decision within forty-five (45) days following the termination of the hearings unless the Parties consent to an extension. The majority decision of the board shall be final and binding upon all parties of the proceeding. Judgment may be entered upon the award of the board in any court having jurisdiction thereof.

Each Party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other Party the expense of the umpire. The remaining costs of the arbitration proceedings shall be allocated by the board.

8.4 No Waiver: NHCS and PTNA each agree that no ratification after the fact of any violation or breach of any provision of this Agreement by either, shall be construed as a waiver of any of its rights hereunder.

**8.5 Entire Agreement:** The terms and provisions contained herein constitute the entire agreement between the parties, and supersede any previous communications, representations or agreements, either oral or written, with respect to the subject matter hereof.

**8.6 Notice:** Any notice required hereunder shall be in writing and shall be deemed sufficiently given on the date of service, if served personally, or on the third business day after mailing if mailed by certified or registered mail, postage prepaid, or sent by some other means at least as fast and reliable as certified or registered mail, or on the first business day after placement with a reputable overnight delivery service, addressed as follows (or to such other address as any party may give the other in the manner herein provided for the giving of notice):

>If to PTNA:
>PENN TREATY NETWORK AMERICA INSURANCE COMPANY
>Attention: Glen A. Levit, President
>3440 Lehigh Street
>Allentown, Pennsylvania 18103-7001
>
>If to NHCS:
>NATIONAL HEALTHCARE SERVICES, INC.
>Attention: H. E. Schwartz, President
>4523 102nd Lane, N.E.
>Kirkland, WA 90833

**8.7 Severability:** The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if the invalid or unenforceable provision had been omitted. To the extent this Agreement requires the approval of any public official, agency, board, commission or bureau, it shall not be effective until such approval shall have been obtained or otherwise as required by applicable law.

**8.8 Assignment:** This Agreement shall be binding upon and inure to the benefit of PTNA, NHCS, and their respective successors and assigns; provided, however, that this Agreement shall not be assignable or transferable, and the duties of PTNA and NHCS, respectively, shall not be delegated to others, by operation of law or otherwise, without the prior written consent of both parties.

**8.9 Choice of Law:** This Agreement shall be interpreted in all respects in accordance with the internal laws of the State of Pennsylvania, without regard to principles of conflicts of law.

**8.10 Amendments:** This Agreement may be amended only by a written document signed by authorized representatives of PTNA and NHCS.

8.11 <u>Survival of Rights</u>: Except as provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective permitted successors and assigns.

8.12 <u>Headings:</u> Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

8.13 <u>Counterparts</u>: This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. All of such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the ____21____ day of October, 1999.

| PENN TREATY NETWORK AMERICA INSURANCE COMPANY | NATIONAL HEALTHCARE SERVICES, INC. |
|---|---|
| By: _____<br>Glen A. Levit, President | By: _____<br>H. E. Schwartz, President |

13

## EXHIBIT "B"

## NHCS Ongoing Program Development, Management and Service Functions

- Benefit provider screening and recommendations.
- Create vendor relationships.
- Manage development of all creative materials and forms; sales brochures, fulfillment package, salesmen's forms, processing forms.
- Develop and register trade names, trademarks, and logos to be owned by National Healthcare Services, Inc.
- Develop all Program Logistics – orders, fulfillment, payments.
- Develop and oversee all data activity between Penn Treaty and the service providers.
- Develop systems for payment processing and accounting to network providers.
- Develop system for Penn Treaty agents to suggest senior care facilities to network providers.
- Develop customer service requirements and correspondence, phone scripts, Q&A forms.
- Provide all fulfillment materials to members as they sign up.
- Provide all inbound toll free customer service and/or correspondence for provider locator, cancellations, etc.
- Provide a quality control system to monitor customer service.
- Provide regular reports of customer satisfaction and quality control.
- Screen and source all new benefits, add new and unique benefits periodically to keep the program competitive and unique.
- Provide recommendations and programs targeted at maintaining persistency and renewals.
- Maintain and manage customer databases and data transfer between all parties.
- Act as liaison between Penn Treaty, National Healthcare Services and benefits/services providers.
- If requested or desired, provide a program to collect payments, process disbursements to all parties.