1

1         UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF PENNSYLVANIA
2

       ------------------------------x
3      NATIONAL HEALTHCARE SERVICES,:   CIVIL ACTION
       INC.,                         :
4           Plaintiff,               :   NO. 02-CV-3600
                                     :   (MM)
5           VS.                      :
                                     :   COPY
6      PENN TREATY AMERICAN          :
       CORPORATION, et al.,          :
7           Defendants.              :
       ------------------------------x
8
9           Videotaped deposition of
10     HERBERT E. SCHWARTZ, held at the law
11     offices of BALLARD, SPAHR, ANDREWS &
12     INGERSOLL, LLP, 1735 Market Street, 51st
13     Floor, Philadelphia, Pennsylvania 19103,
14     on Monday, September 29, 2003, beginning
15     at 9:04 a.m., before Debra J. Weaver, a
16     Federally Approved Registered
17     Professional Reporter, Certified Realtime
18     Reporter and Certified Shorthand Reporter
19     of NJ (No. XI 01614) and Delaware (No.
20     138-RPR, Expiration 1/13/05).
21
           ESQUIRE DEPOSITION SERVICES
22        1880 John F. Kennedy Boulevard
                   15th Floor
23           Philadelphia, PA   19103
                (215) 988-9191
24

**PLAINTIFF'S EXHIBIT F**

1   Q. To half, right?
2   A. Right.
3   Q. So with the new fees
4 implemented, it actually did less than
5 half the business than it had done in the
6 prior year; isn't that right?
7   A. Yes.
8   Q. So if it had run at your
9 suggested fees, and in fact it did in the
10 second year, it actually did less
11 business, correct, AllRisk?  AllRisk did
12 less business at the reduced fees than it
13 did at the higher fees; is that right?
14   A. Do you just want a yes or no
15 on that?
16   Q. Yes.
17        MR. LYONS: Objection. You
18     can answer the question however
19     you want.
20        THE WITNESS: Yes, there
21     were less fees collected.
22 BY MR. YOHAI:
23   Q. Okay. That's fine.
24   A. Well, the reason was because

1  there was less effort put into the
2  marketing of the program.  In fact, they
3  should have -- they stopped marketing
4  altogether.
5           Q.      Do you believe that Penn
6  Treaty did not market this program in
7  2001?
8           A.      Technically, they were
9  marketing it, but no effort was really
10 put into it.
11          Q.      What should they have done?
12          A.      What should they have done?
13          Q.      Yes.  What should they have
14 done?
15          A.      Everything that Glen Levit
16 wanted to do would have made it very
17 successful.  When Glen Levit died
18 unexpectedly, the whole program,
19 everything, died.  But, okay, what should
20 they have done?
21          Q.      I'm just going to move to
22 strike that answer as nonresponsive to my
23 question.  But it's a technical --
24                  Go ahead.  What should they

1  have done?
2       A.    The program was designed
3  specifically to target the market of the
4  uninsurable.  They claimed to have had
5  some 20,000 licensed, contracted agents
6  selling long-term care insurance.  They
7  were doing -- they claim to have been
8  doing 10,000 applications a month in
9  long-term care insurance.  Okay.  It is a
10 known fact that any -- that all companies
11 selling long-term care insurance are
12 going to turn down over 20 percent.  20
13 to 25 percent of those applications
14 submitted are not going to be taken
15 because of underwriting, i.e.,
16 uninsurables.  That would result in over
17 2000 applications a month being rejected.
18 That is -- if they would have targeted
19 just that market, as Glen said that they
20 were going to do, it would have been a
21 very successful program for everybody
22 involved.
23      Q.    So you believe that the
24 communications should have been that this

1  was a product to be marketed to people
2  who are not insurable?
3        A.    That was a target market,
4  correct.
5        Q.    And it should have been made
6  clear that this was not an insurance
7  product, that this was some other type of
8  product?
9        A.    You have to -- yes, correct.
10       Q.    And Penn Treaty failed to do
11 those things?  Those are the things that
12 you believe Penn Treaty should have done
13 that it really didn't do?
14       A.    Well, let's take them one at
15 a time here.  Penn Treaty did not go and
16 tell it's not an insurance product
17 because they did say it was not an
18 insurance product.
19       Q.    Okay.
20       A.    But they -- the whole
21 objective of our program with Penn Treaty
22 was, because they had such a large sales
23 force and they were writing so many
24 long-term care applications and they had

1  a large declination, they were supposed
2  to give to their agents what we call a
3  second offering, so when the agent
4  received the rejection on the case that
5  he submitted, they were supposed to send
6  back to the agent, along with the letter
7  of rejection, a proposal, offer your
8  client the AllRisk program.  That would
9  have made the program very successful.
10             Q.    So you believe that in fact
11 Penn Treaty did tell its agents that this
12 was not an insurance product, right?
13             A.    Yes.
14             Q.    So you can't criticize Penn
15 Treaty for failing to do that?  That
16 would be an inappropriate criticism?
17             A.    I believe that Penn Treaty
18 made it clear that the AllRisk program
19 was a non-insurance product to everybody
20 involved.
21             Q.    Okay.  Did they also make it
22 clear that this was a product for people
23 who are non-insurable?
24             A.    I don't know that.

1  Q. Well, do you believe that
2  this should only have been marketed to
3  people who are non-insurable or should it
4  have been marketed to both?
5  A. Well, I -- I'm not saying
6  it's not something that shouldn't be sold
7  to the general public. I'm just saying
8  that it's a natural market to sell to.
9  Q. Do you believe that Penn
10 Treaty failed to communicate the fact
11 that this product was available to all of
12 its agents?
13 A. No.
14 Q. So, in your view, Penn
15 Treaty did communicate to its agents that
16 the AllRisk product was available?
17 A. Yes.
18 Q. Do you believe that Penn
19 Treaty failed to roll this product out in
20 the states that it was supposed to roll
21 this product out in?
22 A. Yes.
23 Q. You believe they did not
24 roll it out in the states that they were

1  supposed to roll it out in?
2       A.   We have to talk about
3  rollout.  They did make it known that, to
4  their agents, of such a product.  But how
5  they rolled it out was not the way we set
6  out to roll it out.
7       Q.   Okay.  What was it that you
8  believed was deficient about their
9  rollout?
10      A.   By not -- by not making it
11 clear that it was specifically to be used
12 for -- primarily used for a declination
13 of a long-term care applicant, one.  Two,
14 not making it as a second offering on a
15 declination to the agent.  That was the
16 big shortfall, that part.
17      Q.   Where was it made clear in
18 any of the documentation that Penn Treaty
19 was supposed to offer this as a second
20 offering on a declination?
21      A.   I don't think it was
22 documented.
23      Q.   Okay.  And where was this
24 made clear in any of the documentation

1  to sell it to you for a dollar. So if
2  you thought it was worth more than a
3  dollar and you were only going to pay a
4  dollar, that would be a good deal for
5  you, wouldn't it?
6       A.   I don't understand what you
7  mean, I was only going to pay a dollar.
8       Q.   Well, "PTNA/SFCC will sell
9  its 50 percent interest in AllRisk to
10 NHCS for a nominal sum." You, Herb
11 Schwartz, and NHCS would pay the nominal
12 sum, a dollar, whatever amount of money.
13      A.   We would give them a dollar?
14      Q.   Correct. Isn't that what's
15 being offered here?
16      A.   Yeah. But why would I do
17 that?
18      Q.   That's what I'm asking. Why
19 wouldn't you do that, Mr. Schwartz? Why
20 not?
21      A.   Now you're asking me to
22 elaborate on this?
23      Q.   I'm just asking what your
24 position was at that time. Why did you

1  not just take back AllRisk from Penn
2  Treaty?
3      A.   Because they wasted over a
4  year's time of ours.  Number two, we
5  never received a contract from them,
6  according to this, a letter of intent
7  from the Senior Financial Consultants, we
8  never received any contract.  Number two,
9  the company had such -- was withdrawn
10 from all the other states all over the
11 United States and kept saying, well,
12 we're going to do this, we're going to do
13 this, we're going to roll it out to our
14 agents anyway, we're going to do a lot of
15 things, and it never happened.  In fact,
16 I couldn't even talk to the people half
17 the time.  Finally, this guy, Underhill,
18 got on the phone and he told us in a
19 conference call that, Herb, I want to be
20 honest with you.  Your program is not a
21 priority of ours.  I said, what do you
22 mean it's not a priority?  He said, we
23 can't even look at it for the next two
24 years.  I said, you wasted two years of

1  our time here.  And -- anyway. . .
2          Q.    Okay.  But I guess what I'm
3  asking is, given what you thought was
4  going on, okay, why not just take Penn
5  Treaty up on its offer to sell the
6  business back to you for a buck and go
7  about your business and make if you
8  believe money yourselves with some other
9  provider, why not?
10         A.    I didn't want to do that.
11 It's not me, I didn't want to do it.
12 Neal didn't want to do it.
13         Q.    You might have done it, Herb
14 Schwartz, but Neal Forman didn't want to
15 do it?
16         A.    Both of us decided not to do
17 it.
18         Q.    Okay.  You said that the
19 reason you didn't -- one of the reasons
20 you didn't do that is because they never
21 forwarded you a contract to do that?
22         A.    No.  I said that we didn't
23 even have a contract with Senior
24 Financial Consultants.

1    Q.    Okay.  Okay.  Was there any
2 component to this that they didn't
3 forward you a contract saying they would
4 sell the interest back to you for 50
5 percent for a nominal sum?  Was that at
6 all unclear to you in some way from this
7 letter?  Did you think that wasn't going
8 to happen?
9    A.    It was a shock to me to get
10 this letter, to be honest with you.  I
11 never even expected something like this.
12 All my calls and everything I was trying
13 to do was trying to make the program
14 work.  And they totally ignored my phone
15 calls.  I mean, I'm talking about for
16 weeks I could not get a phone call back,
17 a return call.  I didn't know they were
18 having such financial problems.  I mean,
19 you know, that wasn't until it became a
20 public issue.
21    Q.    Okay.  By the end of the
22 day, Mr. Schwartz, why didn't you just
23 take the business back and make it
24 successful for yourselves?  If you

275

```
 1  fulfillment and service job.  His name is
 2  Mike Callahan."
 3          A.      Who is this memo from?
 4          Q.      It's from Web Barth.
 5          A.      From Web.  Okay.
 6          Q.      "First of all, we have a new
 7  exec helping to manage our fulfillment
 8  and service job.  His name is Mike
 9  Callahan."  Do you see that?
10          A.      Okay.  Yes.
11          Q.      So was Mike Callahan an exec
12  at Web Barth's company?  He was a new
13  exec somewhere?
14          A.      You know, I don't know.  All
15  I know is he loaned Web money and he
16  worked -- started working with Web Barth
17  on -- relating to our -- what Web was
18  doing for our program and any other thing
19  that Web Barth may have been involved in.
20  I don't know.  But he was not an
21  executive employee or anything else with
22  National Healthcare Services.
23          Q.      Well, isn't it a fact that
24  Mr. Callahan purchased 250 shares of
```

276

1   National Healthcare Services, Inc.?
2           A.      He purchased 250 shares?  He
3   did -- you know what, I don't want to
4   play ignorant on this, but I'll tell you
5   what I do know, but Neal Forman knows the
6   whole deal because he and Neal Forman,
7   like I said, were friends and had many
8   different ventures and partnerships, I
9   think, together, and Neal wanted to sell
10  some of his National Healthcare Services
11  stock to Mike Callahan.  I don't know how
12  it happened.  Again, I was against that.
13  And, finally, I did okay the issue -- for
14  Neal to issue him stock, part of his
15  stock, part of Neal Forman's stock,
16  non-voting-only stock, only non-voting,
17  and that Michael Callahan would not have
18  any management or any say-so in the
19  company whatsoever.
20          Q.      Okay.  What was the value
21  that Mr. Callahan paid for his 250 shares
22  of the company?
23          A.      That's between he and Neal
24  Forman.  Neal issued the shares -- Neal's

1　of this company? That was of no interest
2　to you?
3　　　　A.　No.
4　　　　Q.　Okay. Now, you said as far
5　as you're aware Mr. Callahan only worked
6　for Web Barth, for his company; Callahan
7　never worked for National Healthcare
8　Services, was never a principal in
9　National Healthcare Services?
10　　　　A.　No.
11　　　　Q.　He was never a principal in
12　National?
13　　　　A.　He was never a principal.
14　　　　Q.　Okay. Let me show you
15　what's been marked as Schwartz Exhibit
16　38.
17　　　　　　(Whereupon, Deposition
18　　　　Exhibit No. Schwartz-38, e-mail
19　　　　dated 10/1/01 to T. Sadler from
20　　　　Michael Callahan, Bates PT
21　　　　0011756, was marked for
22　　　　identification.)
23　BY MR. YOHAI:
24　　　　Q.　This is a memo from Mr.

1   the situation by Neal Forman and Herb
2   Schwartz, the other two principals."
3   Okay.
4           Q.   Do you wish to change your
5   testimony that Mr. Callahan was not a
6   principal at this point in time or is Mr.
7   Callahan wrong that he was a principal?
8               MR. LYONS:   Objection.
9               THE WITNESS:   To my
10          knowledge, he was never an
11          employee and never paid a fee from
12          National Healthcare Services or
13          was he voted into the company as
14          an officer, nor did he ever have
15          any control or voting stock or
16          say-so in the company.   That's to
17          my knowledge at the time I was
18          there.
19  BY MR. YOHAI:
20          Q.   And can you think of a
21  reason why Mr. Callahan is representing
22  himself to be a principal of the company?
23          A.   Maybe he was referring to
24  his association with Web Barth.