IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | CIVIL ACTION |
| Plaintiff, | NO.: 02-CV-3600 |
| v. | |
| PENN TREATY AMERICAN CORPORATION, et al., | |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Martin C. Bryce, Jr.
Douglas L. Flitter
BALLARD SPAHR ANDREWS &
  INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

-and-

Mindy J. Spector
David L. Yohai
Anna J. Hong
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

Attorneys for Defendants

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  ARGUMENT –
     PLAINTIFF'S BREACH OF CONTRACT CLAIMS
     FAIL AS A MATTER OF LAW ................................................................................ 4

     A.   Plaintiff Has Failed To Rebut That Summary Judgment Should Be
          Granted On Its Breach of Contract Claim With Respect To The
          October 21, 1999 Agreement ............................................................................. 4

     B.   Defendants Did Not Authorize Or Otherwise Consent To Callahan
          Becoming Part Of The Management Of Plaintiff NHCS ................................. 8

     C.   Plaintiff Has Failed To Rebut That Summary Judgment Should Be
          Granted On Its Breach Of Contract Claim With Respect To The Note ............ 9

     D.   Plaintiff Has Failed To Demonstrate Any Ability To Establish Legally
          Cognizable Damages For Its Breach Of Contract Claims ............................... 12

III. CONCLUSION ......................................................................................................... 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

Commissioner of Internal Revenue v. Indianapolis Power & Light Co.,
   493 U.S. 203 (1990) ................................................................................................ 11-12

Cooper v. Blevins,
   CIV. A. No. 90-3540, 1991 WL 30703 (E.D. Pa. Mar. 4, 1991) ........................... 7 n.10

Fries v. Metropolitan Mgmt. Corp.,
   No. Civ.A. 02-CV-7196, 2003 WL 22831361 (E.D. Pa. Nov. 13, 2003) ..................... 5

Market Dev. Corp. v. Flame-Glo, Ltd.,
   CIV. A. No. 88-9555, 1990 WL 116319 (E.D. Pa. Aug. 8, 1990) .................. 12 n.12, 13

Ortiz v. Duff-Norton Co., Inc.,
   975 F. Supp. 713 (E.D. Pa. 1997) .............................................................................. 6 n.8

Reann Rappucci, Ind. v. AT&T Info. Sys.,
   Civ. A. No. 5-4462, 1986 WL 5717 (E.D. Pa. May 16, 1986) ............................... 13, 14

Sipio v. Township of Springfield,
   No. CIV. A. 94-CV-6180, 1996 WL 479670 (E.D. Pa. Aug. 20, 1996) ................ 7 n.10

## STATE CASES

In re Estate of Tallarico,
   228 A.2d 736 (Pa. 1967) ............................................................................................ 6 n.8

Molag v. Climax Molybdenum Co.,
   637 A.2d 322 (Pa. Super. Ct. 1994) .......................................................................... 12 n.13

Northwestern National Bank v. Commonwealth,
   345 Pa. 192 (Pa. 1942) ............................................................................................... 6 n.8

Pikunse v. Kopchinski,
   631 A.2d 1049 (Pa. Super. Ct. 1993) ........................................................................ 12 n.13

Pollock v. Morelli,
   369 A.2d 458 (Pa. Super. Ct. 1976) ............................................................................. 14

Smith v. Penbridge Assoc., Inc.,
   655 A.2d 1015 (Pa. Super. Ct. 1995) ........................................................................ 12 n.13

Wujcik v. Yorktowne Dental Assoc., Inc.,
   701 A.2d 581 (Pa. Super. Ct. 1997) .............................................................................. 14

Defendants Penn Treaty American Corporation ("PTAC"), Penn Treaty Network America Insurance Company ("PTNA" or "Penn Treaty"), and Senior Financial Consultants Company ("SFCC") (collectively, "Defendants"), respectfully submit this reply Memorandum of Law in further support of their motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment against Plaintiff National Healthcare Services, Inc. ("NHCS," "National Healthcare" or "Plaintiff") as to the Amended Complaint, dated August 12, 2002.

## I.
## PRELIMINARY STATEMENT

Plaintiff's opposition wholly ignores the clear documentary evidence and unrebutted deposition testimony, including from its own witnesses, that demonstrate that Defendants are entitled to judgment as a matter of law.

First, it is undisputed that the only business of Plaintiff was the AllRisk venture and that the only business of Plaintiff in connection with the AllRisk venture at the time the October 21, 1999 Agreement was terminated was Plaintiff's negotiation with Defendant Penn Treaty.[1] Plaintiff does not dispute that Callahan himself wrote to Penn Treaty and stated that he was a principal in the business.[2] Plaintiff's own witness, Herbert Schwartz, the President of Plaintiff, testified at his deposition that the addition of a principal to the business would constitute a material change in management of NHCS, to which change Penn Treaty did not consent.[3] Far from being a "giant and tortured stretch," as Plaintiff claims, the testimony of

---

[1] See Affirmation of David L. Yohai in Support of Defendants' Motion for Summary Judgment previously submitted to the Court on 12/22/03 ("Yohai Decl. dated 12/22/03") Ex. 8 (Callahan Dep. at 144-45).

[2] Plaintiff's Opposition Br. at 4.

[3] See Yohai Decl. dated 12/22/03 Ex. 6 (Schwartz Dep. at 116).

Plaintiff's own witnesses dooms Plaintiff's position. Plaintiff also does not dispute – because it cannot (since Callahan cannot remember either way) – that Callahan told Sadler that he was now involved in the "running" of Plaintiff National Healthcare, that Callahan "had authority to make decisions regarding National Healthcare Services" and that all negotiations should be handled through him.[4] Sadler's unrebutted testimony, plus Callahan's clear and devastating email and Schwartz's own testimony demonstrate conclusively that summary judgment is appropriate here. Penn Treaty cannot be held in breach of the Agreement in light of Plaintiff's own clear representations.

Plaintiff recites a litany of entirely irrelevant bullet points in its opposition in an attempt to prop up its tenuous position. For example, Plaintiff points to Mr. Callahan purportedly receiving "non-voting shares" of the company and the fact that he was never formally named an officer or employee of NHCS as purported evidence prohibiting the grant of summary judgment. Whether Mr. Callahan was given "non-voting shares,"[5] and was made an employee of NHCS, however, is entirely irrelevant if, by his deeds and actions, Callahan was, in fact, managing the business of Plaintiff National Healthcare and, most importantly, <u>clearly and unequivocally represented this to Penn Treaty.</u>

---

[4] Yohai Decl. dated 12/22/03 Ex. 30 (Sadler Dep. at 29, 35).

[5] Plaintiff's repeated reliance on the fact that Mr. Callahan was purportedly given "non-voting shares" to attempt to establish that he was not involved in running the company is interesting in light of the provision in the ByLaws restricting transfer of shares to anyone "not actively interested in its affairs and familiar with the management problems and politics of the corporation." Yohai Decl. dated 12/22/03 Ex. 29 (ByLaws, Art. VI, § 1). Indeed, Plaintiff's 30(b)(6) witness testified that transferring shares to Callahan was itself a violation of the ByLaws. <u>See</u> Affirmation of David L. Yohai in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment as to Liability previously submitted to the Court on 1/16/04 ("Yohai Decl. dated 1/15/04") Ex. A (Forman Dep. at 51-58).

Second, Plaintiff's argument that Penn Treaty somehow "authorized" Callahan's becoming part of the management of Plaintiff is an utter failure and only serves to underscore the weakness of Plaintiff's position. Plaintiff's assertion that an email from an employee in charge of fulfillment and billing agreeing to "copy Callahan" on correspondence constitutes written consent to a change in management is nonsensical. Moreover, the October 21, 1999 Agreement expressly prohibits any ratification of contractual breach based upon subsequent conduct by Penn Treaty. Plaintiff's consent argument only further demonstrates why summary judgment is appropriate for Penn Treaty.

Third, with respect to the Note, Plaintiff's entire argument is that Plaintiff was not in default until <u>after February 2001</u>, when Penn Treaty refused to advance any further funds to Plaintiff. Plaintiff, however, seems to have overlooked the <u>October 2000 invoice</u> it received from Penn Treaty, declaring that its payments were already "past due."[6] Indeed, the undisputed evidence shows that Plaintiff's interest payments were almost 90 days past due – well past the 30-day grace period provided for in the Note. Moreover, Plaintiff seems to have just ignored the testimony of its own 30(b)(6) witness on this topic, Neal Forman, who conceded that National Healthcare had not made its payments on time as early as October 2000. Based on this, Penn Treaty had every right not to continue advancing additional funds pursuant to the clear terms of the Note, let alone advancing funds that were being used by Schwartz and Forman for their personal expenses. Further, Penn Treaty had a good and substantive reason to believe that NHCS was no longer financially capable of making payments under the Note.

---

[6] See Affirmation of David L. Yohai in Support of Defendants' Reply Memorandum in Further Support of Their Motion for Summary Judgment ("Yohai Decl. dated 1/29/04") Ex. 1 (Invoice from PTNA to Forman of 10/24/00).

Finally, Plaintiff has no good response for its inability to establish any legally cognizable damages here. Plaintiff's reliance on profit "projections" and limited purported test marketing runs it right into the case law holding that such facts do not provide a sufficient basis for damages because they are wholly speculative. Plaintiff is wholly unable to establish an element of its breach of contract claim. Accordingly, for this reason too, summary judgment should be granted and Plaintiff's complaint should be dismissed.

## II.
## ARGUMENT

### PLAINTIFF'S BREACH OF CONTRACT CLAIMS FAIL AS A MATTER OF LAW

**A. Plaintiff Has Failed To Rebut That Summary Judgment Should Be Granted On Its Breach of Contract Claim With Respect To The October 21, 1999 Agreement**

Plaintiff plays word games in a desperate attempt to avoid the grant of summary judgment in Defendants' favor on its breach of contract claim based on the Agreement. First, Plaintiff criticizes Defendants' interpretation of Michael Callahan's October 1, 2001 email wherein Callahan acknowledges that he is a "principal in this side of the All Risk venture and was asked to put in some time on correcting the situation by Neal Forman and Herb Schwartz, the other two principals." See Yohai Decl. dated 12/22/03 Ex. 7 (Email from Callahan to Sadler of 10/1/01). Herbert Schwartz, the President of NHCS, himself conceded during his deposition that an addition of another principal to NHCS would constitute a material change in management in NHCS. See Yohai Decl. dated 12/22/03 Ex. 6 (Schwartz Dep. at 26, 116). He even testified that, based upon this email, it would be "reasonable" for Penn Treaty to conclude that Callahan was indeed a principal. See Yohai Decl. dated 12/22/03 Ex. 6 (Schwartz Dep. at 282). The fact that the Agreement itself does not use the words "change in principal" is irrelevant since Mr. Schwartz himself – the President of NHCS – has supplied the missing link.

Moreover, even on its face, the meaning of the email is plain and rarely is there a case where the evidence so cries out for judgment as a matter of law in order to avoid additional enormous expense to Defendants and the Court. See, e.g., Fries v. Metropolitan Mgmt. Corp., No. Civ.A.02-CV-7196, 2003 WL 22831361, at *1 (E.D. Pa. Nov. 13, 2003) ("It is recognized that the underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."). In light of this clear, unequivocal, affirmative representation from Callahan himself, who Plaintiff acknowledges was a "spokesman" for Plaintiff,[7] Penn Treaty cannot be held in breach of the Agreement.

Second, even beyond the email itself, it is undisputed that the only business of NHCS was AllRisk and that, during this time, the only business of NHCS in connection with AllRisk was dealing with Penn Treaty. See Yohai Decl. dated 12/22/03 Ex. 8 (Callahan Dep. at 144-45). Plaintiff attempts to blunt the effect of Thomas Sadler's deposition testimony by suggesting that if adding Callahan was a material change in management, then Sadler's involvement also represented a change in management. In making this overly simplistic and incorrect argument, however, Plaintiff just ignores whole segments of Sadler's testimony. For example, Sadler testified that Callahan, speaking for Plaintiff NHCS (again as NHCS now acknowledges), informed him that "he was involved in the operations and the running of National Healthcare Services, Inc. and that I was to deal with him and him alone." See Yohai Decl. dated 12/22/03 Ex. 30 (Sadler Dep. at 29). Sadler also testified that Callahan informed him that "he was the person that I would contact, that Neal Forman and Herb Schwartz were not to be contacted, just him, that he had authority to make decisions regarding National Healthcare Services and he was very familiar with the matter." See Yohai Decl. dated 12/22/03 Ex. 30

---

[7] Plaintiff now acknowledges that Callahan was a "spokesperson" for NHCS. Plaintiffs' Opp. Br. at 6.

(Sadler Dep. at 35).[8]  This testimony is unrebutted because Callahan, although recalling the conversation, cannot remember what he said.[9]  See Yohai Decl. dated 12/22/03 Ex. 8 (Callahan Dep. at 124-25).  Moreover, Plaintiff cannot escape the fact that Callahan specifically denied that he was acting in any capacity as an attorney.  As he said in his email:  "While it is true that I hold a j.d. and that I used to practice law I am retired and am not acting in that capacity."  See Yohai Decl. dated 12/22/03 Ex. 7 (Email from Callahan to Sadler of 10/1/01).  Plaintiff cannot escape the clear documentary evidence and unrebutted testimony in this matter.

Third, Plaintiff attempts to distinguish Callahan's involvement in National Healthcare prior to the termination of the October 21, 1999 Agreement on November 5, 2001 with his involvement after November 5th and points out that Forman and Schwartz testified that Callahan did not have any say in the business.  The Court should not be blind to the documentary evidence indicating that Callahan was to become a 50% owner of Plaintiff NHCS prior to the matter going into litigation and to Callahan's obvious and repeated involvement in all decisions concerning how the matter should be litigated.  See Defendants' Motion for Summary

---

[8] In light of Callahan's representation in his email (as now admitted "spokesperson" for NHCS) to Penn Treaty, and Sadler's unrebutted testimony about Callahan's representations to him, Plaintiff NHCS is bound and Schwartz and Forman's conclusory testimony that Callahan "never" exercised management authority cannot stave off summary judgment.  See Ortiz v. Duff-Norton Co., Inc., 975 F. Supp. 713, 718 (E.D. Pa. 1997) (where one holds another out as possessing power to speak, principal is bound); see also In re Estate of Tallarico, 228 A.2d 736, 741 (Pa. 1967) (Equitable estoppel applies "when one by his acts, representations, or admissions, or by his silence when he ought to speak out . . . induces another to believe certain facts to exist and such other rightfully relies . . . on such belief, [and] will be prejudiced if the former is permitted to deny the existence of such facts."); Northwestern National Bank v. Commonwealth, 345 Pa. 192, 196–97 (Pa. 1942) ("[T]he person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements.").

[9] Sadler's testimony on this point is also supported by the deposition testimony of Jane Bagley, Penn Treaty's in-house counsel.  See Yohai Decl. dated 1/29/04 Ex. 2 (Bagley Dep. at 71, 95–97).

Judgment at 20-21; Yohai Decl. dated 12/22/03 Ex. 36 (Mem. of Agreement between Schwartz, NHCS, Forman, and Callahan of 12/24/01).[10]  Indeed, Schwartz himself testified that this litigation was not his idea and that it was being driven by Forman and Callahan.  See Yohai Decl. dated 1/29/04 Ex. 3 (Schwartz Dep. at 171-72); Yohai Decl. dated 12/22/03 Ex. 6 (Schwartz Dep. at 174-75). These events demonstrate that Penn Treaty was undeniably correct in its analysis of what was going on with respect to the management of Plaintiff NHCS and that there is no basis to establish a breach of contract here.

Fourth, Plaintiff cites to the corporate law of the State of Washington and the NHCS's ByLaws for the proposition that only NHCS's board of directors may manage the company.  See Plaintiff's Opposition Br. at 3.  First, whether Forman and Schwartz have violated NHCS's ByLaws or the Washington statute does not affect Defendants' rights or serve as a defense under the Agreement, a contract between private entities.  Further, as set forth in Defendants' brief in opposition to Plaintiff's summary judgment motion, the Washington statute itself recognizes that individuals other than board members may manage the company with its use of the phrase "managed under the direction of the board of directors."  See Defendants' Opposition Br. at 4-7 (emphasis added).  Plaintiff admits that Callahan was acting "under the direction of – Forman and Schwartz," who were undisputedly members of the board of NHCS. See Plaintiff's Opposition Br. at 5.  Finally, Mr. Forman himself testified that NHCS violated its ByLaws in granting Callahan shares of the company.  See Yohai Decl. dated 1/15/04 Ex. A

---

[10] In light of these undisputed facts, Forman and Schwartz's testimony that Callahan "never" had any involvement in managing Plaintiff simply cannot be credited sufficiently here to avoid summary judgment. See Sipio v. Township of Springfield, No. CIV. A. 94-CV-6180, 1996 WL 479670, at *5 (E.D. Pa. Aug. 20, 1996) ("While credibility determinations are not normally the province of the trial court upon a motion for summary judgment, the court may nonetheless resolve credibility conflicts if the opponent's evidence is too incredible to be believed by reasonable minds."); Cooper v. Blevins, CIV. A. No. 90.-3540, 1991 WL 30703, at *2 (E.D. Pa. Mar. 4, 1991) (granting defendant's motion for summary judgment).

(Forman Dep. at 51-58). Accordingly, none of these arguments provide any cover to Plaintiff or should, in any way, preclude the grant of summary judgment in favor of Defendants.

B.  **Defendants Did Not Authorize Or Otherwise Consent To Callahan Becoming Part Of The Management Of Plaintiff NHCS**

As more fully set forth in Defendants' brief in opposition to Plaintiff's summary judgment motion, there was no consent to a material change in management of NHCS by Defendants in writing or by conduct. See Defendants' Opposition Br. at 11-15. No reasonable fact finder could conclude that the March 26, 2001 email from Jackie Frantz, a Penn Treaty employee involved with AllRisk fulfillment and billing, to Web Barth simply agreeing to copy Callahan on correspondence constitutes written consent of Penn Treaty to a material change in management of NHCS. Penn Treaty is not taking the position that Callahan became part of the management of NHCS in March 2001. Rather, it was through his deeds and actions subsequent to March 2001, culminating in his October 1, 2001 email declaring himself to be a "principal," that his role became clear.

As pointed out in Defendants' opposition brief to Plaintiff's motion for summary judgment, the Agreement states that to avoid a breach, any material change in management of one party must be approved by the other party "in writing." See Yohai Decl. dated 12/22/03 Ex. 5 (Agreement § 6.2.3(d)). Any notices "in writing" were to be provided to Penn Treaty Network American Insurance Company to the attention of Glen Levit (or his successor). See id. (Agreement § 8.6). The Agreement further states that the "Agreement may be amended only by a written document signed by authorized representatives of PTNA and NHCS" and that both parties "agree that no ratification after the fact of any violation or breach of any provision of this Agreement by either, shall be construed as a waiver of any of its rights hereunder." See id. (Agreement §§ 8.4, 8.10).

The correspondence between Frantz and Barth does not represent consent to any change in management of NHCS. Further, that email does not comply with the notice provision of the Agreement. See id. (Agreement § 8.6). In addition, in light of the clear, unambiguous provisions regarding no ratification by conduct, NHCS is precluded from arguing that Penn Treaty's conduct excused NHCS's failure to obtain Penn Treaty's written consent to a material change in management. Plaintiff's argument here, to say the least, is a "giant and tortured" stretch.

C. **Plaintiff Has Failed To Rebut That Summary Judgment Should Be Granted On Its Breach Of Contract Claim With Respect To The Note**

Plaintiff contends that Defendants rely on after-the-fact evidence dated post-February, 2001 to justify failing to advance further monies under the Note. The undisputed factual record, however, buries Plaintiff's position.

First, NHCS wholly ignores the undisputed fact that it failed to make timely repayments of monies as early as October, 2000, which under the clear, unambiguous terms of the Note constitutes a default pursuant to which the line can be terminated and no further monies need be advanced. Yohai Decl. dated 12/22/03 Ex. 9 (NHCS Promissory Note ¶ 9). The Note clearly states that:

> No interest payment will be required within six months following any advance. However, interest will accrue during this time. After six months, all accrued interest will be added to the outstanding balance of the advance for purposes of future interest calculations and outstanding Line balance. Current monthly interest will become payable each month thereafter, as defined by the outstanding advance plus accrued interest multiplied by the Interest Rate multiplied by the number of calendar days in the preceding month divided by three hundred, sixty-five (365), with no subsequent advances made until current interest is paid.

Id. (NHCS Promissory Note ¶ 7) (emphasis added).

NHCS first withdrew monies under the Note on January 12, 2000, thereby making NHCS's interest payment due in July of 2000 (six months later). See Yohai Decl. dated 1/29/04 Ex. 1 (Invoice from Penn Treaty to Forman of 10/24/00 at 7101 (showing schedule)). Three months after its first interest payment was due, in October, 2000, NHCS had failed to make even a single interest payment. See Yohai Decl. dated 1/29/04 Ex. 1 (Invoice from Penn Treaty to Forman of 10/24/00). Indeed, Penn Treaty noted this default in an October 24, 2000 invoice to National Healthcare: "Please note that your agreement calls for the payment of interest beginning after the 6th month following an advance, thereby making the first invoice past due." Id. As set forth above, failure to make interest payments permits "no subsequent advances." Moreover, any such failure which remains unremedied for over 30 days (and this situation remained for over three months) "constitute[s] default under this Promissory Note and may cause the revocation of this Line and immediate action for collection of the then outstanding principal and interest amounts." Yohai Decl. dated 12/22/03 Ex. 9 (NHCS Promissory Note ¶ 9). The record could not be clearer and Defendants are entitled to judgment as a matter of law.

Second, as set forth in Defendants' moving brief, Plaintiff never denies that its own 30(b)(6) witness, Neal Forman, conceded that amounts due under the Note were not paid to PTNA in a timely manner and that the default had occurred in October 2000 and lasted through December 2001. See Defendant's Motion for Summary Judgment at 7, 22–23; Yohai Decl. dated 12/22/03 Ex. 3 (Forman Dep. at 110–11, 130).[11] In addition, under the clear and

---

[11] Contrary to Plaintiff's contention that NHCS was not in default because the parties agreed that payments would be deducted from Plaintiff's portion of the AllRisk income, PTNA only acquiesced to this arrangement once NHCS had already failed to make timely payments. See Yohai Decl. dated 1/29/04 Ex. 1 (Invoice from Penn Treaty to Forman of 10/24/00). Importantly, the Note itself contains a no waiver by subsequent conduct provision. See Yohai

unambiguous terms of the Note, PTNA was also granted the right to revoke the Line in the event that it had a "good and substantive reason to believe that Debtor is no longer financially capable of repaying any advanced funds or interest arising from borrowings under the Line." Yohai Decl. dated 12/22/03 Ex. 9 (NHCS Promissory Note ¶ 1). As stated above, it is undisputed that Plaintiff was in default as of October, 2000. Accordingly, without question, PTNA had good and substantive reason to believe NHCS was not financially capable of repaying the monies borrowed.

Finally, NHCS's impermissible use of a majority of funds advanced under the Line to make personal loans to Schwartz and Forman was also of serious concern to Penn Treaty. Plaintiff's response that "there is nothing in the Promissory Note that prohibited Forman or Schwartz . . . from drawing a salary for the services they rendered" is utter nonsense. The Note clearly and unambiguously states that the funds advanced to NHCS were to be used for the "start-up, marketing and establishment" of the AllRisk Healthcare Venture. Yohai Decl. dated 12/22/03 Ex. 9 (NHCS Promissory Note at 1). Yet, the undisputed testimony of Plaintiff's witnesses reveals that the majority of funds were actually used for personal loans in the form of promissory notes, not salary, to the two principals of NHCS, Schwartz and Forman, to pay for their personal living expenses. Yohai Decl. dated 12/22/03 Ex. 3 (Forman Dep. at 120–21); Yohai Decl. dated 12/22/03 Ex. 19 (Forman and Schwarz Promissory Notes). NHCS intended that the funds advanced under the promissory notes be repaid, but they never were. Yohai Decl. dated 12/22/03 Ex. 3 (Forman Dep. at 138–39). A loan that must be repaid is simply not a salary for services rendered as a matter of law, lest this would be the predominant form of

---

Decl. dated 12/22/03 Ex. 9 (NHCS Promissory Note ¶ 10(b)). Accordingly, Plaintiff may not assert that Penn Treaty's acquiescence to such an arrangement constituted any waiver of Penn Treaty's rights under the Note.

salary doled out by corporate America.  See Commissioner of Internal Revenue v. Indianapolis Power & Light Co., 493 U.S. 203, 207 (1990) (stating that "a loan is not income to the borrower").  The words and explanation offered by Plaintiff's own corporate representative thus clearly demonstrate the futility of this last-ditch effort to evade summary judgment.

D. **Plaintiff Has Failed To Demonstrate Any Ability To Establish Legally Cognizable Damages For Its Breach Of Contract Claims**

Plaintiff contends that it will be able to prove damages with a "reasonable" degree of certainty.[12]  The profit projections developed by NHCS, test marketing data, and expert testimony to be provided based on comparable businesses, however, are all still too speculative in nature as a matter of law even under the reasonableness standard.[13]  Accordingly, summary judgment should be granted on Plaintiff's claims on this basis, too.

---

[12] Even under this reasonableness standard, "[a] new business with no history of profitability has a heavier burden than would an established business in proving that lost profits are sufficiently certain to be recovered."  Market Dev. Corp. v. Flame-Glo, Ltd., CIV. A. No. 88-9555, 1990 WL 116319, at *10 (E.D. Pa. Aug. 8, 1990).  The undisputed record is clear that AllRisk was a new and untried business at the inception of the venture in September 1999.  Memorandum in Support of Defendants' Motion for Summary Judgment, dated 12/22/03, at 26.  For the same reasons set forth below, Plaintiff is unable to meet this heavier burden of proof required to prove the amount of future lost profits of a new and untried business.

[13] The cases relied upon by Plaintiff on page 11 of its Opposition to Defendants' Motion for Summary Judgment are inapposite.  Those cases all involve circumstances where the value of the loss due to the breach could be estimated with reasonable certainty.  For example, in Smith v. Penbridge Assoc., Inc., 655 A.2d 1015 (Pa. Super. Ct. 1995), the court found that damages for defendant's failure to provide a "proven breeder pair" of emus, as bargained for, could be calculated with a reasonable degree of certainty where there was evidence regarding the expected chick production of the bargained for "proven breeder pair" and the fair market value of emu chicks was ascertainable.  Id. at 1021-22.  The court in Molag, Inc. v. Climax Molybdenum Co., 637 A.2d 322 (Pa. Super. Ct. 1994), awarded damages for breach of a mineral lease based on the remaining years of the contract, a minimum removal requirement in the contract, and the average quantity of slag removed over the previous five years of the contract.  Id. 324-25.  Finally, Pikunse v. Kopchinski, 631 A.2d 1049 (Pa. Super. Ct. 1993), involved an action against landlords for conversion of personal property.  Id.  The court awarded damages to plaintiff for her loss based on the trial court's estimation of the fair market value of her property.  Id. at 1051.  Conversely, as demonstrated below, NHCS has no such definite figures to rely upon.

First, courts have refused to permit plaintiffs to rely on profit projections as evidence of future lost profits of a new and untried business. See Market Dev., 1990 WL 116319, at *11 (refusing to rely on profit projections of a new business as evidence of anticipated lost profits where the figures were not verifiable); Reann Rappucci, Ind. v. AT&T Info. Sys., Civ. A. No. 5-4462, 1986 WL 5717, at *2 (E.D. Pa. May 16, 1986) (granting summary judgment, refusing to rely on plaintiff's forecasts of expected profits and stating that while plaintiff "may have a good faith belief that her business was going to grow at a certain level, she has been unable to come forward with anything to substantiate her position beyond pure conjecture."). As such, Plaintiff's overly optimistic profit projections created at the beginning of the venture cannot provide an estimate of anticipated lost profits to a reasonable degree of certainty.[14]

Second, Plaintiff's attempt to rely on the limited test market as a basis for determining future lost profits is untenable. AllRisk was first released in nine states, a "test market," in February 2000. The test market lasted for only a few months, after which time the parties modified AllRisk's pricing structure and substituted SFCC for PTNA as the entity through which AllRisk would be marketed. Yohai Decl. dated 12/22/03 Ex. 15 (Letter from Bagley to Schwartz and Forman of 6/8/00); Yohai Decl. dated 12/22/03 Ex. 16 (Letter from Levit to Schwartz and Forman of 8/21/00). Due to these adjustments, the AllRisk product that

---

[14] Plaintiff includes numerous self-serving statements regarding Penn Treaty's purported delays and inattentiveness to AllRisk and enthusiasm during various times of the AllRisk program to divert attention away from its inability to prove nonspeculatory damages. The truth, however, is that the program was plagued with various recurring problems from its inception, despite Penn Treaty's many efforts to cure. See Yohai Decl. dated 1/29/04 Ex. 3 (Schwartz Dep. at 145); Yohai Decl. dated 1/29/04 Ex. 4 (Forman Dep. at 90; 182); Yohai Decl. dated 1/29/04 Ex. 5 (Letter from Mankamyer to Levit of 4/28/00); Yohai Decl. dated 1/29/04 Ex. 6 (Letter from Levit to Axmann of 4/25/00). The bottom line is that if AllRisk had actually been hugely successful, as Plaintiff touts, Penn Treaty would have continued with the program.

was first released in February 2000 is different from the AllRisk product that was eventually sold nationwide starting in February 2001, for ten months until the Agreement was terminated, and cannot be used as an accurate predictor of future sales in the marketplace. See Reann Rappucci, Ind. 1986 WL 5717, at *2 (denying plaintiff's claim for lost profits of a new and untried business which had been in business for three months), Pollock v. Morelli, 369 A.2d 458, 463 (Pa. Super. Ct. 1976) (refusing to allow the plaintiff to recover lost profits where the plaintiff's dry cleaning business had only been in operation for nine months when the contract was breached).

Finally, evidence regarding profits of other non-insurance discount healthcare products marketed by other companies, which features are not the same as AllRisk, cannot provide a basis for assessing lost future profits to a reasonable degree of certainty because Plaintiff cannot demonstrate that AllRisk would have yielded the same or similar profits as other established businesses in the industry. See, e.g., Wujcik v. Yorktowne Dental Assoc., Inc., 701 A.2d 581, 584 (Pa. Super. Ct. 1997) (finding that dentist could not prove his damages on the basis of industry-wide average of fees collected because such an average collection percentage would be little more than pure speculation of the actual amount collected). Accordingly, Plaintiff has not alleged a theory of damages which is not wholly speculative and upon which it can recover.[15] Plaintiff's claims, therefore, should be dismissed as a matter of law.

---

[15] The Certification of Neal Forman, dated 1/14/04 ("Certification"), fails to provide support for Plaintiff's argument that its theory of damages is supported by the profit projections created at the beginning of the venture. In addition to the arguments stated above, even Forman acknowledged at his deposition that projections created at the beginning of a new venture may not be a reliable predictor of the actual success of the business. See Yohai Decl. dated 1/29/04 Ex. 4 (Forman Dep. at 262-64). Forman also claims that the test market validates the projections. Yet, as stated above, a four-month test market cannot be used as a basis to predict the future sales of a business as a matter of law. In addition, while Forman blames Penn Treaty for allegedly derailing NHCS's efforts to establish outside sales, (see Certification at 4 n.1), it is undisputed that Schwartz testified that NHCS had no success recruiting any additional agents to sell the AllRisk product. See Yohai Decl. dated 1/29/04 Ex. 3 (Schwartz Dep. at 72-74).

## III.
## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Defendants and the Amended Complaint should be dismissed with prejudice.

_____
Martin C. Bryce, Jr.
Douglas L. Flitter
BALLARD SPAHR ANDREWS &
  INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

- and –

Mindy J. Spector
David L. Yohai
Anna J. Hong
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

Attorneys for Defendants

Dated: January 30, 2004

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused true and correct copies of Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment and Affirmation of David L. Yohai, dated January 29, 2004, to be served on the following counsel by hand delivery:

> Roberto A. Rivera-Soto, Esq.
> Fox Rothschild O'Brien & Frankel
> 2000 Market Street, 10th Floor
> Philadelphia, PA  19103-3291

Dated: January 30, 2004

*[signature]*
Douglas L. Flitter