## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : | NO.: 02-CV-3600 |
|  | : |  |
| v. | : |  |
|  | : |  |
| PENN TREATY AMERICAN CORPORATION, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

### AFFIRMATION OF DAVID L. YOHAI IN SUPPORT OF DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DAVID L. YOHAI**, an attorney duly admitted to practice law before the Courts of the State of New York and admitted, *pro hac vice*, in the United States District Court for the Eastern District of Pennsylvania, affirms the following to be true under penalties of perjury:

1.     I am a partner of the law firm of Weil, Gotshal & Manges LLP, co-counsel for defendants Penn Treaty American Corporation, Penn Treaty Network America Insurance Company ("PTNA"), and Senior Financial Consultants Company. This affirmation is submitted in further support of Defendants' motion for summary judgment.

2.     Annexed hereto as Tab "1" is a true and correct copy of a letter, dated October 24, 2000, from Michael F. Grill to Neal A. Forman ("Forman") attaching invoices for amounts due under the Promissory Note, dated January 11, 2000, by and between PTNA and National Healthcare Services, Inc ("National Healthcare").

3.      Annexed hereto as Tab "2" is a true and correct copy of excerpts from the videotape deposition of Jane M. Bagley, Esq. ("Bagley"), taken on October 30, 2003.

4.      Annexed hereto as Tab "3" is a true and correct copy of excerpts from the videotape deposition of Herbert E. Schwartz ("Schwartz"), taken on September 29, 2003.

5.      Annexed hereto as Tab "4" is a true and correct copy of excerpts from the videotape deposition of Forman, in his individual capacity and as the corporate designee by plaintiff National Healthcare pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, taken on October 14, 2003.

6.      Annexed hereto as Tab "5" is a true and correct copy of a letter, dated April 28, 2000, from Charles R. Mankamyer to Glen A. Levit.

7.      Annexed hereto as Tab "6" is a true and correct copy of a letter, dated April 25, 2000, from Glen A. Levit to Joe Axmann.

**WHEREFORE**, it is respectfully requested that Defendants' motion for summary judgment be granted together with such other and further relief which this Court deems just and proper.

Dated: New York, New York
        January 29, 2004

David L. Yohai

Tab 1



# Penn Treaty Network America Insurance Company

### (PTNA Life Insurance Company in CA)

October 24, 2000

Mr. Neal Forman
National Healthcare Services, Inc.
4523 102nd Lane N.E.
Kirkland, WA   98033

Dear Neal:

Please find enclosed invoices totaling $2,562 for accrued and unpaid interest on your advances to-date.

Please note that your agreement calls for the payment of interest beginning after the 6th month following an advance, thereby making the first invoice past due.  Please remit your payment to Penn Treaty Network America as soon as possible or, if you prefer, these amounts can be deducted from your monthly AllRisk payment.  Please let me know of your preferred method.

I am available to answer any questions.

Sincerely,


Michael F. Grill
Treasurer



Confidential
PT 007100

3440 Lehigh Street ● P.O. Box 7066 ● Allentown, Pennsylvania 18103 ● (800) 362-0700 ● Fax (610) 967-461€

Invoice Date:         23-Oct-00

| Date | Advance Amount | Interest Rate | Prior Balance | Payment Applied | Interest Accrued | Current Balance | Interest Due | Principal Due |
|------|----------------|---------------|---------------|-----------------|------------------|-----------------|--------------|---------------|
| 01/12/2000 | 50,000 | 10.50% | - | - | - | 50,000 | - | - |
| 02/12/2000 | | 10.50% | 50,000 | - | 438 | 50,438 | - | - |
| 03/12/2000 | | 10.50% | 50,438 | - | 441 | 50,879 | - | - |
| 04/12/2000 | | 10.50% | 50,879 | - | 445 | 51,324 | - | - |
| 05/12/2000 | | 10.50% | 51,324 | - | 449 | 51,773 | - | - |
| 06/12/2000 | | 10.50% | 51,773 | - | 453 | 52,226 | - | - |
| 07/12/2000 | | 10.50% | 52,226 | - | 457 | 52,683 | 457 | - |
| 08/12/2000 | | 10.50% | 52,683 | - | 461 | 53,144 | 918 | - |
| 09/12/2000 | | 10.50% | 53,144 | - | 465 | 53,609 | 1,383 | - |
| 10/12/2000 | | 10.50% | 53,609 | - | 469 | 54,078 | 1,852 | - |

Total Amount Currently Due For This Advance:

Interest --  $    1,852
Principal --  _____-_____

Total --  $    1,852

Please Make Check Payable to:

Penn Treaty Network America
c/o Michael Grill, Treasurer
3440 Lehigh Street
Allentown, PA   18103

Confidential
PT 007101

Invoice Date:           23-Oct-00

| Date | Advance Amount | Interest Rate | Prior Balance | Payment Applied | Interest Accrued | Current Balance | Interest Due | Principal Due |
|------|------|------|------|------|------|------|------|------|
| 03/09/2000 | 25,000 | 10.75% | - | - | - | 25,000 | - | - |
| 04/09/2000 | | 10.75% | 25,000 | - | 224 | 25,224 | - | - |
| 05/09/2000 | | 10.75% | 25,224 | - | 226 | 25,450 | - | - |
| 06/09/2000 | | 10.75% | 25,450 | - | 228 | 25,678 | - | - |
| 07/09/2000 | | 10.75% | 25,678 | - | 230 | 25,908 | - | - |
| 08/09/2000 | | 10.75% | 25,908 | - | 232 | 26,140 | - | - |
| 09/09/2000 | | 10.75% | 26,140 | - | 234 | 26,374 | 234 | - |
| 10/09/2000 | | 10.75% | 26,374 | - | 236 | 26,610 | 470 | - |

Total Amount Currently Due For This Advance:

Interest --  $      470
Principal --  _____-_____

Total --  $      470

Please Make Check Payable to:

Penn Treaty Network America
c/o Michael Grill, Treasurer
3440 Lehigh Street
Allentown, PA   18103

Confidential
PT 007102

Invoice Date:              23-Oct-00

| Date | Advance Amount | Interest Rate | Prior Balance | Payment Applied | Interest Accrued | Current Balance | Interest Due | Principal Due |
|---|---|---|---|---|---|---|---|---|
| 04/29/2000 | 25,000 | 11.00% | - | - | - | 25,000 | - | - |
| 05/29/2000 | | 11.00% | 25,000 | - | 229 | 25,229 | - | - |
| 06/29/2000 | | 11.00% | 25,229 | - | 231 | 25,460 | - | - |
| 07/29/2000 | | 11.00% | 25,460 | - | 233 | 25,694 | - | - |
| 08/29/2000 | | 11.00% | 25,694 | - | 236 | 25,929 | - | - |
| 09/29/2000 | | 11.00% | 25,929 | - | 238 | 26,167 | - | - |
| 10/29/2000 | | 11.00% | 26,167 | - | 240 | 26,407 | 240 | - |

Total Amount Currently Due For This Advance:

Interest — $    240
Principal —          -

Total — $    240

Please Make Check Payable to:

Penn Treaty Network America
c/o Michael Grill, Treasurer
3440 Lehigh Street
Allentown, PA   18103

Confidential
PT 007103

Invoice Date:          23-Oct-00

| Date | Advance Amount | Interest Rate | Prior Balance | Payment Applied | Interest Accrued | Current Balance | Interest Due | Principal Due |
|------|------|------|------|------|------|------|------|------|
| 08/24/2000 | 25,000 | 11.50% | - | - | - | 25,000 | - | - |
| 09/24/2000 | | 11.50% | 25,000 | - | 240 | 25,240 | - | - |
| 10/24/2000 | | 11.50% | 25,240 | - | 242 | 25,481 | - | - |

Total Amount Currently Due For This Advance:

Interest — $      -
Principal —        -

Total — $      -

Please Make Check Payable to:

Penn Treaty Network America
c/o Michael Grill, Treasurer
3440 Lehigh Street
Allentown, PA  18103

Confidential
PT 007104

Tab 2



1            UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF PENNSYLVANIA

3

4    NATIONAL HEALTHCARE SERVICES,    : Civil Action
                                      : No. 02-CV-3600
5                    Plaintiff,       :
                                      :
6          vs.                        :
                                      :
7    PENN TREATY AMERICAN CORPORATION :
                                      :
8                    Defendants.      :

9

10                       - - -
                Thursday, October 30, 2003
11              Philadelphia, Pennsylvania
                         - - -
12

13

14        Oral videotaped deposition of JANE M. BAGLEY, ESQUIRE,

15    taken at the Law Offices of FOX ROTHSCHILD, LLP, 2000

16    Market Street, beginning at approximately 10:00 a.m., on

17    the above date, before Margaret M. Reihl, RPR, CRR, CSR

18    and Commissioner of Deeds.

19                       - - -

20

21

22            MARGARET M. REIHL
          Certified Shorthand Reporter
23            80 Annapolis Drive
        Sicklerville, New Jersey  08081
24            (856) 435-6638

25

1    exactly when.

2    Q.      Can you pinpoint it any better than that?

3    A.      I don't recall the date of the E-mail.

4    Q.      But it was before Mr. Sadler started

5    communicating with Mr. Callahan?

6    A.      Yes.  And I believe that's what I wrote to

7    Mr. Callahan, that we've retained an attorney and he

8    will be in touch with you.

9    Q.      And, to your knowledge, were Mr. Callahan and

10   Mr. Sadler in communication one with the other?

11   A.      Yes.

12   Q.      How do you know that?

13   A.      Because Mr. Sadler called me and he said that

14   he spoke with Mr. Callahan and he said do you know who

15   this guy is, and I said no, who the heck is this guy,

16   you know, and he explained to me that he bought out a

17   large portion of the shares of Network Insurance, that

18   he was handling the business, that he was a principal,

19   that he lived in Hawaii, that he was an attorney, and

20   I found out information at that point.  But then he

21   moved to Washington.

22   Q.      Now, who told you that Mr. Callahan had bought

23   out a large portion of the shares of National

24   Healthcare Services?

25   A.      I believe Mr. Sadler.  He had spoken with

Jane M. Bagley, Esquire                    95

1               MS. SPECTOR:  Objection.

2               THE WITNESS:  Yes.

3               MS. SPECTOR:  You can take your time

4    and read it.

5    BY MR. RIVERA-SOTO:

6    Q.      Have you ever seen Bagley-11 before today?

7               MS. SPECTOR:  And, again, it's other

8    than in connection with this lawsuit.

9    BY MR. RIVERA-SOTO:

10   Q.      Well, actually, other than in connection with

11   your preparation for this deposition?

12   A.      I don't remember.  I don't remember it.

13   Q.      When did Penn Treaty make the decision that it

14   was going to terminate the Agreement with National

15   Healthcare Services?

16              MS. SPECTOR:  Objection as to form.

17              THE WITNESS:  I believe we sent the

18   letter to -- Tom sent a letter to them in November,

19   the beginning of November.  We were trying to make

20   this work at a certain point, it just was not working,

21   and Tom notified us of his conversations with Mike

22   Callahan and said, you know, if you wanted to

23   terminate this Agreement, it seems that they violated

24   this provision, it would be grounds for termination.

25   BY MR. RIVERA-SOTO:

1    Q.      That's what Mr. Sadler said to you?

2    A.      I don't remember exactly what he said.

3    Q.      But in substance?

4    A.      He said that this guy is clearly managing

5    their business and at that point we were looking to

6    terminate.

7    Q.      That's what I'm asking you, when is that

8    point, when is the point that you decided that you,

9    meaning Penn Treaty, decided that it was going to

10   terminate the Agreement with National Healthcare

11   Services?

12                  MS. SPECTOR:  Well, that's the basis to

13   my objection as to form.  Are you saying decided to

14   terminate for the reasons set forth in the

15   November 5th letter or gave consideration to

16   termination for any reason at any point in time?

17                  MR. RIVERA-SOTO:  No, neither of those.

18                  MS. SPECTOR:  Okay.  Well, then I

19   object to your question.

20   BY MR. RIVERA-SOTO:

21   Q.      My question is pretty straightforward.

22           When did Penn Treaty decide it was going to

23   terminate the agreement with National Healthcare

24   Services?

25                  MS. SPECTOR:  You can answer.

Jane M. Bagley, Esquire                97

1                    THE WITNESS:  Oh, okay.  Sometime

2      before November 5th.

3      BY MR. RIVERA-SOTO:

4      Q.      And what is the earliest date that you can

5      give me that that decision was made?

6      A.      Sometime during the month of October I would

7      imagine, or the beginning of November, because these

8      e-mails are dated the beginning of October.

9      Q.      And whose idea or suggestion was it that the

10     termination be because of a material change in the

11     management of National Healthcare Services?

12     A.       Mr. Sadler's conversations with Mr. Callahan

13     were relayed to us and he said that, essentially,

14     generally speaking, based on what Mr. Callahan's role

15     is as a principal in this company, that that's a

16     violation of the contract and you can terminate the

17     contract for those grounds.

18     Q.      I'm sorry.  I didn't mean to interrupt.  Were

19     you finished?

20     A.       Mm-hmm.

21     Q.      Did Mr. Sadler ever make that communication to

22     you in writing?

23     A.       I don't know.

24     Q.      Who drafted the termination notice?

25     A.       Mr. Sadler.

Tab 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - -x

NATIONAL HEALTHCARE SERVICES, :    CIVIL ACTION

INC.,                          :

        Plaintiff,             :    NO. 02-CV-3600

                               :    (MM)

        vs.                    :

PENN TREATY AMERICAN           :

CORPORATION, et al.,           :

        Defendants.            :

- - - - - - - - - - - - - - - - - - - - - - - - - -x

ORIGINAL

                Videotaped deposition of

HERBERT E. SCHWARTZ, held at the law

offices of BALLARD, SPAHR, ANDREWS &

INGERSOLL, LLP, 1735 Market Street, 51st

Floor, Philadelphia, Pennsylvania 19103,

on Monday, September 29, 2003, beginning

at 9:04 a.m., before Debra J. Weaver, a

Federally Approved Registered

Professional Reporter, Certified Realtime

Reporter and Certified Shorthand Reporter

of NJ (No. XI 01614) and Delaware (No.

138-RPR, Expiration 1/13/05).

                ESQUIRE DEPOSITION SERVICES

        1880 John F. Kennedy Boulevard

                15th Floor

        Philadelphia, PA    19103

                (215) 988-9191

1

1    Q.    Was Penn Treaty supposed to

2    market the product to anyone other than

3    their long-term care agents?

4    A.    No.

5    Q.    Who is to market to people

6    other than Penn Treaty's long-term care

7    agents, whose responsibility was that?

8    A.    That's a difficult question

9    to answer.

10    Q.    Okay.

11    A.    Okay.    The reason it's

12    difficult to answer is because Penn

13    Treaty wanted all salespeople and anybody

14    that would sell the product to be an

15    insurance-licensed and contracted only

16    with Penn Treaty to sell their insurance

17    products.

18    Q.    You mentioned -- well,

19    strike that.

20    Notwithstanding whatever you

21    believe Penn Treaty was requiring or

22    thought --

23    A.    No, I didn't think that.

24    That is a fact.

72

73

1          Q.       I don't want to argue with

2    you.

3          A.       I don't either.

4          Q.       Notwithstanding that, what

5    you believe about that, who was to market

6    to people other than Penn Treaty's agent

7    sales force?  Who was to do that?

8          A.       National Healthcare

9    Services.

10         Q.       Okay.  And how many agents

11   did National Healthcare Services market

12   to beyond Penn Treaty's sales force?

13         A.       In numbers, I'd say --

14   market to or contract?

15         Q.       Let's say -- let's take

16   contract first.  How many agents did

17   National Healthcare Services contract

18   with other than Penn Treaty's sales

19   force?

20         A.       Very few.

21         Q.       When you say very few, about

22   how many?

23         A.       Less than a hundred.

24         Q.       And other than people who

74

1    actually signed up contracts, which you

2    say were less than a hundred, how many

3    people did National Healthcare Services

4    attempt to market this product to, how

5    many other agents?

6              A.      Several thousand.

7              Q.      So of the several thousand

8    that National Healthcare Services, Inc.,

9    attempted to market this product to, only

10   a few hundred signed contracts?

11             A.      Correct.

12             Q.      Did National Healthcare

13   Services receive any letters back from

14   any agents that it attempted to market it

15   to describing the reasons why they did

16   not wish to market this product?

17             A.      Did National Healthcare

18   Services receive such a letter?

19             Q.      Yes.  Any such letter.

20             A.      Did our corporation at the

21   time?  No, not that I -- no.  I don't

22   think so.

23             Q.      Okay.  Did National

24   Healthcare Services receive any negative

145

1    problems and things?

2         A.    Correct.

3         Q.    Yes?

4         A.    Correct.    Yes.

5         Q.    This March 28th, 2000,

6    e-mail describes an issue with a Ms.

7    Hollis.    This is the second e-mail in the

8    chain.    That she wants to cancel as the

9    result of delays in getting her

10   fulfillment kit.    Do you see that?

11        A.    Yes.

12        Q.    Okay.    Were you aware of

13   delays in folks getting fulfillment kits

14   during the pendency of the AllRisk

15   product?

16        A.    Yes.

17        Q.    Okay.    You can put that

18   aside.

19             MR. YOHAI:    Let's mark this.

20             (Whereupon, Deposition

21   Exhibit No. Schwartz-10, Series of

22   e-mails to and from Sharon

23   Fritzinger, Bates PT

24   011662-0011663, was marked for

171

1           (Whereupon, a short recess

2       was taken.)

3           THE VIDEOGRAPHER:    Back on

4       the record at 12:36.

5    BY MR. YOHAI:

6           Q.    Mr. Schwartz, you've made a

7    comment to me just now and I'm just

8    curious as to what that means.    You said

9    you're not part of this lawsuit or

10   something like that.    Could you explain

11   just what that means?

12          A.    Well, I mean, I'm not part

13   of the people that brought the lawsuit.

14   I'm not a complainer here.

15          Q.    Do you believe that this

16   lawsuit was inappropriately filed?

17          A.    No, I do not believe it was

18   inappropriately filed.

19          Q.    If you had been asked or if

20   you were in control of whether to file or

21   not file the lawsuit, would you be in

22   litigation now with Penn Treaty?

23          A.    If it was my decision?

24          Q.    Yes.

172

1

2          A.      That's a difficult question

3   to answer.   One, I believe that the

4   people that filed the lawsuit, I agree

5   with them as to the reasons why.  Whether

6   I do those things or not is another

7   story.  I just don't like going around

8   suing.

9          Q.      Who are the people that you

10  believe filed the lawsuit?   Who are the

11  people?

12          A.      National Healthcare

13  Services.

14          Q.      Okay.  But National

15  Healthcare Services is you and Neal

16  Forman, correct?

17          MR. LYONS:   Objection.

18          THE WITNESS:   I am not a

19  member of that corporation.  I'm

20  not a stockholder, nor an

21  employee, nor an officer.

22  BY MR. YOHAI:

23          Q.      Currently?

24          A.      Currently.

25          Q.      Were you at any time?

Tab 4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NATIONAL HEALTHCARE        :

SERVICES, INC.,            :    CIVIL ACTION

Plaintiff,                 *

- vs -                     :

PENN TREATY AMERICAN       :

CORPORATION, et al.,       :    NO. 02-CV-3600

Defendants.                *    (MM)



Tuesday, October 14, 2003

Realtime videotape

deposition of NEAL A. FORMAN, in his

individual capacity, and Rule 30 (b)(6)

realtime videotape deposition of NATIONAL

HEALTHCARE SERVICES, INC., taken through

its representative NEAL A. FORMAN, held

in the law offices of BALLARD SPAHR,

ANDREWS & INGERSOLL, LLP, 1735 Market

Street, 42nd Floor, Philadelphia,

Pennsylvania 19103, on Tuesday, October

14, 2003, beginning at 9:33 a.m., before

Kimberly A. Cahill, a Registered

Professional Reporter and Approved

Reporter of the United States District

Court.

*                *                *

*                *                *

ESQUIRE DEPOSITION SERVICES

15th Floor

1880 John F. Kennedy Boulevard

Philadelphia, PA 19103

(215) 988-9191

1

90

    Q.      Okay.

            And that the agents couldn't

be specific about the discounts

available; is that right?

    A.      Correct.

    Q.      Who was responsible for

knowing or having the information as to

what discounts were available?

    A.      On what?

    Q.      On the healthcare services

being provided, for example, eye care or

vision care or dental care.

    A.      We -- we entered into an

agreement at contract with DDS, and they

had prenegotiated discounts with various

providers and vendors; and whatever those

negotiated discounts were, that's what we

could offer.

    Q.      Okay.

            So it was DDS that was

responsible for knowing what discounts

were available; correct?

    A.      Right.

    Q.      And DDS was contracted by

of foundation.

    THE WITNESS:  I don't know
how they could without knowing
what was required.

BY MR. YOHAI:

    Q.    And in -- and in some
instances, customers of all the AllRisk
-- potential customers, I should say, of
the AllRisk program, they wanted to know
what -- what the -- what the discounts
were at specific homes, isn't that right,
specific nursing --

    A.    I don't think the customer
wanted to know so much as the agent
that's representing the program wanted to
know.

    Q.    Okay.

    The agent wanted to know
because the agent was going to be selling
the program.

    A.    That's correct.

    Q.    Okay.

    So the agent wanted to know
the specific discounts --

NEAL A. FORMAN

262

1          MR. YOHAI:  Okay.

2          THE WITNESS:  Do I agree

3     with them?  I don't know.

4  BY MR. YOHAI:

5          Q.    Here's my point:  Over the

6  course of several months, isn't it true

7  there were a number of projections that

8  went -- that went back and forth about

9  this program?

10          A.    Yes, because I think Glen

11  Levit asked for various -- different

12  projections, what if we sold at this

13  price, what if this persists, what if

14  this -- and Web did all those --

15          Q.    Right.

16          A.    -- projections for Glen.

17          Q.    Some of them showed the

18  program making hundreds of millions of

19  dollars; correct?

20          A.    Uh-hum.

21          Q.    Correct?  And some of these

22  projections show the program making

23  substantially less than that; isn't that

24  right?

NEAL A. FORMAN

263

1      A.      It doesn't mean that these
2   projections are necessarily -- this is
3   right.  I don't know.
4      Q.      Exactly.
5      A.      I don't know.
6      Q.      But it's correct that some
7   of the projections showed the -- the
8   program making substantially less than
9   hundreds --
10      A.      Some of the projections are
11   different, but that's all I can say.
12      Q.      And you would agree with me
13   that some of them show the company making
14   substantially less than a couple hundred
15   million dollars; isn't that right?  Yes
16   or no.
17            MR. LYONS:  Objection.  You
18        can answer the question however
19        you want.
20            THE WITNESS:  If I was --
21        compare the two projections, one's
22        higher; one's lower.
23   BY MR. YOHAI:
24      Q.      Projections don't always

NEAL A. FORMAN

264

1    come true; isn't that right, Mr. Forman?

2         A.    Yes.    There's a lot of

3    circumstantial things that can happen to

4    change the projections.

5         Q.    You're experienced in the

6    insurance industry, are you not?

7         A.    Yes, I am.

8         Q.    Okay.

9              And from your experience in

10   the insurance industry, it's true, isn't

11   it, that new products, sometimes they

12   work out and sometimes they don't; isn't

13   that true?

14        A.    That is correct.

15        Q.    And no matter what you

16   project at the beginning of the process,

17   no one really knows how the product's

18   going to -- going to sell; isn't that

19   right?

20             MR. LYONS:    Objection to the

21        form.

22             THE WITNESS:    That is

23        correct.

24             MR. YOHAI:    Okay.    Thank

Tab 5



# AMERICAN LIFE & HEALTH GROUP, INC.

*National Distributors of Quality Life, Health, Annuity & Viatical Settlements*

April 28, 2000



**PRESIDENT**

MAY 0 2 2000

Glen Levit
Penn Treaty Network America
3440 Lehigh Street
Allentown, PA 18103

Dear Glen,

In light of our due diligence regarding the All Risks product we feel for our protection against very serious charges and the very real possibility of lawsuits, we will no longer promote the sale of All Risks. We have told our captive agents we will no longer accept applications; and we have removed it from our General Agent recruiting kits. I would strongly suggest you re-evaluate the company's position regarding All Risks!

I want to explain what has led to this conclusion:

First, you have claimed this product is doing well, as Derrick Brickhouse said, "it is one of the most successful new released plans in company history". Because of your apparent success, I thought if we could add a credible PPO network of nursing homes to our very real program, Liberty Care Plan, it would be the best in the country...by far! So, we started to search for a PPO network we could plug into our existing product. As luck would have it, my partner in Liberty Care Plan, Glen Bly, came across your same provider. Not realizing it was your provider, he commenced to negotiate a contract for our programs with a Mr. Fink. He was very excited with the addition of a nursing home PPO network along with our real savings on our Nationwide Home Health Care Program with the largest provider in America (40 year old NY Stock Exchange Co.) Liberty Care Plan would be flying!

However, when he started explaining to me the program, cost and benefits...I said STOP! This sounds too much like Penn Treaty. He checked with the provider, and I was right. That's of course is not a problem in itself, the problem was we were having trouble getting a complete providers list. This is the same problem you were having! After several discussions, we came to the conclusion there was no real PPO network set up.

Then, two days later Mr. Fink has a PPO Network and is very interested in contracting with us. Since I was already skeptical about this guy, I said, we have to check this out!

This is what we did:

Confidential
PT 011568

Glen called him directly and received a partial list of providers in the Sarasota area, and I called the number on your brochure and secured the network providers in the southeast Florida area. I called the first nursing home, Pompano Rehab Nursing home (954) 942-5530 and told them I was interested in placing my mother in a home. I inquired about what services they offered and the

cost, then I said my mother was considering becoming a member of All Risks and requested what my discount would be. Through all the normal channels no person at this facility had even heard of All Risk, Penn Treaty, or the network provider! They would not agree to any discount. I asked to talk to the head administrator who called me back the next day. Gary Kurkwitz emphatically informed me that their nursing home was not part of this PPO network. He had never heard of any of the players! He also said that if they had given me his company's name and selling a product to seniors claiming a discount, they were committing fraud to seniors!

This, as you know, is a very serious charge!

Upon hearing, with my own ears, that at least this facility was not part of the All Risk program and never has been, we thought we should check closer.

I had our Liberty Care Plan marketer, J.R. Reese, Jr. call the entire list provided by the people at the 800 number on your brochure. There was thirteen institutions listed in addition to the one I received. I'm very sorry to report to you that in every case the conclusion was exactly the same...we are not part of this PPO network, we have never heard of the people and we provide no discounts for members of the All Risk program! J.R., contacted ten of the thirteen, all the same answer!

Glen Bly called eleven from his list with all the same results! Glen went one step more than we did. In each case he had them also check with their home office or regional office in addition to speaking to the person in charge of the local facility. But once again, all the same answers, no discounts for members of All Risk.

The comments we were getting from the administrators over and over were phrases like, "It's a scam!" "That's fraud!" "That would be fraud to a senior!" "It sounds to me like this should be investigated!" "That's fraud and racketeering!"

Glen, I don't want to be the bearer of bad news; but as your friend and a very interested party in the well-being of Penn Treaty, our agency, and our brokers, I have to share our findings with you. Yesterday, I told some of our captive agents not to sell All Risk, and one told me he had gone to your web-site and pulled off the network providers in his area and called the list. He had the same results, but that several were no longer in business.

This All Risks program appears to have more faults, than benefits, and I'm very concerned about law suits and our reputation...not to mention Federal Fraud and Racketeering charges! Just imagine a senior is sold this plan and then tries to use a nursing home and has the same results we have had...then it happens to everyone on the plan! We could be in serious trouble! The senior or their children will be suing our agent, you and us! I can tell you from experience what bad publicity can do (our Viatical business is off over 80%, locally, because of the bad publicity about other Viatical companies!). None of us need these kind of problems.

I have enclosed the copies of the worksheets used to call these non-providers, names, dates, etc. Feel free to also talk with J.R. Reese, Jr. at 561-547-9133 or Glen Bly at 800-425-2554 or me at 561-547-9009 about anything that was said. I urge you to re-think All Risk!

On a positive note, Liberty Care Plan, Inc.,with its court decision and clean bill of health from the insurance department is now ready to go National! Our provider is real...40 years in business; a national company with over 22,000 full-time employees and their stock is traded on the New York Stock Exchange. We provide a direct contract between the member and the provider

Confidential
PT 011569

leaving you and us with a great deal of legal protection. This plan can be adjusted with additional benefits, and we can offer it with just your name on everything. No one would have to know of our connection. Plus, I think one of your biggest considerations; Liberty Care Plan is with someone that has a proven track record with you and your company. Someone you can trust! Can you ever trust Mr. Fink? Or the broker who is making this so-called plan available to you?

We would love to do business together with our plan that we have been perfecting since 1994! It is real, it is proven, and it works! It is a program that you could be proud to sell!

Please, let me hear from you, and remember I'm only the messenger...not the problem!

Sincerely,

Charles R. Mankamyer
National Marketing Director

P.S. Plus, you might find it interesting that Discount Card Services, Inc. sell's virtually the same benefits on the World Wide Web for $150.00 per year. How do you explain that to agents, attorneys, government departments controlling business activities, newspapers, clients, or a judge hearing a case from a senior citizen who claims we all cheated him???

Confidential
PT 011570

Tab 6

Faxed to
Herb
+ Neal
4/27

AllR-h



Confidential
PT 004349

 # Penn Treaty Network America Insurance Company

### (PTNA Life Insurance Company in CA)

Via electronic mail delivery [hsinet@flash.net]
and Overnight Delivery

April 25, 2000

Joe Axmann
HealthCare Synergies, Inc.
2165 West Park Court
Suite A
Stone Mountain, GA 30087

Dear Joe:

It was a pleasure speaking with you last week concerning our AllRisk product. As we discussed, the AllRisk product is currently being marketed through our field force of independent insurance agents. While the initial feedback from our agents has been extremely positive, our agents have repeatedly expressed to us their need to have access to the provider discount percentages available in their specific areas. Without this information, the product (and our agents) lacks the credibility that is needed in order for AllRisk to be the great success we all believe it can be.

Furthermore, as you know, Penn Treaty is an insurance company yet the AllRisk product is a non-insurance plan. Because of our insurance company status, we are subjected to the regulations of all states in which we conduct business and we must give extra consideration to the higher level of our exposure and liability with regard to this product. Additionally, the AllRisk product is a stand-alone discount health benefits program and is not just a benefit that is a part of an insurance policy, as you have experienced with other insurance companies.

These factors, coupled with the regulatory and consumer advocacy exposure to which we are subjected, are the underlying reasons why access to provider discount information is of the utmost importance.

During our conversation last week, we addressed several significant issues that are summarized below. I think you will agree that a workable solution for both HSI and Penn Treaty is within reach and these issues should form the basis of a formal agreement between us.

1. Due to contractual obligations with its providers, HSI is not permitted to release to Penn Treaty the providers' contracted rates.
2. HSI does not offer a guaranteed minimum discount amount with regard to its contracted providers.
3. HSI maintains a database of reasonable and customary ("R & C") charges by providers and HSI has agreed to grant Penn Treaty's agents and prospective AllRisk members access to this database on the basis of zip code areas. In other words, Penn Treaty agents and prospective AllRisk members will be able to retrieve information about R & C provider charges for specific zip code areas.

Confidential
PT 004350

4. HSI has further agreed to grant Penn Treaty's agents and prospective AllRisk members access to HSI's database of average provider discounts in specific zip code areas.

5. Penn Treaty shall have access to HSI and/or individual providers in order to obtain the specific discount offered by those providers as well as the specific rate, which is being discounted so that Penn Treaty may provide the information to its agents and to prospective AllRisk members. Penn Treaty would like to make such information available to its agents and prospective AllRisk members directly through Penn Treaty's web site, but is aware of HSI's concerns about releasing this information in such a fashion.

6. Penn Treaty and HSI shall enter into confidentiality agreement concerning the access and use of HSI's database by Penn Treaty, its insurance agents and prospective AllRisk members. Penn Treaty agrees that it shall date all information obtained from HSI and shall utilize appropriate disclaimers when releasing said information.

7. Neither Penn Treaty's insurance agents nor prospective AllRisk members will be required to sign individual confidentiality agreements.

8. Penn Treaty's agents and prospective AllRisk members will be able to access the information discussed in items 3 & 4 above directly through Penn Treaty its insurance agents or directly through Penn Treaty's web site.

9. Penn Treaty understands and agrees that the information shall be released to Penn Treaty agents and prospective AllRisk members on an individual basis only. The information shall not be distributed to agents and prospective AllRisk members in bulk or in a "wholesale" manner.

10. Penn Treaty and HSI shall negotiate an agreeable fee that Penn Treaty shall pay to HSI for use of said information.

We appreciate your cooperation in this matter and we truly look forward to working with you in order to make the AllRisk product the most attractive and desirable of its kind. We are anxious to get this matter resolved by the end of this week as we are ready to release AllRisk on a national level. In fact, there is a meeting scheduled for the end of next week with one of our largest agencies and I will be in attendance. I would really like to use that forum as the national "kick-off" of the AllRisk plan and therefore ask that you call me as soon as you receive this letter so that we can resolve this expeditiously.

Very truly yours,

PENN TREATY NETWORK AMERICA INSURANCE COMPANY

Glen A. Levit, President

GAL/jmb

Confidential
PT 004351