IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC.,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>PENN TREATY AMERICAN<br>CORPORATION, et al.<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: CIVIL ACTION NO. 02-CV-3600 (MM)<br>:<br>:<br>:<br>:<br>: |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Plaintiff National Healthcare Services, Inc. ("**NHCS**") submits this reply in further support of its motion for partial summary judgment against defendants Penn Treaty American Corporation, Penn Treaty Network America Insurance Company and Senior Financial Consultants Company (collectively, "**Penn Treaty**").

A.  **THERE WAS NO "MATERIAL CHANGE IN THE MANAGEMENT" OF NHCS.**

NHCS has already submitted two memoranda on this issue – one in favor of NHCS's motion for partial summary judgment and one in opposition to Penn Treaty's motion for summary judgment – and there is no need to belabor this point. Simply put, NHCS is entitled to summary judgment on the issue of Penn Treaty's liability because Michael Callahan did not represent a "material change in the management" of NHCS so as to justify a termination of the Agreement pursuant to Section 6.2.3(d).[1]

---

[1] For ease of reference, a true and correct copy of the Agreement is attached hereto as **Exhibit "A"** and is made a part hereof by reference.

Despite Penn Treaty's contortions, it is inescapable that there are only three people who have <u>firsthand</u> knowledge of Callahan's role at NHCS prior to Penn Treaty's November 5, 2001 termination of the Agreement:  Neal Forman, Herb Schwartz and Callahan himself.  All three of these men have testified that Callahan had no management responsibilities at NHCS whatsoever; it is helpful to review that testimony in detail,[2] bearing in mind that Messrs. Forman and Schwartz were the founders/owners of NHCS and Callahan is the one Penn Treaty seeks somehow to cast as the villain here.

***First,*** Neal Forman unequivocally testified that "Michael Callahan has never had any say in the running of this company, ever."[3]

***Second,*** Herb Schwartz also unequivocally testified that "he [Michael Callahan] was not an executive employee or anything else with National Healthcare Services" and that, although he approved Neal Forman's sale of a 25% non-voting interest to Callahan from Forman's part of NHCS, that approval was conditioned on the caveat "that Michael Callahan would not have any management or any say-so in the company whatsoever."[4]  Herb Schwartz was emphatic: Callahan "was never an employee and never paid a fee from National Healthcare Services or was he voted into the company as an officer, nor did he ever have any control or voting stock or say-

---

[2] For ease of reference, the following deposition references from the depositions of Messrs. Forman, Schwartz and Callahan, respectively, are collectively attached hereto as **Exhibit "B"** and are made a part hereof by reference.

[3] Forman Deposition at 32:2-32:4.

[4] Schwartz Deposition at 275:20-275:24; 276:17-276:19.

so in the company"[5] and that "[t]here was no other management in this company [NHCS] other than Neal [Forman] and myself."[6]

  ***Third, and finally,*** Michael Callahan testified as follows:

> Q. Mr. Callahan, are you now or have you ever been an officer of [NHCS]?
>
> A. No.
>
> Q. Are you now or have you ever been a director of [NHCS]?
>
> A. No.
>
> Q. Are you now or have you ever been in management charge of [NHCS]?
>
>   MS. SPECTOR: Objection.
>
>   THE WITNESS: No.
>
> Q. Have you at any time communicated to anyone at Penn Treaty that you are either an officer, director or in management charge of [NHCS]?
>
>   MS. SPECTOR: Objection.
>
>   THE WITNESS: No.
>
> Q. Has anyone at Penn Treaty ever asked you if you are an officer, director or in management charge of [NHCS]?
>
> A. No.
>
> Q. To your knowledge, has Penn Treaty ever asked anybody whether you were an officer, director or in management charge of [NHCS]?
>
>   MS. SPECTOR: Objection.
>
>   THE WITNESS: Not to my knowledge, no.

---

[5] Schwartz Deposition at 281:10-281:16

[6] Schwartz Deposition at 114:21-114:23 (emphasis supplied).

. . . .

Q. Did you ever represent to anyone at Penn Treaty that you had acquired either all or substantially all of the assets of [NHCS]?

A. No.

Q. Did anybody at Penn Treaty ever ask you whether you had received a majority - - all or substantially all of the assets of [NHCS]?

A. No.

Q. Did anyone at Penn Treaty ever ask you whether you had received a majority of the stock of [NHCS]?

A. No.

Q. To your knowledge, has Penn Treaty ever asked anybody whether you had received all or substantially all of the assets of [NHCS]?

  MS. SPECTOR: Objection.

  THE WITNESS: Not to my knowledge, no.

Q. To your knowledge, has Penn Treaty ever asked anybody whether you had received a majority of the stock of [NHCS]?

  MS. SPECTOR: Objection.

  THE WITNESS: No.

Q. Do you know what basis Mr. Sadler had when he wrote the letter of termination?

  MS. SPECTOR: Objection.

  THE WITNESS: He couldn't have had any basis. There was no basis to be had.[7]

---

[7] Callahan Deposition at 207:11-210:21.

Penn Treaty's use of smoke and mirrors does not and cannot change these unavoidable truths.[8]

B.     <u>**PENN TREATY APPROVED CALLAHAN'S INVOLVEMENT.**</u>

Even if Callahan could somehow be considered a "material change in the management" of NHCS, Penn Treaty still loses because Penn Treaty approved that change by both word and deed.

In a March 23, 2001 e-mail to Jackie Frantz of Penn Treaty, third-party service provider Web Barth informed Penn Treaty that Callahan was a "new exec helping to <u>manage</u>" part of the AllRisk Healthcare® program under Barth's direction.[9] This was the first and only time prior to Penn Treaty's termination of the Agreement that Callahan's name and the word "manage" – the key term in this lawsuit –were mentioned in the same sentence. Frantz responded to Barth's e-mail by agreeing to keep Callahan advised on matters related to AllRisk Healthcare®.[10]

Understandably, Penn Treaty tries to downplay the significance of Barth's e-mail and brush aside Frantz's response. In its opposition to NHCS's motion for partial summary judgment, Penn Treaty goes to great lengths when it claims that NHCS was required to comply

---

[8]     Penn Treaty relies on <u>Parfait v. Central Towing, Inc.</u>, 660 F.2d 608 (5th Cir. 1981), which involved an insurance policy that was voidable if the insured underwent an unapproved "change of management." Penn Treaty's reliance is misplaced. In <u>Parfait</u>, the Fifth Circuit determined that a "change of management" occurred because <u>all</u> of the corporate stock of the insured was sold, and there was a <u>total</u> change in the directors and officers. <u>Id.</u> at 609-10 ("The entire corporation, literally, changed hands."). In stark contrast here, Callahan only acquired a minority, 25% <u>non-voting</u> stock interest in NHCS, while the majority shareholders – Forman and Schwartz – remained in complete control of the company at all times, and there was <u>no</u> change in the company's officers and directors.

[9]     (emphasis supplied). For ease of reference, a true and correct copy of the e-mail from Barth to Frantz dated March 23, 2001 is attached hereto as **Exhibit "C"** and is made a part hereof by reference.

[10]     A true and correct copy of the e-mail from Frantz to Barth dated March 26, 2001 is included in the e-mail correspondence already attached as Exhibit "C" hereto.

with the Agreement's notice provision by (a) giving Penn Treaty's President – and no one else – formal notice of any material change in the management of NHCS, and (b) formally requesting approval from Penn Treaty's President – and no one else – for such a material change in the management. Yet, the stark terms of the Agreement do not support Penn Treaty's defense. Section 6.2.3(d) – the termination provision of the Agreement – does not require that any formal notice be given with respect to a "material change in the management" of one of the parties, nor does Section 6.2.3(d) specify by whom a "material change in the management" may be approved. Penn Treaty, instead, has conjured up this argument out of whole cloth, based on contract language that simply does not exist. Because there is no notice requirement specified in Section 6.2.3(d) of the Agreement, Penn Treaty is not immunized simply because Frantz was the person at Penn Treaty who initially approved Callahan's involvement in the AllRisk Healthcare® program.

Penn Treaty also ignores certain salient facts. Barth's March 23, 2001 e-mail – which, again, put Penn Treaty on notice that Callahan was a "new exec helping to manage" part of the AllRisk Healthcare® program – was later copied and pasted within Penn Treaty's chain of command, and then forwarded to Penn Treaty's in-house counsel, Jane Bagley, the person Penn Treaty identified as the one who made the decision to terminate the Agreement.[11] After being expressly told of Callahan's role, Bagley did absolutely nothing about it. To the contrary, she and other senior executives at Penn Treaty continued writing to Callahan and conducting

---

[11] A true and correct copy of the August 20, 2001 copied-and-pasted e-mail forwarded to Bagley is attached hereto as **Exhibit "D"** and is made a part hereof by reference. See also Defendants' Responses to Plaintiff's First Set of Interrogatories, a true and correct copy of which is attached hereto as **Exhibit "E"** and is made a part hereof by reference; in response to interrogatory no. 11, Penn Treaty states that "the decision to terminate the Agreement was made by Jane M. Bagley, in consultation with Cameron Waite and Bill Hunt."

business with him on matters related to AllRisk Healthcare® as before.  Curiously, when asked under oath about this copy-and-paste job at her deposition, Bagley had no answer.[12]

At all levels, then, Penn Treaty knew who Callahan was and what role he played with respect to the AllRisk Healthcare® program.  For eight months, Penn Treaty approved of Callahan's involvement without objection.[13]

Left with no other alternative, Penn Treaty argues that its eight-month acquiescence to Callahan's involvement, by itself, does not satisfy Section 6.2.3(d) of the Agreement, which requires written approval of any "material change in the management."  Again, Penn Treaty's protestations are to no avail.  First, this argument ignores the fact that Frantz did, in fact, approve Callahan's involvement in writing on behalf of Penn Treaty.  Second, even if Penn Treaty had not approved Callahan's involvement in writing (which it did), Penn Treaty's eight-month period of consent to Callahan's role still operates as an approval.[14]  Regardless of Frantz's e-mail, Penn Treaty's conduct over the ensuing eight months unequivocally showed that Penn Treaty had no

---

[12] Deposition of Jane M. Bagley, October 30, 2003, at 58:25-65:17, true and correct copies of relevant portions of this deposition are attached hereto as **Exhibit "F"** and are made a part hereof by reference.

[13] Section 6.2.3(d) of the Agreement gives either party the right to terminate "<u>immediately</u>" if there is an unapproved "material change in the management" of the other party.  Agreement, Exhibit "A" at § 6.2.3(d) (emphasis added).  Rather than act "immediately" when it learned of Callahan, Penn Treaty communicated freely with Callahan on business matters for eight months.  See assorted communications between Penn Treaty and Callahan, which are collectively attached hereto as **Exhibit "G"** and are made a part hereof by reference.

[14] See Accu-Weather, Inc. v. Prospect Communications, Inc., 644 A.2d 1251, 1255 (Pa. Super. Ct. 1994) ("An agreement prohibiting non-written modification may be modified by a subsequent oral agreement if the parties' conduct clearly shows an intent to waive the requirement that amendments be in writing.").  Pennsylvania law does not allow a party to invoke a contractual provision that has been waived by the complaining party's conduct.  See also Parking Auth. of City of Wilkes-Barre v. Ten East South Street Co., 788 A.2d 1096, 1101 (Pa. Commw. Ct. 2001) ("Parties to a written contract may abandon, modify or change it either by words or conduct.").

objection to Callahan. Penn Treaty's actions then drown out Penn Treaty's litigation-generated words now.

In sum, because no reasonable jury could find that Penn Treaty's termination of the Agreement was proper, NHCS is entitled to summary judgment in its favor.

C. CONCLUSION.

For all of the foregoing reasons, as well as the reasons set forth in NHCS's prior submissions, NHCS respectfully requests that the Court enter summary judgment in its favor and against Penn Treaty on the issue of Penn Treaty's liability for breaching the Agreement.

Respectfully submitted,

*[signature]*

Roberto A. Rivera-Soto
FOX ROTHSCHILD LLP
2000 Market Street – Tenth Floor
Philadelphia, Pennsylvania 19103-3291
(215) 299-2000

ATTORNEYS FOR PLAINTIFF
NATIONAL HEALTHCARE SERVICES, INC.

DATED:    January 30, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing plaintiff's reply in support of its motion for partial summary judgment as to liability was served by hand delivering the same to:

Martin C. Bryce, Jr., Esq.<br>
Douglas L. Flitter, Esq.<br>
Ballard Spahr Andrews & Ingersoll, LLP<br>
1735 Market Street, 51st Floor<br>
Philadelphia, Pennsylvania 19103

Roberto A. Rivera-Soto

**DATED:**    January 30, 2004