## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | : | CIVIL ACTION |
| Plaintiff, | : | NO.: 02-CV-3600 |
| v. | : | |
| PENN TREATY AMERICAN CORPORATION, et al., | : | |
| Defendants. | : | |

### AFFIRMATION OF DAVID L. YOHAI IN SUPPORT OF
### DEFENDANTS' MOTION TO AMEND THEIR ANSWER

**DAVID L. YOHAI**, an attorney duly admitted to practice law before the

Courts of the State of New York and admitted *pro hac vice* to practice before the United

States District Court for the Eastern District of Pennsylvania, affirms the following to be

true under penalties of perjury:

        1.     I am a partner of the law firm of Weil, Gotshal & Manges LLP,

co-counsel for defendants Penn Treaty American Corporation, Penn Treaty Network

America Insurance Company ("PTNA"), and Senior Financial Consultants Company.

This affirmation is submitted in support of Defendants' motion to amend their answer to

add a counterclaim.

        2.     Annexed hereto as Exhibit "A" is a true and correct copy of

Defendants' proposed First Amended Answer and Counterclaim.

        3.     Annexed hereto as Exhibit "B" is a true and correct redlined copy

of Defendants' proposed First Amended Answer and Counterclaim.

4.    Annexed hereto as Exhibit "C" is a true and correct copy of the

Agreement, dated October 21, 1999, by and between PTNA and National Healthcare.

5.    Annexed hereto as Exhibit "D" is a true and correct copy of

Defendants' Answer to Plaintiff's Amended Complaint, dated October 21, 2002.

6.    Annexed hereto as Exhibit "E" is a true and correct copy of

excerpts from the videotape deposition of Herbert E. Schwartz taken on

September 29, 2003.

7.    Annexed hereto as Exhibit "F" is a true and correct copy of

excerpts from the videotape deposition of Neal A. Forman, in his individual capacity and

as the corporate designee by plaintiff National Healthcare Services, Inc. pursuant to Rule

30(b)(6) of the Federal Rules of Civil Procedure, taken on October 14, 2003.

It is respectfully requested that Defendants' motion to amend their answer

be granted together with such other and further relief which this Court deems just and

proper.

Dated: New York, New York
        January 5, 2005

_____
David L. Yohai

EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.: 02-CV-3600 |
| v. | : | |
| | : | |
| PENN TREATY AMERICAN CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' FIRST AMENDED ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Defendants Penn Treaty American Corporation ("Penn Treaty"), Penn Treaty Network America Insurance Company ("PTNA"), and Senior Financial Consultants Company ("SFCC") (collectively, "defendants"), by their undersigned attorneys, submit this First Amended Answer to Plaintiff's Amended Complaint (the "Amended Complaint"):

1.     Deny the averments of paragraph 1, except admit that plaintiff asserts claims against defendants for breach of contract and misappropriation.

2.     Defendants lack knowledge or information sufficient to form a belief as to the averments of paragraph 2, except admit that NHCS is a State of Washington corporation with its principal place of business at 4523 102nd Lane N.E., Kirkland, Washington 98033.

3.–4.     Admit the averments of paragraphs 3 and 4.

5.     Deny the averments of paragraph 5, except admit that SFCC is a Pennsylvania corporation and maintains its principal place of business at 3440 Lehigh Street, Allentown, Pennsylvania 18103-7001.

6.     Admit the averments of paragraph 6.

7.–8.     Deny the averments of paragraphs 7 and 8 as conclusions of law to which no response is required.

9.–16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraphs 9 through 16 and therefore deny the averments and demand strict proof thereof at trial, except admit that the AllRisk program purportedly provided the services described in paragraph 14.

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 17 and therefore deny the averments and demand strict proof thereof at trial, except admit that NHCS contacted Penn Treaty regarding the AllRisk Healthcare product and program.

18.    Admit the averments of paragraph 18.

19.–20.    Deny the averments of paragraphs 19 and 20, except lack knowledge or information sufficient to form a belief as to the truth of the averments regarding what Glen Levit recognized or communicated to NHCS and therefore deny the averments and demand strict proof thereof at trial.

21.    With respect to the averments of paragraph 21, respectfully refer the Court to Exhibit A to the Amended Complaint for the contents thereof.

22.    With respect to the averments of paragraph 22, respectfully refer the Court to Exhibit B to the Amended Complaint for the contents thereof.

23.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 23 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit C to the Amended Complaint for the contents thereof.

24.    Defendants lack knowledge or information to form a belief as to the truth of the averments of paragraph 24 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit D to the Amended Complaint for the contents thereof.

25.     Deny the averments of paragraph 25.

26.     Defendants lack knowledge or information to form a belief as to the truth of the averments of paragraph 26 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit E to the Amended Complaint for the contents thereof.

27.     Deny the averments of paragraph 27, except admit that defendant PTNA wired $125,000 to defendant NHCS's bank account pursuant to the Promissory Note.

28.     Deny the averments of paragraph 28.

29.     Deny the averments of paragraph 29.

30.     With respect to the averments of paragraph 30, respectfully refer the Court to Exhibit F to the Amended Complaint for the contents thereof.

31.     With respect to the averments of paragraph 31, respectfully refer the Court to Exhibit G to the Amended Complaint for the contents thereof.

32.     Admit that Penn Treaty and PTNA did not, as the parties envisioned, provide a draft agreement documenting the August 21, 2000 Letter Amendment, except respectfully refer the Court to the August 21, 2000 Letter Amendment for the contents thereof.

33.     Admit the averments of paragraph 33.

34.     Deny the averments of paragraph 34.

35.     Admit that Glen Levit died unexpectedly on October 3, 2000,

36.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 36 and therefore deny the averments and demand strict proof thereof at trial.

37.     Deny the averments of paragraph 37, except admit that while SFCC itself did not begin marketing the AllRisk program until February 2001, the program had been marketed by PTNA until that point.

38.    Deny the averments of paragraph 38, except admit that the AliRisk program was never marketed in some states because, _inter alia_, such marketing would have been contrary to law.

39.    Deny the averments of paragraph 39.

40.    With respect to the averments of paragraph 40, respectfully refer the Court to Exhibit H to the Amended Complaint for the contents thereof.

41.    With respect to the averments of paragraph 41, respectfully refer the Court to Exhibit I to the Amended Complaint for the contents thereof.

42.–47.    Deny the averments of paragraphs 42 through 47.

48.    Deny the averments of paragraph 48, except respectfully refer the Court to Exhibit J to the Amended Complaint for the contents thereof.

49.    With respect to the averments of paragraph 49, respectfully refer the Court to Exhibits I and K to the Amended Complaint for the contents thereof.

50.    Deny the averments of paragraph 50.

51.    Deny the averments of paragraph 51, except respectfully refer the Court to Exhibit L to the Amended Complaint for the contents thereof.

52.    Admit the averments of paragraph 52 and respectfully refer the Court to Exhibit M to the Amended Complaint for the contents thereof.

53.    Deny the averments of paragraph 53, except admit that plaintiff demanded arbitration with the defendants in December 2001 under the Agreement.

54.    Deny the averments of paragraph 54.

55.    With respect to the averments of paragraph 55, respectfully refer the Court to Exhibit N to the Amended Complaint for the contents thereof.

### COUNT ONE

56.      Restate and reaver their answers to paragraphs 1 through 55 as though fully set forth herein.

57.–61.   Deny the averments of paragraphs 57 through 61.

### COUNT TWO

62.      Restate and reaver their answers to paragraphs 1 through 61 as though fully set forth herein.

63.–64.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraphs 63 and 64 and therefore deny the averments and demand strict proof thereof at trial.

65.–67.   Deny the averments of paragraphs 65 through 67.

### AFFIRMATWE DEFENSES

### FIRST DEFENSE

The complaint, and each of the counts thereof, fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

Plaintiff's misappropriation claim is barred by the gist of the action doctrine.

### THIRD DEFENSE

Plaintiff's claims are barred by the doctrines of res judicata and collateral estoppel.

### FOURTH DEFENSE

Plaintiff's misappropriation claim is barred by the statute of limitations.

### FIFTH DEFENSE

Plaintiff's claims are barred by the doctrines of waiver and estoppel.

### SIXTH DEFENSE

The complaint fails as a matter of law to state a claim for punitive damages.

### SEVENTH DEFENSE

Any and all damage to plaintiff was not caused by defendants, but by the wrongful conduct of plaintiff and/or others.

### EIGHTH DEFENSE

Plaintiff's claims are barred by plaintiff's failure to fulfill its obligations under its contracts with defendants, which preceded and excused any alleged breach by defendants of such contracts.

### NINTH DEFENSE

Defendants deny that they have failed to perform their contractual responsibilities, but to the extent any such failure is found, it is excused because performance was either impossible or contrary to law.

### COUNTERCLAIM

### BREACH OF CONTRACT

1.    Defendant PTNA and Plaintiff National Health Care Services, Inc., ("NHCS") entered into a contract dated October 21, 1999 ("Contract").

2.    Under the terms of the Contract, including Exhibit B ("Exhibit B") thereto, NHCS was responsible for "Ongoing, Program Development, Management and Service Functions." Plaintiff's witnesses have admitted that NHCS was obligated to perform the obligations set forth in Exhibit B.

3.    NHCS materially breached the Contract by failing to fulfill its obligations under the Contract, including without limitation the obligations set forth in Exhibit B.

4.    Among other things, NHCS failed to manage the development of fulfillment packages, failed to develop Program logistics, failed to develop a provider network, failed to maintain a toll free customer service number, and involved Michael Callahan – an attorney with absolutely no experience in the discount card or healthcare industries – in the management of NHCS and AllRisk.

5.    Defendants materially performed all of their obligations under the Contract.

6.    Under the Contract, Defendants are entitled to recover their reasonable attorneys' fees and costs, in an amount to be determined by the Court, including pursuant to Section 8.2 of the Contract, which provides that NHCS shall indemnify for "reasonable attorneys' fees and associated costs, incurred as a result of or in connection with any breach on the part of NHCS of any duty or obligation" under the Contract.

7.    As a result of these breaches, Defendants have been damaged by having to expend substantial sums on attorneys' fees and costs.

WHEREFORE, defendants pray that judgment on NHCS's claims be entered in Defendants' favor and against NHCS, and that judgment on Defendants' counterclaim be entered in Defendants' favor and against NHCS, and that Defendants be awarded attorneys' fees and costs, in an amount to be determined by the Court, together with such other and further relief as the Court finds just and proper.

Respectfully submitted,

Mindy J. Spector
David L. Yohai
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

-and-

Martin C. Bryce, Jr.
Douglas L. Flitter
BALLARD SPAHR ANDREWS &
   INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
Attorneys for Defendants

Dated:  January 7, 2005

8

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : | NO.: 02-CV-3600 |
| v. | : |  |
|  | : |  |
| PENN TREATY AMERICAN CORPORATION, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

## DEFENDANTS' FIRST AMENDED ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Defendants Penn Treaty American Corporation ("Penn Treaty"), Penn Treaty

Network America Insurance Company ("PTNA"), and Senior Financial Consultants Company

("SFCC") (collectively, "defendants"), by their undersigned attorneys, for theirsubmit this First,

Amended Answer to Plaintiff's Amended Complaint (the "Amended Complaint"):

1.       Deny the averments of paragraph 1, except admit that plaintiff asserts

claims against defendants for breach of contract and misappropriation.

2.       Defendants lack knowledge or information sufficient to form a belief as

to the averments of paragraph 2, except admit that NHCS is a State of Washington corporation

with its principal place of business at 4523 102nd Lane N.E., Kirkland, Washington 98033.

3.–4.     Admit the averments of paragraphs 3 and 4.

5.       Deny the averments of paragraph 5, except admit that SFCC is a

Pennsylvania corporation and maintains its principal place of business at 3440 Lehigh Street,

Allentown, Pennsylvania 18103-7001.

6.       Admit the averments of paragraph 6.

7.–8.    Deny the averments of paragraphs 7 and 8 as conclusions of law to which no response is required.

9.–16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraphs 9 through 16 and therefore deny the averments and demand strict proof thereof at trial, except admit that the AllRisk program purportedly provided the services described in paragraph 14.

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 17 and therefore deny the averments and demand strict proof thereof at trial, except admit that NHCS contacted Penn Treaty regarding the AllRisk Healthcare product and program.

18.    Admit the averments of paragraph 18.

19.–20.    Deny the averments of paragraphs 19 and 20, except lack knowledge or information sufficient to form a belief as to the truth of the averments regarding what Glen Levit recognized or communicated to NHCS and therefore deny the averments and demand strict proof thereof at trial.

21.    With respect to the averments of paragraph 21, respectfully refer the Court to Exhibit A to the Amended Complaint for the contents thereof.

22.    With respect to the averments of paragraph 22, respectfully refer the Court to Exhibit B to the Amended Complaint for the contents thereof.

23.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 23 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit C to the Amended Complaint for the contents thereof.

24.    Defendants lack knowledge or information to form a belief as to the truth of the averments of paragraph 24 and therefore deny the averments and demand strict proof

thereof at trial, except respectfully refer the Court to Exhibit D to the Amended Complaint for the contents thereof.

      25.     Deny the averments of paragraph 25.

      26.     Defendants lack knowledge or information to form a belief as to the truth of the averments of paragraph 26 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit E to the Amended Complaint for the contents thereof.

      27.     Deny the averments of paragraph 27, except admit that defendant PTNA wired $125,000 to defendant NHCS's bank account pursuant to the Promissory Note.

      28.     Deny the averments of paragraph 28.

      29.     Deny the averments of paragraph 29.

      30.     With respect to the averments of paragraph 30, respectfully refer the Court to Exhibit F to the Amended Complaint for the contents thereof.

      31.     With respect to the averments of paragraph 31, respectfully refer the Court to Exhibit G to the Amended Complaint for the contents thereof.

      32.     Admit that Penn Treaty and PTNA did not, as the parties envisioned, provide a draft agreement documenting the August 21, 2000 Letter Amendment, except respectfully refer the Court to the August 21, 2000 Letter Amendment for the contents thereof.

      33.     Admit the averments of paragraph 33.

      34.     Deny the averments of paragraph 34.

      35.     Admit that Glen Levit died unexpectedly on October 3, 2000,

      36.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 36 and therefore deny the averments and demand strict proof thereof at trial.

37.    Deny the averments of paragraph 37, except admit that while SFCC itself did not begin marketing the AllRisk program until February 2001, the program had been marketed by PTNA until that point.

38.    Deny the averments of paragraph 38, except admit that the AliRisk program was never marketed in some states because, _inter alia_, such marketing would have been contrary to law.

39.    Deny the averments of paragraph 39.

40.    With respect to the averments of paragraph 40, respectfully refer the Court to Exhibit H to the Amended Complaint for the contents thereof.

41.    With respect to the averments of paragraph 41, respectfully refer the Court to Exhibit I to the Amended Complaint for the contents thereof.

42.–47.  Deny the averments of paragraphs 42 through 47.

48.    Deny the averments of paragraph 48, except respectfully refer the Court to Exhibit J to the Amended Complaint for the contents thereof.

49.    With respect to the averments of paragraph 49, respectfully refer the Court to Exhibits I and K to the Amended Complaint for the contents thereof.

50.    Deny the averments of paragraph 50.

51.    Deny the averments of paragraph 51, except respectfully refer the Court to Exhibit L to the Amended Complaint for the contents thereof.

52.    Admit the averments of paragraph 52 and respectfully refer the Court to Exhibit M to the Amended Complaint for the contents thereof.

53.    Deny the averments of paragraph 53, except admit that plaintiff demanded arbitration with the defendants in December 2001 under the Agreement.

54.    Deny the averments of paragraph 54.

55.    With respect to the averments of paragraph 55, respectfully refer the Court to Exhibit N to the Amended Complaint for the contents thereof.

## COUNT ONE

56.    Restate and reaver their answers to paragraphs 1 through 55 as though fully set forth herein.

57.–61.  Deny the averments of paragraphs 57 through 61.

## COUNT TWO

62.    Restate and reaver their answers to paragraphs 1 through 61 as though fully set forth herein.

63.–64.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraphs 63 and 64 and therefore deny the averments and demand strict proof thereof at trial.

65.–67.  Deny the averments of paragraphs 65 through 67.

## AFFIRMATWE DEFENSES

## FIRST DEFENSE

The complaint, and each of the counts thereof, fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

Plaintiff's misappropriation claim is barred by the gist of the action doctrine.

## THIRD DEFENSE

Plaintiff's claims are barred by the doctrines of res judicata and collateral estoppel.

## FOURTH DEFENSE

Plaintiff's misappropriation claim is barred by the statute of limitations.

## FIFTH DEFENSE

Plaintiff's claims are barred by the doctrines of waiver and estoppel.

## SIXTH DEFENSE

The complaint fails as a matter of law to state a claim for punitive damages.

## SEVENTH DEFENSE

Any and all damage to plaintiff was not caused by defendants, but by the wrongful conduct of plaintiff and/or others.

## EIGHTH DEFENSE

Plaintiff's claims are barred by plaintiff's failure to fulfill its obligations under its contracts with defendants, which preceded and excused any alleged breach by defendants of such contracts.

## NINTH DEFENSE

Defendants deny that they have failed to perform their contractual responsibilities, but to the extent any such failure is found, it is excused because performance was either impossible or contrary to law.

## COUNTERCLAIM

## BREACH OF CONTRACT

1.    Defendant PTNA and Plaintiff National Health Care Services, Inc., ("NHCS") entered into a contract dated October 21, 1999 ("Contract").

2.    Under the terms of the Contract, including Exhibit B ("Exhibit B") thereto, NHCS was responsible for "Ongoing, Program Development, Management and Service Functions." Plaintiff's witnesses have admitted that NHCS was obligated to perform the obligations set forth in Exhibit B.

3.    NHCS materially breached the Contract by failing to fulfill its obligations under the Contract, including without limitation the obligations set forth in Exhibit B.

4.      Among other things, NHCS failed to manage the development of fulfillment packages, failed to develop Program logistics, failed to develop a provider network, failed to maintain a toll free customer service number, and involved Michael Callahan – an attorney with absolutely no experience in the discount card or healthcare industries – in the management of NHCS and AllRisk.

5.      Defendants materially performed all of their obligations under the Contract.

6.      Under the Contract, Defendants are entitled to recover their reasonable attorneys' fees and costs, in an amount to be determined by the Court, including pursuant to Section 8.2 of the Contract, which provides that NHCS shall indemnify for "reasonable attorneys' fees and associated costs, incurred as a result of or in connection with any breach on the part of NHCS of any duty or obligation" under the Contract.

7.      As a result of these breaches, Defendants have been damaged by having to expend substantial sums on attorneys' fees and costs.

WHEREFORE, defendants pray that judgment on NHCS's claims be entered in their favor and against plaintiffDefendants' favor and against NHCS, and that judgment on Defendants' counterclaim be entered in Defendants' favor and against NHCS, and that Defendants be awarded attorneys' fees and costs, in an amount to be determined by the Court, together with such other and further relief, including attorneys' fees and costs, as the Court finds just and proper.

Respectfully submitted,

_____
Geoffrey A. Kahn
Mindy J. Spector
David L. Yohai

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000
-and-

Martin C. Bryce, Jr.
Douglas L. Flitter~~Ballard Spahr Andrews &~~

BALLARD SPAHR ANDREWS &
    INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500
Attorneys for Defendants

~~Ingersoll, LLP~~

Dated: ~~October 21, 2002~~January 7, 2005

Document comparison done by DeltaView on Thursday, January 06, 2005
12:30:14 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny1/1302605/1 |
| Document 2 | pcdocs://ny1/1302605/3 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 28 |
| Deletions | 10 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 40 |

EXHIBIT "C"




AGREEMENT

This Agreement is made and entered into on the ____ 2/ day of October, 1999, by and between Penn Treaty Network America Insurance Company (hereinafter referred to as "PTNA") with its principal place of business in Allentown, Pennsylvania and National Healthcare Services, Inc. (hereinafter referred to as "NHCS"), with its principal place of business in Bellevue, Washington.

RECITALS:

WHEREAS, PTNA is a life insurance company organized under the laws of the Commonwealth of Pennsylvania and, together with its affiliates, is licensed to conduct insurance business in all of the United States; and

WHEREAS, NHCS is a duly licensed registered firm authorized to conduct business in all jurisdictions in which its activities so require; and

WHEREAS, NHCS has developed a relationship with a network of long-term care service providers who have entered into agreements with long-term care facilities and ancillary providers to provide long-term care services to individuals ("Beneficiaries") covered by certain long-term care benefits programs ("Benefit Program"); and

WHEREAS, PTNA and NHCS desire to enter into an arrangement for the shared development, marketing and sale of the Benefits Program (the "Venture") pursuant to the terms and conditions set forth in this Agreement; and,

NOW THEREFORE, intending to be legally bound, and in consideration of the foregoing premises and the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Article I.  The Benefit Program

1.1 Benefit Program Design: Within thirty (30) days of the date this Agreement is executed, NHCS shall prepare and deliver to PTNA a business plan describing the general business direction, products and programs for the Venture for the immediately succeeding fiscal year.

1.2 Offering and Issuance to Beneficiaries: Upon execution of this Agreement, PTNA and NHCS shall enter into a Marketing General Agent's Contract (the "MGA Contract") whereby PTNA will designate and appoint NCHS as a general sales agent and producer in all states in which both PTNA and NHCS are duly licensed for certain long-term care insurance products as mutually agreed upon by both parties. The provisions of said Contract shall set forth and govern the responsibilities of NHCS as a General Agent of PTNA and an executed copy of said Contract shall be attached to this Agreement as Exhibit A.

PLAINTIFF'S
EXHIBIT
, B

1

The Benefit Program shall be offered for sale to individuals exclusively through a distribution network consisting of (i) duly appointed insurance agents ("Agents") and other individuals ("Other Producers") as designated by NHCS and as appointed with (or approved by, in the case of Other Producers) PTNA, and (ii) duly licensed insurance agents who are either already, or those who will be, directly appointed with PTNA. No Agent or Other Producer affiliated with NHCS shall offer to sell the Benefit Program in any state unless such individuals are (a) affiliated with NHCS pursuant to a contract provided by NHCS for such purposes; (b) authorized by PTNA to sell the Benefit Program, and (iii) in the case of an Agent, licensed with PTNA in accordance with the rules of the insurance regulatory authority of said state. PTNA shall appoint such Agents pursuant to forms for such purpose submitted to PTNA by NHCS. PTNA shall have the right to approve all such Agents and Other Producers appointed by NHCS and, in its sole discretion, may give, withhold, suspend or terminate any Agent's or Other Producer's rights or privileges to participate in the marketing and/or sale of the Benefit Program. Both parties agree to use their best efforts to recruit members of their respective agency networks to market and solicit sales under the Benefit Program. PTNA and NHCS shall jointly develop and approve the commission scale under which the agents will be compensated for Benefit Program sales.

1.3 Marketing Means and Methods: The parties will jointly develop a plan detailing the marketing means and methods to be used in the marketing, distribution and sale of the Benefit Program. The marketing plan, and any modifications thereto, shall be subject to and require the prior written approval of both parties, which approval shall not be unreasonably withheld. Both parties covenant and agree that during the term of this Agreement, they shall use their best efforts to promote, market and distribute the Benefit Program.

1.4 Exclusivity: During the term of this Agreement and for a period of one year following the termination of this Agreement, both parties agree that neither they nor any of their affiliates shall engage in or possess any interest in any business or activity that directly competes with the benefit Program without the prior written approval of the other party. The Benefit Program shall be offered for sale exclusively as set forth in Section 1.2 above. No provision or condition of this Agreement shall be interpreted to restrict in any way the sales activity of any PTNA agent, broker or representative of PTNA with respect to the offer and sale of this Benefit Program in any state.

1.5 Trademarks, Service-marks and Logos:

   1.5.1    Neither party shall have the right to use the other's name or any of the other's service marks, trademarks, designs or logos relating to such names, trade or business, without the other party's prior written consent.
   1.5.2    The parties agree that upon agreement by the parties of a name for the Benefit Program (i) any related products, and any variant of the foregoing, and all related symbols, trademarks and service marks shall be the sole

2

 

and exclusive property of the Venture, and (ii) PTNA shall file for service mark registration of the name, and all such related designs and logos.

1.5.3     Upon the expiration or termination of this Agreement pursuant to Section 6.2 herein, it is agreed that both parties shall immediately cease from using the Benefit Program name(s), related products, and any variant of the foregoing, and all related symbols, trademarks and service marks to bind or issue any further Benefit Programs. Pursuant to Section 6.6 herein, the parties may continue to use such names, marks, logos and designs in order to perform duties with respect to the business produced prior to the expiration or termination, until all such obligations on the part of both parties have been fully satisfied.

## Article II. Contributions and Financing

2.1  Contributions and Percentage Interests:  The parties shall each have a 50% (fifty-percent) ownership interest in the Venture. It is further agreed that PTNA shall be responsible to pay for all reasonable and necessary initial Venture start-up costs for printing, materials and other related expenses.

## Article III.  Distributions and Allocations

3.1 Distribution to Parties/ Allocation of Profits and Losses: Distribution shall be made to the parties as follows:

    a.   The first ninety-five dollars ($95.00) of premium for every household enrolled in the Benefit Program shall be distributed to NHCS, or as NHCS shall direct in writing, which shall be earned and payable for all specific functions for which NHCS is responsible and which it may provide directly or, upon the prior written approval of PTNA, through contract with others. At the signing of this Agreement, NHCS has elected, and PTNA gives its approval, to provide such functions through a contract with Web Barth and, until further written notice, NHCS directs that this fee be disbursed directly to Web Barth. This fee shall be earned and payable when PTNA receives the full premium in cash for Benefit Program business pursuant to the applications procured while this Agreement is in effect.  Renewal fees shall be ninety-five dollars ($95.00) for every household enrolled in the Benefit Program and shall be earned and payable to NHCS, or as NHCS may direct as provided above, when PTNA receives the applicable renewal premiums in cash services and responsibilities as set forth in Exhibit B.

    b.   While this Agreement is in effect, a fee in the amount of twenty-five dollars ($25.00) for every household enrolled in the Benefit Program shall be disbursed directly to PTNA and shall be earned and payable to PTNA for all administrative functions performed by PTNA. Renewal fees shall be twenty-five dollars ($25.00) for every household enrolled in the Benefit Program and shall be earned and payable to PTNA when PTNA receives the applicable

3



    renewal premiums in cash. Said functions include, but are not limited to billing, collection of premium and commission services.

  c.  Each month, after all Venture cash expenditures are paid or reserved for payment (including commissions payable to NHCS, PTNA, Agents or Other Producers, respectively, as set forth in Exhibit "A") and the disbursements called for in Sections 3.1(a) and 3.1(b) are made, fifty percent (50%) of the remaining and available cash shall be distributed to NHCS and fifty percent shall be distributed to PTNA. It is the intent of the parties that such profits or losses shall be shared equally between them.

3.2 <u>Commissions:</u> Subject to the terms of the MGA Contract and in accordance with the rules and regulations of PTNA, PTNA shall pay commissions as appropriate to NHCS on account of Benefit Program plans issued by PTNA during the term of this Agreement with respect to applications procured by NHCS through its Agents and submitted to PTNA. All such first year commissions shall be earned and payable when PTNA receives the full premium in cash for Benefit Program business pursuant to the applications procured while this Agreement is in effect. Renewal commissions shall be earned and payable by the fifteenth of the month following the month when PTNA receives the applicable renewal premiums in cash.

3.3 <u>Payments After Termination</u>:

  a.  Upon termination of this Agreement, both parties shall be entitled to receive payment of commissions on all premiums which are received in cash by PTNA after such termination, the first year commission and any renewal commission which said party would have earned had this Agreement continued in effect. These commissions are vested to both parties and their respective agents.

  b.  Notwithstanding the provisions of Section 3.3(a) of this Agreement, if at any time before or following termination of this Agreement either party determines in good faith, with just cause and documented proof that the other party has entered into or engaged in a pattern of conduct to induce Beneficiaries of the Benefit Program to terminate enrollment in the Benefit Program or has entered into or engaged in a pattern of conduct to induce agents of the other party to terminate their services for said party, all of the breaching party's rights to earned commissions otherwise payable after termination shall immediately thereafter terminate, and the breaching party's commissions shall be retained by the non-breaching party.

  c.  If at any time before or following termination of this Contract either party determines in good faith, with just cause and documented proof that any Agent or Other Producer of the other party has entered into or engaged in a pattern of conduct to induce Beneficiaries of the Benefit Program to terminate enrollment in the Benefit Program, or has entered into or engaged in a pattern of conduct to induce representatives of the other party to terminate their services for said party, the party who recruited said Agent (or Other Producer) shall, immediately upon notice of such conduct, take immediate and reasonable action to remedy

4

the situation.

d. Notwithstanding the provisions of Section 3.3(a) of this Agreement, if the termination of this Agreement is required pursuant to Section 6.2.3(a), all of the breaching party's rights to earned commissions otherwise payable after termination shall immediately thereafter terminate, and the breaching party's commissions shall be retained by the non-breaching party.

### Article IV.  Representations and Warranties

4.1 Representations and Warranties of PTNA:  PTNA hereby makes the following representations and warranties to NHCS:

4.1.1  PTNA is, and during the term of this Agreement shall, at all times, continue to be a duly incorporated insurance company, validly existing and in good standing under the laws of the State of Pennsylvania.  The execution, delivery and performance of this Agreement and the performance by PTNA of its obligations hereunder, have been duly and validly authorized by all necessary corporate action on the part of PTNA. This Agreement has been duly and validly executed and delivered to NHCS and constitutes the valid and legally binding obligation of PTNA, enforceable in accordance with its terms.

4.1.2  To the best of PTNA's current knowledge, the execution and delivery of and the performance by PTNA under this Agreement does not and will not conflict with or result in a breach or violation of, or a default under the bylaws or certificate of incorporation of PTNA or any other obligation to which PTNA is a party or by which it is or may be bound.

4.1.3  To the best of PTNA's current knowledge, there are no actions, suits, investigations or proceedings pending or threatened against PTNA, in law or in equity, that individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement or the transactions contemplated hereby.

4.1.4  To the best of PTNA's current knowledge, no warranty or representation by PTNA in this Agreement, or in any writing furnished, or to be furnished to NHCS by PTNA pursuant hereto or in connection herewith, contains or will contain any untrue statement of material fact, or omits, or will fail to state, any material fact necessary to make the statements herein or therein not misleading.

4.2 Representations and Warranties of NHCS:  NHCS hereby makes the following representations and warranties to PTNA:

4.2.1  NHCS is, and during the term of this Agreement shall, at all times, continue to be a duly incorporated company, validly existing and in good standing under the laws of the State of Washington.  The execution, delivery and performance of this Agreement and the performance by NHCS of its obligations hereunder, have been duly and validly authorized

5



by all necessary corporate action on the part of NHCS. This Agreement has been duly and validly executed and delivered to PTNA and constitutes the valid and legally binding obligation of NHCS, enforceable in accordance with its terms.

4.2.2 To the best of NHCS's current knowledge, the execution and delivery of and the performance by NHCS under this Agreement does not and will not conflict with or result in a breach or violation of, or a default under the bylaws or certificate of incorporation of NHCS or any other obligation to which NHCS is a party or by which it is or may be bound.

4.2.3 To the best of NHCS's current knowledge, there are no actions, suits, investigations or proceedings pending or threatened against NHCS, in law or in equity, that individually or in the aggregate have or may reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement or the transactions contemplated hereby.

4.2.4 To the best of NHCS's current knowledge, no warranty or representation by NHCS in this Agreement, or in any writing furnished, or to be furnished to PTNA by NHCS pursuant hereto or in connection herewith, contains or will contain any untrue statement of material fact, or omits, or will fail to state, any material fact necessary to make the statements herein or therein not misleading.

Article V.  Proprietary Interests

5.1  PTNA Proprietary Information: During the course of performance under this Agreement, NHCS and its agents, employees and representatives may obtain or have access to certain proprietary information of PTNA including, without limitation, names of policyholders, the identity and production of PTNA's distribution network (the "Proprietary Information"). NHCS covenants as follows with respect to PTNA Proprietary Information:

5.1.1 NHCS will maintain PTNA Proprietary Information on a strictly confidential basis and will permit its disclosure to only those employees, representative and agents of NHCS who require such for purposes in furtherance of the transaction contemplated herein and who have been advised of, and have agreed to be bound by, the terms of this Article V.

5.1.2 NHCS will, and will cause its employees, representatives and agents, to (i) keep PTNA Proprietary Information confidential; (ii) use PTNA Proprietary Information only as necessary to carryout the terms and conditions of this Agreement; and (iii) not disclose such information to others without the prior written consent of PTNA, except as may be required by law.

5.1.3 In the event that NHCS or anyone to whom NHCS discloses PTNA Proprietary Information as permitted by this Agreement becomes legally compelled to disclose any of PTNA's Proprietary Information, NHCS will provide PTNA with prompt notice so that they may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is

6



not obtained or that PTNA waives compliance with the provisions of this Agreement, NHCS will disclose only that portion of the PTNA Proprietary Information which is legally required, and NHCS will exercise best efforts to obtain assurance that confidential treatment will be accorded PTNA Proprietary Information.

5.1.4   Upon termination of this Agreement, NHCS will deliver all documents in its possession reflecting PTNA Proprietary Information to PTNA.

5.2 NHCS Proprietary Information: During the course of performance under this Agreement, PTNA and its agents, employees and representatives may obtain or have access to certain proprietary information of NHCS including, without limitation, the identity and production of NHCS's distribution network (the "Proprietary Information"). PTNA covenants as follows with respect to NHCS Proprietary Information:

5.2.1   PTNA will maintain NHCS Proprietary Information on a strictly confidential basis
and will permit its disclosure to only those employees, representative and agents of PTNA who require such for purposes in furtherance of the transaction contemplated herein and who have been advised of, and have agreed to be bound by, the terms of this Article V.

5.2.2   PTNA will, and will cause its employees, representatives and agents, to (i) keep NHCS Proprietary Information confidential; (ii) use NHCS Proprietary Information only as necessary to carryout the terms and conditions of this Agreement; and (iii) not disclose such information to others without the prior written consent of NHCS, except as may be required by law.

5.2.3   In the event that PTNA or anyone to whom PTNA discloses NHCS Proprietary Information as permitted by this Agreement becomes legally compelled to disclose any of NHCS's Proprietary Information, PTNA will provide NHCS with prompt notice so that they may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. In the event that a protective order or other remedy is not obtained or that NHCS waives compliance with the provisions of this Agreement, PTNA will disclose only that portion of the NHCS Proprietary Information which is legally required, and PTNA will exercise best efforts to obtain assurance that confidential treatment will be accorded NHCS Proprietary Information.

5.2.4   Upon termination of this Agreement for reasons other than as set forth in Section 6.3 of this Agreement, PTNA will deliver all documents in its possession reflecting NHCS Proprietary Information to NHCS, except as necessary for any continuing servicing responsibilities or obligations PTNA may have with respect to the Benefit Program.

Article VI.  Term and Termination

6.1 Term:  The initial term of the Venture shall commence on the date of this Agreement, and shall continue until December 31, 2005 unless earlier dissolved and terminated pursuant to the provisions of this agreement or applicable law.  In the event

the agreement is not terminated (pursuant to Section 6.2 below) prior to that date, the term of this Agreement shall automatically extend for additional, successive three year periods unless either party gives the other party written notice of intent to terminate at least ninety (90) days prior to the end of the initial term or the then current three year extension, as the case may be.

6.2 Termination:  This Agreement shall be terminable as follows:

    6.2.1  At any time, by mutual written agreement of the parties hereto.

    6.2.2  By either party, thirty (30) days following written notice to the other party that the other party has breached any material duty or obligation under this Agreement, provided that such breach remains uncured at the expiration of thirty (30) days after such notice;

    6.2.3  Immediately and without notice, by either party, in the event of:

        (a)    Fraud or willful misconduct committed by the other party, including but not limited to, a party willfully acting beyond the scope of its duties as contemplated by this Agreement or a party willfully binding the other party in any manner not contemplated by this Agreement;

        (b)    The insolvency of the other party;

        (c)    The commencement of any proceeding in bankruptcy, liquidation, receivership or dissolution by or against the other party which, if commenced against the other party, is not dismissed within  sixty (60) days;

        (d)    The sale of all or substantially all of the assets of, the merger or transfer of a majority of the voting stock of, or a material change in the management of one party which has not been approved in writing by the other party provided, however, that this shall not apply to any transfer of interest between the existing shareholders of NHCS and/or their estates; or

        (e)    A determination by any official agency, board, commission or governmental entity that the provisions of this Agreement are invalid and unenforceable.

6.3  PTNA's Right of First Refusal:  If, at any time, NHCS desires to sell or otherwise transfer all or any its ownership interest in the Venture, NHCS shall first obtain a bona fide written offer which they desire to accept (hereinafter called the "Offer") to purchase said interest for a fixed cash price.  The Offer shall set forth its date, the proposed purchase price and the other terms and conditions upon which the purchase is proposed to be made, as well as the name and address of the prospective purchaser. NHCS shall transmit copies of the Offer to PTNA within seven days of NHCS's receipt of the Offer.

Transmittal of the Offer to PTNA shall constitute an offer by NHCS to sell NHCS's interest in the Venture to PTNA at the price and upon the terms of the Offer.  For a

period of thirty (30) days after the submission of the Offer to PTNA, PTNA shall have the option, exercisable by written notice to NHCS, to (i) accept NHCS's offer as to the purchase of NHCS's interest in the Venture, or (ii) approve the sale or transfer of NHCS's ownership interest to the prospective purchaser.  PTNA agrees that, in the event it elects not to exercise its option to purchase NHCS's interest pursuant to the terms of the Offer, PTNA shall not unreasonably withhold approval of NHCS's sale or transfer to the prospective buyer.

6.4   PTNA's Buy-Out Option:  Notwithstanding the provisions of Section 6.3 of this Agreement, PTNA, in its sole discretion, may at any time, elect to purchase NHCS's entire interest in the Venture as follows: (i) PTNA shall provide written notice of it's election to NHCS; and (ii) the parties shall agree to a mutually agreeable amount to effectuate such purchase.

6.5   Transfer of Interest; Withdrawal:   Neither party shall, without in each instance obtaining the prior written approval of the other party, sell, assign or otherwise transfer, or mortgage, charge or otherwise encumber, or suffer or permit any third party to sell, assign or otherwise transfer, or mortgage, charge or otherwise encumber, all or any part of its interest, or contract to do, suffer or permit any of the foregoing.  Any such transfer or encumbering or attempted transfer or encumbering by a party of its interest in violation of this Agreement shall be void and of no force or effect.

6.6 Duty to Perform Post-Termination.  Upon the expiration or termination of this Agreement, both parties and their respective Agents and Other Producers shall cease and desist from marketing or issuing any further Benefit Program plans, but shall continue to perform all other duties described in this Agreement with respect to the business produced prior to the expiration or termination, until all such obligations on the part of both parties have been fully satisfied.  The parties shall continue to be reimbursed for services provided post-termination with respect to the Benefit Program business in accordance with Sections  3.3 above.

6.7   Effect of Termination on Prior Rights and Obligations.  The termination or expiration of this Agreement shall not affect the rights and obligations of the parties hereto with respect to acts committed prior to the effective date of termination of expiration, nor shall such termination or expiration affect the indemnification obligations of the parties described in Section 8.2 below.

VII. Accounting and Records

7.1 Books and Records.

    7.1.1   Maintenance.  At all times during the term hereof, the parties shall cause accurate books and records of account to be maintained for the Venture in which shall be entered all matters relating to the business and operations of the Venture, including all income, expenditures, assets and liabilities thereof.  PTNA shall be responsible for maintaining all of the Venture's

9

books and records, which shall be maintained at PTNA. Each party, its authorized representatives, and any supervisory or regulatory authority shall have the right to inspect, examine and copy the books, records, files and other documents of the Venture at all reasonable times. Either party may at any time request an audit of the Venture's books and records; provided, however, that such audit shall be conducted in a manner that causes it to not unreasonably interfere with the conduct of business. The cost of any such audit, if separate from the annual audit to be performed pursuant to Subsection 7.1.3. hereof, shall be borne by the party requesting such audit; provided, however, that if such audit shall reveal any substantial discrepancy from any regular Venture audit, the cost of the audit shall be paid by the Venture.

7.1.2. <u>Method of Accounting.</u>  Venture books and financial records shall be kept in accordance with the accrual method of accounting and as otherwise may be required by law and generally accepted account principles, and shall otherwise be adequate to provide each party with all such financial information as such party shall reasonably require to satisfy the tax and financial reporting obligations of such party. Each party shall be entitled to any additional information necessary for the party to adjust its financial basis statements to federal income tax basis statements (or vice versa) as the party's individual needs may dictate.

7.1.3  <u>Reports.</u>  Within fifteen (15) business days after the end of each month of the term of this Agreement, the parties shall report to each other, in a form acceptable to both parties, such information with respect to the Benefit Program written during the previous month as, and in such form, either party reasonably may request.

Article VIII, Miscellaneous Provisions

8.1  <u>Conformance with Law:</u>  NHCS and PTNA shall perform their respective duties hereunder in accordance with all applicable statutes and administrative regulations and shall immediately notify the other party of any notice received of any alleged violation thereof, and the violating party promptly shall correct such violation regardless of whether it has notified the other party.

8.2 <u>Mutual Indemnification:</u>  PTNA shall hold harmless and indemnify NHCS, its officers, directors, employees and affiliates from and against any expenses, damages, liability, actions, costs or other claims, including, but not limited to, reasonable attorneys' fees and associated costs, incurred as a result of or in connection with any breach on the part of PTNA of any duty or obligation hereunder. Additionally, PTNA shall be responsible for any fines or liabilities incurred by the Venture as a result of the conduct of any Agent or Other Producer appointed by PTNA.

10

NHCS shall hold harmless and indemnify PTNA, its officers, directors, employees and affiliates from and against any expenses, damages, liability, actions, costs or other claims, including, but not limited to, reasonable attorneys' fees and associated costs, incurred as a result of or in connection with any breach on the part of NHCS of any duty or obligation hereunder. Additionally, NHCS shall be responsible for any fines or liabilities incurred by the Venture as a result of the conduct of any Agent or Other Producer appointed with PTNA by NHCS.

8.3  Arbitration: As a condition precedent to any right of action hereunder, any dispute arising out of this Agreement shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire, meeting in Lehigh County, Pennsylvania, unless otherwise agreed.

The members of the board of arbitrators shall be active or retired disinterested officials of insurance or reinsurance companies other than the Parties or their affiliates. Each Party shall appoint its arbitrator, and the two arbitrators shall choose an umpire before instituting the hearing. If the respondent fails to appoint its arbitrator within thirty (30) days after being requested to do so by the claimant, the latter shall also appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of an umpire within thirty (30) days after their nominations, each of them shall name three, of whom the other shall decline two and the decision shall be made by drawing lots.

The claimant shall submit its initial statement within twenty (20) days from appointment of the umpire. The respondent shall submit its statement within twenty (20) days after receipt of the claimant's statement, and the claimant may submit a reply statement within ten (10) days after receipt of the respondent's statement.

The board shall make its decision with regard to the custom and usage of the insurance and reinsurance business. The board shall issue its decision in writing upon evidence introduced at the hearing or by other means of submitting evidence in which strict rule of evidence need not be followed, but in which cross-examination and rebuttal shall be allowed if requested. The board shall make its decision within forty-five (45) days following the termination of the hearings unless the Parties consent to an extension. The majority decision of the board shall be final and binding upon all parties of the proceeding. Judgment may be entered upon the award of the board in any court having jurisdiction thereof.

Each Party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other Party the expense of the umpire. The remaining costs of the arbitration proceedings shall be allocated by the board.

8.4  No Waiver: NHCS and PTNA each agree that no ratification after the fact of any violation or breach of any provision of this Agreement by either, shall be construed as a waiver of any of its rights hereunder.

11

8.5 Entire Agreement:  The terms and provisions contained herein constitute the entire agreement between the parties, and supersede any previous communications, representations or agreements, either oral or written, with respect to the subject matter hereof.

8.6 Notice:    Any notice required hereunder shall be in writing and shall be deemed sufficiently given on the date of service, if served personally, or on the third business day after mailing if mailed by certified or registered mail, postage prepaid, or sent by some other means at least as fast and reliable as certified or registered mail, or on the first business day after placement with a reputable overnight delivery service, addressed as follows (or to such other address as any party may give the other in the manner herein provided for the giving of notice):

> If to PTNA:
> PENN TREATY NETWORK AMERICA INSURANCE
> COMPANY
> Attention: Glen A. Levit, President
> 3440 Lehigh Street
> Allentown, Pennsylvania 18103-7001
>
> If to NHCS:
> NATIONAL HEALTHCARE SERVICES, INC.
> Attention: H. E. Schwartz, President
> 4523 102nd Lane, N.E.
> Kirkland, WA 90833

8.7 Severability:  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if the invalid or unenforceable provision had been omitted. To the extent this Agreement requires the approval of any public official, agency, board, commission or bureau, it shall not be effective until such approval shall have been obtained or otherwise as required by applicable law.

8.8  Assignment: This Agreement shall be binding upon and inure to the benefit of PTNA, NHCS, and their respective successors and assigns; provided, however, that this Agreement shall not be assignable or transferable, and the duties of PTNA and NHCS, respectively, shall not be delegated to others, by operation of law or otherwise, without the prior written consent of both parties.

8.9 Choice of Law:  This Agreement shall be interpreted in all respects in accordance with the internal laws of the State of Pennsylvania, without regard to principles of conflicts of law.

8.10 Amendments:  This Agreement may be amended only by a written document signed by authorized representatives of PTNA and NHCS.

12



8.11 Survival of Rights: Except as provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective permitted successors and assigns.

8.12 Headings: Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

8.13 Counterparts:  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  All of such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the _____ 2/ day of October, 1999.

PENN TREATY NETWORK AMERICA
INSURANCE COMPANY

By:_____
      Glen A. Levit,  President

NATIONAL HEALTHCARE
SERVICES, INC.

By:_____
      H. E. Schwartz, President

13

## EXHIBIT "B"

### NHCS Ongoing Program Development, Management and Service Functions

- Benefit provider screening and recommendations.
- Create vendor relationships.
- Manage development of all creative materials and forms; sales brochures, fulfillment package, salesmen's forms, processing forms.
- Develop and register trade names, trademarks, and logos to be owned by National Healthcare Services, Inc.
- Develop all Program Logistics – orders, fulfillment, payments.
- Develop and oversee all data activity between Penn Treaty and the service providers.
- Develop systems for payment processing and accounting to network providers.
- Develop system for Penn Treaty agents to suggest senior care facilities to network providers.
- Develop customer service requirements and correspondence, phone scripts, Q&A forms.
- Provide all fulfillment materials to members as they sign up.
- Provide all inbound toll free customer service and/or correspondence for provider locator, cancellations, etc.
- Provide a quality control system to monitor customer service.
- Provide regular reports of customer satisfaction and quality control.
- Screen and source all new benefits, add new and unique benefits periodically to keep the program competitive and unique.
- Provide recommendations and programs targeted at maintaining persistency and renewals.
- Maintain and manage customer databases and data transfer between all parties.
- Act as liaison between Penn Treaty, National Healthcare Services and benefits/services providers.
- If requested or desired, provide a program to collect payments, process disbursements to all parties.

14

EXHIBIT "D"

*USDC/ENPA*
*FILED 10/21/02*
*3:50 PM*
*LHL*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., : | CIVIL ACTION |
| : | |
| Plaintiff, : | NO.: 02-CV-3600 |
| : | |
| v. : | |
| : | |
| PENN TREATY AMERICAN CORPORATION,: | |
| et al., : | |
| : | |
| Defendants. : | |

### DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

Defendants Penn Treaty American Corporation ("Penn Treaty"), Penn Treaty

Network America Insurance Company ("PTNA"), and Senior Financial Consultants Company

("SFCC") (collectively, "defendants"), by their undersigned attorneys, for their Answer to

Plaintiff's Amended Complaint (the "Amended Complaint"):

1. Deny the averments of paragraph 1, except admit that plaintiff asserts

claims against defendants for breach of contract and misappropriation.

2. Defendants lack knowledge or information sufficient to form a belief as to

the averments of paragraph 2, except admit that NHCS is a State of Washington corporation with

its principal place of business at 4523 102nd Lane N.E., Kirkland, Washington 98033.

3. – 4.  Admit the averments of paragraphs 3 and 4.

5. Deny the averments of paragraph 5, except admit that SFCC is a

Pennsylvania corporation and maintains its principal place of business at 3440 Lehigh Street,

Allentown, Pennsylvania 18103-7001.

6. Admit the averments of paragraph 6.

PHL_A #1673363 v3

7. – 8.  Deny the averments of paragraphs 7 and 8 as conclusions of law to which no response is required.

9. – 16.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraphs 9 through 16 and therefore deny the averments and demand strict proof thereof at trial, except admit that the AllRisk program purportedly provided the services described in paragraph 14.

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 17 and therefore deny the averments and demand strict proof thereof at trial, except admit that NHCS contacted Penn Treaty regarding the AllRisk Healthcare product and program.

18.    Admit the averments of paragraph 18.

19. – 20.  Deny the averments of paragraphs 19 and 20, except lack knowledge or information sufficient to form a belief as to the truth of the averments regarding what Glen Levit recognized or communicated to NHCS and therefore deny the averments and demand strict proof thereof at trial.

21.    With respect to the averments of paragraph 21, respectfully refer the Court to Exhibit A to the Amended Complaint for the contents thereof.

22.    With respect to the averments of paragraph 22, respectfully refer the Court to Exhibit B to the Amended Complaint for the contents thereof.

23.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 23 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit C to the Amended Complaint for the contents thereof.

PHL_A #1673363 v3                                2

24.    Defendants lack knowledge or information to form a belief as to the truth of the averments of paragraph 24 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit D to the Amended Complaint for the contents thereof.

25.    Deny the averments of paragraph 25.

26.    Defendants lack knowledge or information to form a belief as to the truth of the averments of paragraph 26 and therefore deny the averments and demand strict proof thereof at trial, except respectfully refer the Court to Exhibit E to the Amended Complaint for the contents thereof.

27.    Deny the averments of paragraph 27, except admit that defendant PTNA wired $125,000 to defendant NHCS's bank account pursuant to the Promissory Note.

28.    Deny the averments of paragraph 28.

29.    Deny the averments of paragraph 29.

30.    With respect to the averments of paragraph 30, respectfully refer the Court to Exhibit F to the Amended Complaint for the contents thereof.

31.    With respect to the averments of paragraph 31, respectfully refer the Court to Exhibit G to the Amended Complaint for the contents thereof.

32.    Admit that Penn Treaty and PTNA did not, as the parties envisioned, provide a draft agreement documenting the August 21, 2000 Letter Amendment, except respectfully refer the Court to the August 21, 2000 Letter Amendment for the contents thereof.

33.    Admit the averments of paragraph 33.

34.    Deny the averments of paragraph 34.

35.    Admit that Glen Levit died unexpectedly on October 3, 2000.



36.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 36 and therefore deny the averments and demand strict proof thereof at trial.

37.    Deny the averments of paragraph 37, except admit that while SFCC itself did not begin marketing the AllRisk program until February 2001, the program had been marketed by PTNA until that point.

38.    Deny the averments of paragraph 38, except admit that the AllRisk program was never marketed in some states because, inter alia, such marketing would have been contrary to law.

39.    Deny the averments of paragraph 39.

40.    With respect to the averments of paragraph 40, respectfully refer the Court to Exhibit H to the Amended Complaint for the contents thereof.

41.    With respect to the averments of paragraph 41, respectfully refer the Court to Exhibit I to the Amended Complaint for the contents thereof.

42. – 47.  Deny the averments of paragraphs 42 through 47.

48.    Deny the averments of paragraph 48, except respectfully refer the Court to Exhibit J to the Amended Complaint for the contents thereof.

49.    With respect to the averments of paragraph 49, respectfully refer the Court to Exhibits I and K to the Amended Complaint for the contents thereof.

50.    Deny the averments of paragraph 50.

51.    Deny the averments of paragraph 51, except respectfully refer the Court to Exhibit L to the Amended Complaint for the contents thereof.



52.    Admit the averments of paragraph 52 and respectfully refer the Court to Exhibit M to the Amended Complaint for the contents thereof.

53.    Deny the averments of paragraph 53, except admit that plaintiff demanded arbitration with the defendants in December 2001 under the Agreement.

54.    Deny the averments of paragraph 54.

55.    With respect to the averments of paragraph 55, respectfully refer the Court to Exhibit N to the Amended Complaint for the contents thereof.

## COUNT ONE

56.    Restate and reaver their answers to paragraphs 1 through 55 as though fully set forth herein.

57. – 61.  Deny the averments of paragraphs 57 through 61.

## COUNT TWO

62.    Restate and reaver their answers to paragraphs 1 through 61 as though fully set forth herein

63. – 64.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments of paragraphs 63 and 64 and therefore deny the averments and demand strict proof thereof at trial.

65. – 67.  Deny the averments of paragraphs 65 through 67.

 

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The complaint, and each of the counts thereof, fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

Plaintiff's misappropriation claim is barred by the gist of the action doctrine.

### THIRD DEFENSE

Plaintiff's claims are barred by the doctrines of res judicata and collateral estoppel.

### FOURTH DEFENSE

Plaintiff's misappropriation claim is barred by the statute of limitations.

### FIFTH DEFENSE

Plaintiff's claims are barred by the doctrines of waiver and estoppel.

### SIXTH DEFENSE

The complaint fails as a matter of law to state a claim for punitive damages.

### SEVENTH DEFENSE

Any and all damage to plaintiff was not caused by defendants, but by the wrongful conduct of plaintiff and/or others.

### EIGHT DEFENSE

Plaintiff's claims are barred by plaintiff's failure to fulfill its obligations under its contracts with defendants, which preceded and excused any alleged breach by defendants of such contracts.

## NINTH DEFENSE

Defendants deny that they have failed to perform their contractual responsibilities, but to the extent any such failure is found, it is excused because performance was either impossible or contrary to law.

WHEREFORE, defendants pray that judgment be entered in their favor and against plaintiff, together with such other and further relief, including attorneys' fees and costs, as the Court finds just and proper.

Respectfully submitted,

Geoffrey A. Kahn
Douglas L. Flitter
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Defendants

Dated: October 21, 2002

 

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served true and correct copies of defendants'

answer to plaintiff's amended complaint by hand delivery upon:

Roberto A. Rivera-Soto, Esq.
Daniel G. Lyons, Esq.
Fox Rothschild O'Brien & Frankel LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103

Dated: October 21, 2002

_____
Douglas L. Flitter

# EXHIBIT "E"

9/29/2003  Schwartz, Herbert

1          two.   The time is 11:16.

2     BY MR. YOHAI:

3          Q.    Before we went off the

4     record, Mr. Schwartz, I had asked you to

5     review the list, which is Exhibit B to

6     the October 21st, 1999, agreement, which

7     is titled "NHCS Ongoing Program

8     Development, Management and Service

9     Functions."  Do you see that?

10          A.    Yes.

11          Q.    Okay.  Have you had an

12     opportunity to review this list?

13          A.    Yes.

14          Q.    And do these items which are

15     listed in bullet points all represent

16     functions which National Healthcare

17     Services was supposed to provide under

18     the agreement between the two parties?

19          A.    I want to ask, are these

20     highlights or are these markings on here

21     or is it scratch-outs?

22          Q.    The way the document was

23     produced to us was with this.

24          A.    Okay.  It looks correct.

1          Q.     Okay.  So as far as you're

2     aware, all of the items listed under

3     "NHCS Ongoing Program Development,

4     Management and Services Function,"

5     Exhibit B, were items that National

6     Healthcare Services was supposed to

7     provide?

8          A.     Correct.

9          Q.     Okay.  And that list

10    included such things as providing all

11    fulfillment materials to members as they

12    sign up, which is the tenth bullet point

13    from the top?

14         A.     Yes.

15         Q.     Providing a quality control

16    system to monitor customer service?

17         A.     Yes.

18         Q.     Providing regular reports of

19    customer satisfaction and quality

20    control?

21         A.     Yes.

22         Q.     And from the top, providing

23    benefit provider screening and

24    recommendations?  It's the top bullet

9/29/2003  Schwartz, Herbert

```
1     point.
2              A.    Uh-huh.
3              Q.    Creating vendor
4     relationships?
5              A.    Correct.
6              Q.    Okay.  And the third bullet
7     point from the bottom, NHCS is also
8     supposed to maintain and manage customer
9     databases and data transfer between all
10    parties, correct?
11             A.    Manage -- maintain and
12    manage customer databases, correct.
13             Q.    Okay.  Put that exhibit
14    aside.
15                   MR. YOHAI:  Let's mark this.
16                   (Whereupon, Deposition
17             Exhibit No. Schwartz-5, Letter
18             dated 10/21/99 to Webster E. Barth
19             from NHCS, no Bates, was marked
20             for identification.)
21    BY MR. YOHAI:
22             Q.    Mr. Schwartz, I'm showing
23    you now a letter of engagement dated
24    October 21st, 1999, between National
```

EXHIBIT "F"

10/14/2003  Forman, Neal

1        Q.    Okay.

2              Now, this wasn't the first

3    money that was advanced to you; correct?

4              Looking at the ledger here,

5    I see an advance in February of 2000 of

6    $10,000 each, 10,000 to Mr. Schwartz and

7    10,000 to you, Mr. Forman.

8              Do you see that, on the

9    first page?  February 1st, 2000?

10       A.    Okay.

11       Q.    Do you see that?

12       A.    Correct.

13       Q.    Okay.

14             What did you use the $10,000

15   for that was advanced to you in -- in

16   February 2000?

17       A.    I can't remember what we

18   used it for other than to pay expenses

19   and pay bills.

20       Q.    What --

21       A.    And living expenses based on

22   --

23       Q.    I'm sorry.  And what -- and

24   what?

**10/14/2003 Forman, Neal**

1    personal expenses, like your mortgage on

2    your house?

3            A.    We felt that -- that we

4    needed to draw some type of an income due

5    to the -- all of the delays of the

6    program to cover expenses for the

7    business as well as perhaps some personal

8    expenses.

9            Q.    And when you say "personal

10    expenses," that would be things like the

11    mortgage on your house; correct?

12            A.    It could be.

13            Q.    Okay.

14                  What other personal expenses

15    do you think that you may have paid with

16    the money?

17            A.    I don't remember.

18            Q.    Okay.

19                  What other one -- do you

20    have any other -- any other recollection

21    of what other personal expenses?  How

22    about, like, for your car; did you pay

23    for your car?

24            A.    No, not --

1            speaks for itself.

2    BY MR. YOHAI:

3            Q.    Is that correct?  Is this

4    what they were supposed to do, this list

5    on Exhibit B --

6                  MR. LYONS:  Objection to the

7            form.

8    BY MR. YOHAI:

9            Q.    NH -- is this what National

10   Healthcare Services and Web Barth were

11   supposed to do, Exhibit B?

12                  (PAUSE)

13                  THE WITNESS:  Yes.

14   BY MR. YOHAI:

15           Q.    Okay.

16                  So, for example, Web Barth

17   was supposed to perform for National

18   Healthcare Services, Inc. -- he was

19   supposed to manage development of all

20   creative materials and forms, the sales

21   brochures, fulfillment package,

22   salesmen's forms, and processing forms;

23   correct?

24           A.    Correct.