## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NATIONAL HEALTHCARE SERVICES, INC., | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : | NO.: 02-CV-3600 |
|  | : |  |
| v. | : |  |
|  | : |  |
| PENN TREATY AMERICAN CORPORATION, | : |  |
| et al., | : |  |
|  | : |  |
| Defendants. | : |  |

## AFFIRMATION OF DAVID L. YOHAI IN SUPPORT OF
## DEFENDANTS' REPLY MEMORANDUM OF LAW IN
## SUPPORT OF MOTION TO AMEND ANSWER AND
## IN OPPOSITION TO CROSS-MOTION TO RE-OPEN DISCOVERY

**DAVID L. YOHAI**, an attorney duly admitted to practice law before the

Courts of the State of New York and admitted *pro hac vice* to practice before the United

States District Court for the Eastern District of Pennsylvania, affirms the following to be

true under penalties of perjury:

        1.      I am a partner of the law firm of Weil, Gotshal & Manges LLP,

co-counsel for defendants Penn Treaty American Corporation, Penn Treaty Network

America Insurance Company ("PTNA"), and Senior Financial Consultants Company.

This affirmation is submitted in support of Defendants' reply memorandum of law in

support of their motion to amend their answer to add a counterclaim and in opposition to

Plaintiff's cross-motion to re-open discovery and to assess fees.

        2.      Annexed hereto as Exhibit "G" is a true and correct copy of

excerpts from the videotape deposition of Neal A. Forman, in his individual capacity and

as the corporate designee by plaintiff National Healthcare Services, Inc. pursuant to Rule

30(b)(6) of the Federal Rules of Civil Procedure, taken on October 14, 2003.

    3.  Annexed hereto as Exhibit "H" is a true and correct copy of

excerpts from the videotape deposition of Herbert E. Schwartz taken on

September 29, 2003.

Dated: New York, New York
   January 25, 2005

                 David L. Yohai
                 Validation of Signature Code:  DLY4573

EXHIBIT G

1

IN  THE  UNITED  STATES  DISTRICT  COURT
FOR THE  EASTERN  DISTRICT  OF  PENNSYLVANIA

*    *    *

NATIONAL HEALTHCARE          :    CIVIL ACTION
SERVICES,  INC.,             :
               Plaintiff,    :
                             :
      -vs-                   :       ORIGINAL
                             :
PENN  TREATY  AMERICAN       :
CORPORATION,  et al.,        :    NO.  02-CV-3600
               Defendants.:       (MM)
                *    *    *
          Tuesday,  October  14,  2003
                *    *    *

                    Realtime  videotape
deposition of NEAL A. FORMAN, in his
individual capacity, and Rule 30 (b)(6)
realtime videotape deposition of NATIONAL
HEALTHCARE SERVICES, INC., taken through
its representative NEAL A. FORMAN, held
in the law offices of BALLARD, SPAHR,
ANDREWS & INGERSOLL, LLP, 1735 Market
Street, 42nd Floor, Philadelphia,
Pennsylvania 19103, on Tuesday, October
14, 2003, beginning at 9:33 a.m., before
Kimberly A. Cahill, a Registered
Professional Reporter and Approved
Reporter of the United States District
Court.

                *    *    *

          ESQUIRE  DEPOSITION  SERVICES
                   15th  Floor
          1880 John F. Kennedy Boulevard
             Philadelphia, PA  19103
                 (215)  988-9191

NEAL A. FORMAN

89

1          A.      Yes, but those were through

2    Penn Treaty's agents that they were

3    criticizing the program.

4          Q.      Okay.

5          A.      This wasn't someone that we

6    talked to to bring on board to market the

7    program, because we were restricted to

8    their agents that they already had

9    contracted.

10          Q.      Okay.

11                  Now let's go to that side.

12    What criticisms were you aware of by

13    agents of Penn Treaty over the program?

14          A.      Well, I had already answered

15    that question.

16          Q.      Okay.

17                  The two things that I had as

18    concerns, not criticisms, were a lack of

19    knowledge about facilities in their area;

20    is that right?

21          A.      Uh-hum.

22          Q.      You have to answer "yes" or

23    "no."

24          A.      Yes.

NEAL A. FORMAN

90

1          Q.      Okay.

2                  And that the agents couldn't

3    be specific about the discounts

4    available; is that right?

5          A.      Correct.

6          Q.      Who was responsible for

7    knowing or having the information as to

8    what discounts were available?

9          A.      On what?

10         Q.      On the healthcare services

11   being provided, for example, eye care or

12   vision care or dental care.

13         A.      We -- we entered into an

14   agreement at contract with DDS, and they

15   had prenegotiated discounts with various

16   providers and vendors; and whatever those

17   negotiated discounts were, that's what we

18   could offer.

19         Q.      Okay.

20                 So it was DDS that was

21   responsible for knowing what discounts

22   were available; correct?

23         A.      Right.

24         Q.      And DDS was contracted by

NEAL A. FORMAN

91

1    National Healthcare Services, Inc.;

2    correct?

3              A.      Right, correct.

4              Q.      Okay.

5                      And there were issues or

6    problems in knowing what discounts were

7    available on the program; isn't that

8    right?

9              A.      That is correct.

10             Q.      And do you think that that

11   contributed in any way to the -- to the

12   failure of the program?

13             A.      I would say partly, but a

14   bigger thing that contributed, again --

15   and I just -- it just occurred to me --

16   one of the things when we set up this

17   program that I insisted that we do is,

18   every agent that we contracted would have

19   a fulfillment kit so that they could show

20   the consumer exactly what the benefits

21   were, what the membership card looked

22   like, what the booklet looked like,

23   everything that the consumer would

24   ultimately receive when they bought the

1    program --

2         Q.    And in some instances, these

3    consumers didn't receive those kits;

4    correct?

5         A.    We're not talking about the

6    consumers.  We're talking about the

7    agents that are going to be marketing the

8    program.

9              I wanted the agents to have

10   a professional package of which they

11   could show the consumer, this is what

12   you're going to be receiving once you buy

13   the program.

14        Q.    The kits, though, as I

15   understand it, were designed to be sent

16   to -- to potential customers.  Right?

17   That's what -- that's who the kits went

18   to; isn't that right?

19        A.    That's correct.  It's --

20        Q.    And in some instances, those

21   customers actually didn't receive those

22   kits; isn't that right?

23        A.    I understand there were

24   probably a half a dozen or a dozen people

NEAL A. FORMAN

93

1    that didn't get them due to maybe a wrong

2    mailing address or there was some

3    miscommunication on -- sometimes they

4    were sent to an agent to deliver.  Other

5    times they were sent directly to the

6    agent.

7         Q.    And who --

8         A.    I'm talking about a

9    different problem.  I'm --

10        Q.    Whose responsibilities was

11   it to send out the agent kits?  Whose

12   responsibility was that?

13        A.    I believe that was through

14   Web Barth or Mike Hauert or DDS.  They

15   were responsible to make sure that all of

16   that was executed properly.

17        Q.    And Web Barth -- and Web

18   Barth responded -- I'm sorry.

19              And Web Barth was contracted

20   with National Healthcare Services, Inc.

21   --

22        A.    Correct.

23        Q.    -- isn't that right?

24        A.    Right.

NEAL A. FORMAN

192

1    of 10 percent, could be 15 percent. It's

2    an average savings. Call the 800 line.

3    We will call and see what savings you

4    will be able to get.

5                So I think it was very, very

6    little.

7         Q.    What if the 800 number

8    wasn't able to provide the information;

9    would that -- would that have been a

10   problem?

11               MR. LYONS: Objection; calls

12          for speculation, lack of

13          foundation.

14               THE WITNESS: I could only

15          surmise that if they had no way of

16          getting through to the 800 line,

17          that it would be a problem for any

18          company or any --

19   BY MR. YOHAI:

20        Q.    So -- okay.

21               So the two options were to

22   go to the provider -- but in this case,

23   in AllRisk's, most of the providers, many

24   of the providers, didn't know about the

NEAL A. FORMAN

193

1   AllRisk program.  Right?

2           MR. LYONS:  Objection.

3   BY MR. YOHAI:

4       Q.      Is that correct?

5       A.      Could be.

6       Q.      "Could be" doesn't work.  Is

7   it -- is it correct or incorrect or some

8   other answer --

9           MR. LYONS:  If you know, you

10          know.  If you don't know, you

11          don't.

12          THE WITNESS:  I don't know.

13          MR. YOHAI:  Okay.

14          THE WITNESS:  I'm sorry.  I

15          don't know.

16          MR. LYONS:  You don't have

17          to apologize.

18          MR. YOHAI:  No, you -- you

19          definitely don't have to

20          apologize.

21          THE WITNESS:  Oh, okay.

22  BY MR. YOHAI:

23      Q.      Are there any other options

24  -- either go to the provider or go to the

NEAL A. FORMAN

194

1   800 number.  Were there any other options

2   for the -- for the customer that you're

3   aware of under this program to get the

4   information?

5           A.    It would mean that the

6   customer would have to go to the agent

7   and the agent would have to get the --

8           Q.    Call the 800 --

9           A.    -- information and then get

10  back to the client.

11          Q.    And that would also probably

12  be from the 800 number; correct?

13          A.    Right --

14          Q.    Okay.  So --

15          A.    -- of HSI's 800 line.

16          Q.    Okay.

17                So -- let me show you -- are

18  you -- were you aware of any complaints

19  about the 800 number not providing

20  accurate information?

21          A.    No, because I didn't handle

22  that.

23          Q.    Now, if the 800 number was

24  unable to provide information, there'd

195

1    really be very little way for either the

2    customer or the agent to get information

3    on this program; isn't that right?

4                    MR. LYONS:  Objection; calls

5            for speculation, lack of

6            foundation.

7                    THE WITNESS:  I can't answer

8            that question because I didn't

9            handle that part of it.  That's

10           only -- I mean, it would just be

11           speculation on my part.

12                   MR. YOHAI:  Okay.

13                   Let me show you what's been

14           marked as -- what we'll mark as

15           Forman Exhibit --

16                   MS. KURCIAS:  17.

17                   MR. YOHAI:  -- 17.

18                        *    *    *

19                   (Whereupon, the

20           above-mentioned document was

21           marked for identification as

22           Forman-17.)

23                        *    *    *

24   BY MR. YOHAI:

196

Q.     This is PT 10442 from Pamela
Rodgers to Frank Nikischer at the bottom:
Frank, I had an agent call whose
policyholder was upset because they have
an AllRisk policy and wanted to find a
list of facilities in their area.  So
they called the 1-800 number that is
listed in their booklet, and they told
them to call our 1-800 number.  Neither
one has access to the Internet.  Why
would they be doing this?

                Do you see that?

                MR. LYONS:  Objection to the
        form and objection to the extent
        counsel misread the text of the
        letter.

                MR. YOHAI:  What was the
        misreading, Mr. Lyons?  I -- I
        would not want to misread the text
        of the letter.

                MR. LYONS:  Sure.  I think
        that the -- the actual text says
        "ph."  You said policyholder --
                MR. YOHAI:  Oh.

NEAL A. FORMAN

197

1          MR. LYONS:  -- presuming

2     what the abbreviation means, and

3     you also described the 1-800

4     numbers rather than listing the

5     actual digits.

6          MR. YOHAI:  Okay.  I'll

7     reread it to -- to cure the

8     counsel's objections.

9          "Frank, I had an agent call

10    whose ph was upset because they

11    have an all risk policy and wanted

12    to find a list of facilities in

13    their area so they called the

14    1-800-408-1150 number that is

15    listed in their booklet and they

16    told them to call our

17    1-800-362-0700 number.  Neither

18    one has access to the Internet.

19    Why would they be doing this?"

20          Do you see that?

21          THE WITNESS:  Yes.

22    BY MR. YOHAI:

23          Q.   Does this refresh your

24    recollection that there were problems

NEAL A. FORMAN

198

1    with the 800 number that was set up for

2    the AllRisk program?

3                    MR. LYONS:   Objection to

4            form.

5                    THE WITNESS:   Yeah, I'm

6            going to have to tie this date in.

7            I object to that, because I have

8            to tie this date in --

9                    MR. YOHAI:   Okay.

10                   THE WITNESS:   -- of October

11           19th and then, when we instituted

12           the program, that they had access

13           to the web site to be able to look

14           up this information.

15                   Can you give me that date?

16                   MR. YOHAI:   The date of --

17           what would you like?

18                   THE WITNESS:   When they

19           instituted --

20                   MR. LYONS:   He asks the

21           questions.   You answer them.

22                   MR. YOHAI:   Yeah.

23                   THE WITNESS:   Oh.

24   BY MR. YOHAI:

NEAL A. FORMAN

199

Q.    Well, you're aware, are you not, that there was a roll-out in -- in May of 2000; isn't that right?

A.    That's not what I was referring to.

Q.    Okay. I'm sorry. What are you asking? I'm not -- sorry -- I -- how can I help you?

A.    Okay. The question I asked in relation to this, had the program -- and I don't remember the specific date where we paid the $20,000 to have that information on a web site -- had that information been on the web site prior to this letter is what I'm asking?

MR. YOHAI: Oh, that was what we looked at earlier, June of 2000 --

THE WITNESS: Yes.

MR. YOHAI: -- right?

THE WITNESS: Okay. That's what I'm asking.

MR. YOHAI: So this is October of 2000.

NEAL A. FORMAN

200

1          THE WITNESS:  Yes.  Right.

2          Okay.  Now, what's the

3      question?

4  BY MR. YOHAI:

5          Q.     So the question was, does

6  this refresh your recollection of some

7  problems with the 800 number that was set

8  up?

9          A.     That is correct.

10         MR. YOHAI:  Thank you.  We

11     can take our lunch break now.

12         THE VIDEO TECHNICIAN:  The

13     time is 12:20 p.m.  Off the

14     record.

15                    *   *   *

16         (Whereupon, a luncheon

17     recess was taken from 12:20 p.m.

18     until 1:27 p.m.)

19                    *   *   *

20         THE VIDEO TECHNICIAN:  The

21     time is 1:27 p.m.  We are back on

22     the record.

23  BY MR. YOHAI:

24         Q.     Mr. Forman, do you

NEAL A. FORMAN

228

1    with you?

2           Q.     Please do.

3                       (PAUSE)

4                  THE WITNESS:   Okay.

5    BY MR. YOHAI:

6           Q.     Okay.

7                  So you recognize this

8    document.

9           A.     Yes, I do.

10          Q.     And what is this document?

11          A.     This is a document that

12   memorializes what we have agreed to --

13   National Healthcare service has agreed to

14   compensate Web Barth for the fulfillment

15   of the duties on Exhibit B.

16          Q.     Right.

17                 And this agreement is

18   between National Healthcare Services and

19   Mr. Barth; correct?

20          A.     That is correct.

21          Q.     Okay.

22                 Penn Treaty is not a party

23   to this agreement; correct?

24          A.     That's correct.

NEAL A. FORMAN

229

1          Q.     Okay.

2                 So Web Barth worked for

3     National Healthcare Services, and DDS

4     worked for Mr. Barth; isn't that right?

5                 MR. LYONS:   Objection to the

6          form.

7                 THE WITNESS:   I -- he works

8          with Mr. Barth, not for Mr. Barth.

9     BY MR. YOHAI:

10          Q.     Okay.

11                Well, but DDS also

12    contracted directly with National

13    Healthcare Services.   Right?

14          A.     That is correct.

15          Q.     Okay.

16                So, looking at Exhibit B,

17    which are -- this is, I take it, what

18    NHCS and Web Barth were supposed to do;

19    correct?

20                MR. LYONS:   Objection to the

21          form.

22    BY MR. YOHAI:

23          Q.     Is that right?

24                MR. LYONS:   The document

230

1            speaks for itself.

2    BY MR. YOHAI:

3            Q.    Is that correct?   Is this

4    what they were supposed to do, this list

5    on Exhibit B --

6                 MR. LYONS:   Objection to the

7            form.

8    BY MR. YOHAI:

9            Q.    NH -- is this what National

10   Healthcare Services and Web Barth were

11   supposed to do, Exhibit B?

12                   (PAUSE)

13                 THE WITNESS:   Yes.

14   BY MR. YOHAI:

15           Q.    Okay.

16                 So, for example, Web Barth

17   was supposed to perform for National

18   Healthcare Services, Inc. -- he was

19   supposed to manage development of all

20   creative materials and forms, the sales

21   brochures, fulfillment package,

22   salesmen's forms, and processing forms;

23   correct?

24           A.    Correct.

NEAL A. FORMAN

231

1          Q.      Okay.

2                  So I guess I come back to

3    your problem with the Baptists.  Web

4    Barth was supposed to be managing the

5    creation of the promotional materials.

6    Why didn't you just give the Baptists

7    what Web Barth was creating?  What was

8    the problem, Mr. Forman?

9                  MR. LYONS:  Objection to the

10           form.

11                 THE WITNESS:  The problem is

12           that the material that was all

13           created we never received when we

14           asked for it from Penn Treaty.

15   BY MR. YOHAI:

16         Q.      Why didn't you ask for it

17   from Mr. Barth who worked for you?

18         A.      Because --

19                 MR. LYONS:  Objection to the

20           form.

21                 MR. YOHAI:  You can answer.

22                 THE WITNESS:  I've already

23           answered the question.

24   BY MR. YOHAI:

NEAL A. FORMAN

232

1          Q.      What was the answer?  Why
2   didn't you ask for -- why didn't you ask
3   for the materials from Mr. Bark who --
4   from Mr. Barth who worked for you?
5                  MR. LYONS:  Objection to the
6          form.
7                  THE WITNESS:  I've answered
8          that question previously.
9   BY MR. YOHAI:
10          Q.      Okay.  What's the answer?
11          A.      The answer was that we --
12   the material that was supposed to be
13   provided from DDS was supposed to be
14   given to Penn Treaty.  Penn Treaty, that
15   I asked for, was supposed to send it to
16   me and they never sent it.
17          Q.      As we saw from the prior
18   e-mail, though, they didn't receive the
19   information from DDS; correct?
20          A.      Correct.
21          Q.      Penn Treaty didn't receive
22   the information --
23          A.      Right.
24          Q.      -- from DDS.

EXHIBIT H

1

```
 1            UNITED  STATES  DISTRICT  COURT
            EASTERN  DISTRICT  OF  PENNSYLVANIA

 2
    - - - - - - - - - - - - - - - - - - - - - - - - - - - x
 3  NATIONAL  HEALTHCARE  SERVICES,:    CIVIL  ACTION
    INC.,                            :
 4            Plaintiff,             :    NO.  02-CV-3600
                                     :    (MM)
 5            VS.                    :
                                     :
 6  PENN  TREATY  AMERICAN           :    ORIGINAL
    CORPORATION,  et  al.,           :
 7            Defendants.            :
    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 8

 9            Videotaped  deposition  of
10  HERBERT  E.  SCHWARTZ,  held  at  the  law
11  offices  of  BALLARD,  SPAHR,  ANDREWS  &
12  INGERSOLL,  LLP,  1735  Market  Street,  51st
13  Floor,  Philadelphia,  Pennsylvania  19103,
14  on  Monday,  September  29,  2003,  beginning
15  at  9:04  a.m.,  before  Debra  J.  Weaver,  a
16  Federally  Approved  Registered
17  Professional  Reporter,  Certified  Realtime
18  Reporter  and  Certified  Shorthand  Reporter
19  of  NJ  (No.  XI  01614)  and  Delaware  (No.
20  138-RPR,  Expiration  1/13/05).

21
22            ESQUIRE  DEPOSITION  SERVICES
          1880  John  F.  Kennedy  Boulevard
                    15th  Floor
23          Philadelphia,  PA    19103
                 (215)  988-9191
24
```

145

1  problems and things?

2          A.      Correct.

3          Q.      Yes?

4          A.      Correct.  Yes.

5          Q.      This March 28th, 2000,

6  e-mail describes an issue with a Ms.

7  Hollis.  This is the second e-mail in the

8  chain.  That she wants to cancel as the

9  result of delays in getting her

10  fulfillment kit.  Do you see that?

11          A.      Okay.  Yes.

12          Q.      Okay.  Were you aware of

13  delays in folks getting fulfillment kits

14  during the pendency of the AllRisk

15  product?

16          A.      Yes.

17          Q.      Okay.  You can put that

18  aside.

19                  MR. YOHAI:  Let's mark this.

20                  (Whereupon, Deposition

21          Exhibit No. Schwartz-10, Series of

22          e-mails to and from Sharon

23          Fritzinger, Bates PT

24          011662-0011663, was marked for

146

identification.)

BY MR. YOHAI:

Q.    I marked this as Schwartz Exhibit 10.  Here's another one of these e-mails, Mr. Schwartz, Bates stamp number PT 11662 through PT 11663.  I don't see you copied on this e-mail.  But let me just ask you.  It complains about a Ms. Plotkin who never received her AllRisk kit --

A.    Okay.

Q.    -- after having a month go by.

A.    All right.

Q.    This is one of a number of other instances that I've seen.  As we discussed this morning, it was DDS's responsibility to provide these fulfillment kits, correct?

A.    It appears that way, yes.

Q.    And they worked for -- DDS worked for National Healthcare Services, correct?

MR. LYONS:  Objection to

1          form.

2                    THE WITNESS:   They were

3          contracted to provide those

4          services, yes.

5                    MR. YOHAI:   Okay.   You can

6          put that aside.

7                    I'm going to show you this

8          now.   We'll mark as Schwartz

9          Exhibit 11.

10                   (Whereupon, Deposition

11         Exhibit No. Schwartz-11, e-mail

12         dated 4/25/01 to Herb Schwartz

13         from Tracy Levit-Sussman, Bates PT

14         011873, was marked for

15         identification.)

16    BY MR. YOHAI:

17         Q.    This is another e-mail from

18    Ms. Tracy Levit to you, Mr. Schwartz, PT

19    11873, dated April 25th, 2001.

20         A.    Okay.

21         Q.    Okay.   Do you recognize this

22    e-mail, Mr. Schwartz?   Did you receive

23    it?

24         A.    I assume I received it.   It

 1    looks familiar, yes.

 2         Q.    Okay.  Ms. Levit is

 3    complaining about problems with getting

 4    sample membership kits from DDS.  Do you

 5    see that?

 6         A.    Yes.

 7         Q.    And she says it may have to

 8    do with the fact that the account rep

 9    changed from Jim Bell to Chrissy.  Do you

10    see that?

11         A.    Yes.

12         Q.    Were Jim Bell and Chrissy

13    folks who worked at DDS?

14         A.    Yes.

15         Q.    Okay.  And then it says, I

16    got another call and it changed again to

17    Dea Louis.  Do you see that?

18         A.    Yes.

19         Q.    Was that yet a third person

20    that worked at DDS?

21         A.    Yes.

22         Q.    Do you recall there being

23    some issues with management folks at DDS

24    changing the people in charge of these

1    sample membership kits?  Do you recall

2    that being an issue?

3           A.     It wasn't a problem, but DDS

4    is quite a substantial firm and they

5    either changed employees or they switched

6    responsibilities.  I don't know why these

7    things happened there.  But -- and why

8    there was a delay in them getting sample

9    kits, I don't know why.

10          Q.     Okay.  But it's fair to say

11   that there at least was -- it seemed like

12   a great deal of turnover at DDS in terms

13   of the people handling this

14   responsibility and that may have

15   contributed to the delay in getting some

16   of the fulfillment kits out; is that

17   right?

18          A.     Possibly, yes.

19          Q.     Okay.

20                 MR. YOHAI:  Can we mark this

21          as Schwartz Exhibit 12.

22                 (Whereupon, Deposition

23          Exhibit No. Schwartz-12, Forward

24          e-mail from 11/20/00, Bates NHCS

150

1          00347, was marked for

2          identification.)

3     BY MR. YOHAI:

4          Q.    I'm showing you now what's

5     been marked as Schwartz Exhibit 12,

6     NHS -- NHCS 347.  It's a forward e-mail

7     from 11/20/2000.  You're one of the folks

8     listed at the top there.

9          A.    Okay.

10         Q.    Do you see that?

11         A.    Yes.

12         Q.    Okay.  Do you recall

13    receiving this e-mail?

14         A.    Okay.  Yes, I did.

15         Q.    Okay.  Now, in the text of

16    the e-mail, it says, "Mark Cohn's client,

17    Eleanor Wverger, wanted to use the HHC

18    plan."  Do you see that?

19         A.    Yes.

20         Q.    I take it, it's your

21    understanding that Eleanor Wverger is

22    someone who signed up for the AllRisk

23    program?

24         A.    It appears that way.

1          Q.     And she wanted to use the

2     HHC plan and she called the care

3     coordinator and they gave her a list of

4     providers, and then she apparently called

5     some of the providers on the list and

6     none of them had ever heard of AllRisk,

7     correct?

8          A.     Correct.

9          Q.     And this is an example of an

10    actual customer calling up the nursing

11    home facility --

12         A.     Correct.

13         Q.     -- and concluding that they

14    had never heard of AllRisk, right?

15         A.     Correct.

16         Q.     Now, I know that it's your

17    position that this isn't what the

18    customer was supposed to do --

19         A.     Correct.

20         Q.     -- it was supposed to be

21    handled a different way.

22         A.     Right.

23         Q.     But it's true, is it not,

24    that at least in some instances the

1    people who signed up for the program

2    would call the agencies, the providers

3    directly, and sometimes be informed that

4    they never heard of AllRisk, correct?

5          A.    It appears that way.

6          Q.    Do you think that this could

7    contribute to a lower renewal rate,

8    people who had done this and not gotten

9    information that their person was -- that

10   their local nursing home was covered?

11         A.    I'd say that any product

12   that you're not getting the service, the

13   person is not going to keep it.

14         Q.    And that would include the

15   AllRisk product?

16         A.    That would include any

17   product.

18         Q.    So if the person called up

19   and found out that the nursing home had

20   never really heard of AllRisk, that might

21   be a reason the person would decide not

22   to renew their policy?

23         A.    In this particular case, the

24   DDS employee was not supposed to give

153

1   them a list of the nursing homes.  They

2   were supposed to actually coordinate what

3   nursing homes that they were interested

4   in and then coordinate the discounts and

5   services for them.

6           Q.      So DDS acted incorrectly in

7   this instance?

8           A.      I would think so.

9           Q.      And -- but you would agree

10  that someone who called up and found -- a

11  customer who called up and found that the

12  nursing home had no record of AllRisk,

13  that might be a cause for failing to

14  renew?

15          MR. LYONS:  Objection.  Lack

16      of foundation.

17          THE WITNESS:  I'd say if DDS

18      followed through and provided them

19      with a provider and discount, they

20      would continue to keep the

21      product.  If they just said forget

22      the whole thing when it came up

23      for renewal, probably they would

24      not keep it.

154

 1   BY MR. YOHAI:

 2          Q.    And DDS was an agency which

 3   contracted with your company on the

 4   AllRisk product?

 5          A.    That's correct.

 6                MR. YOHAI:   Let me show you

 7                now what we'll mark now as

 8                Schwartz Exhibit 13.

 9                (Whereupon, Deposition

10                Exhibit No. Schwartz-13, Memo

11                dated 5/9/00 to Kathy Lannen from

12                Web Barth, with attachment, Bates

13                NHCS 00300-00303, was marked for

14                identification.)

15   BY MR. YOHAI:

16          Q.    Now, this is a memo from Web

17   Barth to Kathy Lannen dated May 9th,

18   2000, right?

19          A.    Uh-huh.

20          Q.    Also copied to you, Mr.

21   Schwartz.   It's Bates stamp numbered NHCS

22   300 through 303.   Do you see this?

23          A.    Yes.

24          Q.    Okay.   Do you believe you

163

1   in your kit.   Outside what was listed,

2   you call the 800 number.

3           Q.     Okay.   Let's show you what's

4   been marked as Schwartz 15 --

5                   (Whereupon, Deposition

6            Exhibit No. Schwartz-15, e-mails

7            dated 10/19/00, Bates PT 010442,

8            was marked for identification.)

9   BY MR. YOHAI:

10          Q.     -- Bates stamp number PT

11   10442.   It's a few e-mails dated October

12   19th, 2000.

13                  Now, this e-mail recounts an

14   episode where the agent's policyholder,

15   the actual person who had one of the

16   AllRisk programs, called the 800 number

17   and the people at the 800 number actually

18   referred them to Penn Treaty's 800

19   number.   Can you think of a reason why

20   they would be doing that?

21          A.     Let me read this, please.

22          Q.     Sure.

23                  MR. LYONS:   And I object to

24            lack of foundation.

164

1          THE WITNESS:  I'm not aware

2      of this.  And it's very possible

3      they had a policy with Penn

4      Treaty, an insurance policy, in

5      addition to this.  They just

6      happened to call them.  I don't

7      know.

8  BY MR. YOHAI:

9          Q.     Okay.  But it would be

10  inappropriate to your understanding for

11  DDS to be referring people to Penn

12  Treaty's 800 number if it was a question

13  about the AllRisk product?

14          A.     Correct.

15          Q.     Okay.  And that would just

16  generate more confusion?

17          A.     Absolutely.

18          Q.     Okay.

19          MR. YOHAI:  Mark this as

20      Schwartz-16, if that's what we're

21      up to.

22          (Whereupon, Deposition

23      Exhibit No. Schwartz-16, Memo

24      dated 11/3/00 to Derrick

165

1           Brickhouse, Jackie Frantz, Jane

2           Bagley from Larry Hausman, Bates

3           PT 010400-010401, was marked for

4           identification.)

5    BY MR. YOHAI:

6           Q.    Mr. Schwartz, this is a

7    memorandum from a Larry Hausman to

8    Derrick Brickhouse, Jackie Frantz and

9    Jane Bagley  I don't see you copied on

10   this, so I don't know if you received it

11   or anything like it, but I'll let you

12   take a look at it and you can tell me if

13   you received this.

14          A.    I don't recall seeing this,

15   but let me just read this.

16          Q.    Okay.

17          A.    I don't -- who is Larry

18   Hausman?

19          Q.    My question --

20          A.    I'm not aware of this.

21          Q.    Okay.  And that's fine.  My

22   question to you is simply this.  The

23   e-mail recounts a situation where the

24   woman entered into a contract in March of